21sc171 SRN/DTS

RECEIVED

JAN 22 2021

CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* TIM WALSH,<br><br><br>PLAINTIFF-RELATOR,<br><br>vs.<br><br>NU-WAY HOUSE INC., D/B/A NUWAY,<br>AND DAVID VENNES,<br><br>DEFENDANTS. | CASE NO:<br><br><br><br>**PLAINTIFF-RELATOR'S *EX PARTE*<br>COMPLAINT AND JURY TRIAL DE-<br>MAND FILED IN CAMERA AND UN-<br>DER SEAL PURSUANT TO U.S.C. 31<br>§3730(b)(1)(2)** |

## <u>INTRODUCTION AND PURPOSE OF UNLAWFUL SCHEME</u>

1.      Plaintiff-Relator Tim Walsh, through his attorneys, brings this action on behalf of
the United States of America (the "Government" or the "Federal Government" or the
"Plaintiff"), for his Complaint against Defendant NU-WAY House Inc. (hereinafter "De-
fendant NUWAY" or "Defendant NU-WAY" or "NUWAY" or "Defendant NUWAY" or
"Defendant").

2.      Plaintiff-Relator alleges, based upon personal knowledge, relevant documents, and
upon information and belief, that Defendant NUWAY and its Chief Executive Officer,
Defendant David Vennes knowingly induced participation in NUWAY's intensive outpa-
tient treatment services by providing "free housing" to Medicaid/Medical Assistance



(hereinafter "Medicaid/MA")-eligible patients as long as they participated in NUWAY's treatment, whether or not that level of care was clinically indicated.

3.      Defendant NUWAY's practice is unlawful in two ways. First, NUWAY provides improper levels of care based on what can be shown from objective discharge evaluations of NUWAY patients from their prior treatment facilities. Second, NUWAY's "free housing" inducement to patients is conditioned on the patients' participation in NUWAY's treatment and, as such, is an unlawful kickback. NUWAY's motivation for the "free housing" scheme is the lucrative profits the scheme brings to NUWAY and Defendant David Vennes. The cost of a month of "free housing" at an unlicensed, unregulated sober home is approximately *only* one week's worth of NUWAY's treatment services charged to the Federal and Minnesota State Governments.

4.      The profitability of NUWAY's "free housing" scheme is evidenced by NUWAY's exponential growth from just over $1 million in revenues in 2005 to over $38 million in 2019. NUWAY's revenue attributable to the "free housing" scheme significantly exceeds the growth of all other Minnesota substance abuse and disorder (hereinafter "SUD") treatment providers.

5.      The public outcry against unregulated sober housing has caused Minnesota National Alliance on Mental Illness - Minnesota Chapter, and the Mental Health Legislative Network of Minnesota ("MHLN") to propose "Sober Home Study" legislation to address these concerns. Walsh Aff. Ex. D. (2020 Legislative Issues, MHLN, p. 15)[1].

---

[1]      All affidavits and associated exhibits are itemized in the Table of Attachments and pages numbered accordingly.

## PARTIES

6.    Plaintiff-Relator Tim Walsh (hereinafter "Plaintiff" or "Plaintiff-Relator" or "Plaintiff Walsh") is a resident of the State of Minnesota and is employed as the Vice President of long-term recovery and mental health services for Minnesota Adult and Teen Challenge (hereinafter "MNTC"), a Minnesota nonprofit state-licensed SUD treatment organization.  MNTC has been in existence since 1983.  Plaintiff-Relator brings this action as part of his employment at MNTC.

7.    Defendant NUWAY is a Minnesota nonprofit SUD treatment organization with its principal place of business located at 2217 Nicollet Avenue South, Minneapolis, MN 55404.  Defendant NUWAY has been in existence since 1966.

8.    Defendant David Vennes is Defendant NUWAY's Chief Executive Officer and Chief Operating Officer and the principal architect of NUWAY's unlawful "free housing" inducement scheme.

## BACKGROUND

9.    This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent records, statements and claims made and caused to be made by Defendants NUWAY and David Vennes and/or its agents and employees in violation of the Federal False Claims Act, 31 U.S.C. §§3729 *et seq.* (hereinafter the "FCA").

10.    Furthermore, pursuant to the FCA, Plaintiff also seeks a preliminary and permanent injunction against Defendants under 18 U.S.C. §1345.  Therein, Plaintiff seeks to enjoin Defendants against perpetrating the ongoing scheme to defraud the United States in

connection with a federal health care offense, in violation of Section 1345 and the Federal Anti-Kickback Statute, 42 U.S.C. §1320a-7b (hereinafter "Anti-Kickback Statute" or "AKS").

11.     As set forth more fully below, the Plaintiff-Relator alleges in this action that Defendants NUWAY and Vennes created a scheme to induce vulnerable individuals who lacked stable housing to receive short-term housing under the guise of enrolling in and attending its outpatient SUD programs.

12.     Defendant NUWAY's primary source of revenue are services it provides to patients insured under federal-and state-funded health care programs.  Defendant NUWAY's IRS Form 990 reports are publicly available for tax years 2005-18.  *See* Walsh Aff. Ex. A, A-1.[2]  The IRS Form 990s confirm that since Defendant NUWAY implemented its "free housing" scheme in exchange for attending NUWAY treatment on or about 2007 when Defendant David Vennes became NUWAY's CEO, NUWAY's revenues increased exponentially.

13.     Defendant NUWAY provides free or subsidized housing and other free services and goods to patients on the condition that they must attend a heavy regimen of NUWAY's SUD treatment, services that can be paid for through federal health care and Minnesota health care programs.  *See* NUWAY website, *available at www.NUWAY.org*.

14.     In Minnesota, the costs for services provided to Federal Medicaid- and state Medical Assistance (hereinafter "Medicaid/MA")-eligible individuals are split between the

---

[2]     Being that NUWAY's IRS Form 990's are publicly available, no redactions of information have been made on these exhibits.

federal and state governments.[3]  Currently, the "federal share" of SUD treatment for Medicaid/MA-eligible patients is 50% of the cost of treatment services.

15.     Defendants NUWAY and Vennes know that NUWAY is prohibited from making false claims and accepting kickbacks.  By signing state contracts to provide services for Medicaid/MA-eligible patients, NUWAY must attest that it is aware of all applicable federal and state laws, including the FCA and AKS.  *See* Walsh Aff. Ex. B.

16.     NUWAY charges the federal government via the state of Minnesota for services it provides in two ways:

First, NUWAY directly bills the Minnesota Department of Human Services for Medicaid/MA-eligible patient services, fifty percent of which funding comes from the federal government ("federal share") *See* footnote 2.

Second, NUWAY bills Health Plans (Managed Care Organizations) that administer Medicaid/MA-funded "Pre-paid MA Programs" ("PMAP").  *See* 42 U.S.C. 1396m; *see also* footnote 2.  Defendant NUWAY thus receives payment from the Federal Government via the state government for services including assessments, individual counseling, and group counseling, etc., for outpatient services.

17.     According to its 2019 annual report, Defendant NUWAY logged 777,191 outpatient service hours, housed patients receiving outpatient services an average of 77 days, and held net assets of more than $20 million.  Walsh Aff. Ex. A-2.  The "free housing"

---

[3]     *See* Minnesota House Research Briefing by Randall Chun, *available at https://www.house.leg.state.mn.us/hrd/pubs/medastib.pdf*, September 2020 at 19-21, describing the State-Federal shared funding of health care under Medical Assistance in Minnesota.

incentive provided by NUWAY to its outpatient patients is not actually free: the patient

is obligated to participate in Defendant NUWAY's outpatient services in exchange for

"free housing." Walsh Aff. ¶¶ 17, 22, 26.

18.    The "free housing" attracts individuals to participate in Defendant NUWAY's

treatment. And NUWAY's billing for a large volume of patients and billable service

hours at its outpatient treatment centers allows NUWAY to utilize revenues generated by

state/federal-funded reimbursements of this treatment to remunerate independent sober

housing owners which house NUWAY's patients. This is demonstrated in NUWAY's

annual Form 990's because only negligible revenues are reported for anything but ser-

vices provided. Walsh Aff. Ex. A-1. Upon information and belief, virtually all, if not all,

patients who receive free housing are MA-eligible or MA-insured.

19.    In Defendant NUWAY's "free housing" scheme, the patient lives at an unlicensed,

unregulated sober home, owned independently from NUWAY, but is required to attend

outpatient services at NUWAY in order to maintain their free housing. Walsh Aff. ¶¶ 6-

36. For example, if NUWAY requires patients to participate in a minimum of 20 hours

of outpatient services per week, and if a patient meets the attendance requirement, NU-

WAY will "scholarship" up to $550 a month to participating sober houses for that pa-

tient's housing, paid directly to the sober house, not the patient. Walsh Aff. Ex. C. Under

this scheme, one week of NUWAY's billable treatment revenues at 20-hours per week

per patient more than pays for a month of free housing expense. Walsh Aff. ¶ 25;

20.    NUWAY directly and indirectly markets free housing in exchange for participa-

tion in their outpatient programs to federal/state-funded health care program recipients.

NUWAY offers remuneration prior to scheduling services. *See, e.g., id.,* NUWAY's on-line marketing and promotional materials. Patients who complete or are otherwise discharged from NUWAY's outpatient programs immediately lose their housing. Walsh Aff. ¶ 27; Cassady Aff. ¶ 5; McAlpin Aff. ¶¶ 5, 8; Johnson Aff. ¶¶ 4,5; Kittelsen Aff ¶¶ 5, 6, 7; Burgraff Aff. ¶ 3.

21.    NUWAY labels the "free housing" in exchange for attending treatment "support", "scholarship", "empowerment" and other euphemisms. For example, the following quote is taken directly from NUWAY's website:

> "Many of our recovery residence partners are temporarily reducing or eliminating deposits, and offering flexible monthly fees to ensure that supportive recovery housing remains available to those who need it. Prices listed below may not reflect these reduced rates. Please contact residences to learn more about current pricing. NUWAY provides recovery residence support up to $550.00 per month toward program fees at a Recovery Residence for treatment compliant NUWAY patients. Deposit and any difference beyond $550.00 in monthly program fees are the responsibility of the client."

> NUWAY website, *https://www.nuway.org/provider-partners/*, accessed December 26, 2020.

22.    NUWAY's "free housing" Kickback shifts costs to Medicaid/Medical Assistance programs by overutilizing or inappropriately utilizing Medicaid-eligible services. Walsh Aff. ¶¶ 8,11; Ronning Aff. ¶ 7-10. The NUWAY "free housing" arrangement creates unnecessary expense to the Federal Government as payor of services. Walsh Aff. ¶ 30.

23.    Upon information and belief, based on objective discharge assessments, patients with a demonstrated *lower* need for outpatient services by virtue of their successful completion of licensed residential treatment, or completion of long-term group residential housing with supports--including outpatient SUD treatment services--are assessed by

NUWAY to need 20 hours or more of outpatient treatment services per week and provided housing as long as they continue treatment at NUWAY.   Walsh Aff. ¶¶ 8, 11, 30, 31; Ronning Aff. ¶¶ 7-9; Kittelsen Aff.  ¶¶ 3,5,8.

24.    NUWAY's "free housing" arrangement is reported by patients to be an irresistible inducement to choose NUWAY as their provider because of the housing component. Cassady Aff. ¶ 5; McAlpin Aff. ¶¶ 5, 8; Johnson Aff. ¶¶ 4,5; Kittelsen Aff ¶¶ 5, 6, 7; Burgraff Aff. ¶ 3.

25.    In comparison with NUWAY's use of low-cost, unregulated sober housing to induce participation, other SUD providers with a licensed residential component must comply with numerous laws involving the housing of patients, including Minnesota Statutes Chapter 245G.21, Requirements for Licensed Residential Treatment, or Minnesota Statutes Chapter 256I, Supportive Housing.  Sober homes are not licensed or regulated in the State of Minnesota.[4]

26.    The Medicaid/MA-funded treatment reimbursement rate in Minnesota was established with consideration of the costs to SUD providers who follow state and federal law in treating patients.  Walsh Aff. ¶ 35.  By contrast, NUWAY intentionally uses unlicensed, unregulated housing to keep costs low, while using that housing to induce

---

[4]    These housing laws and regulations are important for this very vulnerable population.  Serious concerns have been expressed about rampant drug and alcohol use and overdoses within these facilities.  *See e.g.,* Walsh Aff. Ex. D.  This policy recommendation illustrates the problem that arises by providing low-cost, unlicensed, unregulated housing in exchange for treatment: namely, as a condition of treatment, vulnerable patients are placed in residential settings where the temptation to relapse goes unseen and uncontrolled and is highly likely to occur.

patients to participate in its Medicaid/MA-reimbursed treatment, thereby increasing its revenue exponentially over time. *Id.*

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 1345 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729-30. To Plaintiff-Relator's knowledge there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint, as those concepts are used in 31 U.S.C. § 3730(e), as amended by Pub. L. No. 111- 148, § 10104G)(2), 124 Stat. 119, 901-02.

28.     Moreover, whether or not such a disclosure has occurred, Plaintiff-Relator would qualify as an "original source" of the information on which the allegations or transactions in this Complaint are based.

29.     Before filing this action, Plaintiff-Relator voluntarily disclosed to the Government the information on which the allegations or transactions in this Complaint are based.  Additionally, Plaintiff-Relator has direct and independent knowledge about the misconduct alleged herein and that knowledge is independent of and materially adds to any publicly disclosed allegations or transactions relevant to his claims.

30.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. §3732(a) because this claim may be brought in any judicial district in which any one defendant can be found, resides, transacts business, or in which any act proscribed by 31

U.S.C. §3729 occurred. Defendants can be found in and/or transact or have transacted business in the Federal District of Minnesota.

31.    Venue is proper in the District of Minnesota pursuant to 28 U.S.C. §§ 1391(b)-(c) and 31 U.S.C. § 3732(a) because Defendants can be found in and/or transact in or have transacted business in this judicial district, and because violations of 31 U.S.C. §§3729 *et seq* alleged herein occurred within this judicial district. At all times relevant to this Complaint, Defendants regularly conducted substantial business within this Judicial District and/or made significant contacts within this District.

## RELEVANT FACTS

32.    During the course of his employment with Teen Challenge, Plaintiff-Relator Walsh became aware and investigated NUWAY's unlawful practices. *See* Walsh Aff. ¶ 4. Thereafter, his investigation revealed NUWAY's unlawful practices of inducing patients to participate in treatment in exchange for free housing and associated unlawful kickbacks resulting in NUWAY's exponential growth. *Id*. at 16, 17.

33.    In 2018, MNTC program directors noticed and brought to Plaintiff Walsh's attention a significant drop-off in transfers from licensed residential treatment programs to licensed Supportive Housing program for women in Minneapolis, from an approximate 40% transfer rate to 30-34%. Walsh Aff. ¶ 6. A similar pattern appeared in the discharge data of men's programs. *Id*.

34.    Plaintiff Walsh's office is adjacent to the front lobby of MNTC's men's LEVEL I intensive licensed residential SUD treatment program and numerous patients talked to him as they discharged. Walsh Aff. ¶ 7. Based on his interactions with these patients

and receiving staff and patient reports, he learned that MNTC patients were choosing to go to NUWAY outpatient treatment so they could receive "free housing" and "have more freedom" during the day. *Id*. These patients had just completed MNTC licensed intensive residential treatment programs and then oddly chose to discharge to NUWAY outpatient treatment immediately following completion without a clinical basis for needing this level of care. Walsh Aff. ¶ 7.

35.    Following the realization that a significant number of patients were transferring to NUWAY, MNTC conducted a "point-in-time" analysis of discharges from our LEVEL I intensive SUD licensed residential treatment programs in Minneapolis and the diversion of potential patients for our Supportive Housing programs to LEVEL II NUWAY outpatient program with the "free housing" incentive that showed approximately 100 patients were transferring to NUWAY per year from MNTC facilities. Walsh Aff. ¶ 9.

36.    Each patient entering and leaving treatment is evaluated for their current needs. Walsh Aff. ¶ 10; Ronning Aff. ¶ 11. State law requires a comprehensive intake and a discharge summary be prepared for each patient by providers who serve patients insured by federal/state health programs. Walsh Aff. ¶ 10; Ronning Aff. ¶¶ 8, 9, 11. These records should usually align with subsequent levels of care patients receive. Based on the facts outlined below, there is evidence that patients entering Defendant NUWAY's treatment, particularly outpatient treatment, do not align with discharge summaries. Walsh Aff. ¶ 9; Ronning Aff. ¶¶ 7-12.

37.    MNTC discovered a pattern with patients discharging from Defendant NUWAY and being assessed by MNTC. Upon review, it was found that Defendant NUWAY

provided lower levels of treatment than was clinically indicated. Walsh Aff. ¶¶ 11-12; Ronning Aff. ¶¶ 8-9. From 2018 to present, Plaintiff Walsh received reports from MNTC admissions staff that assessments completed by NUWAY assessors demonstrated a pattern of recommending NUWAY outpatient treatment when MNTC assessors objectively determined that the level of risk and scores on the assessment indicated the need for a *more* intensive residential level of care. Walsh Aff. ¶¶ 6, 8; Ronning Aff. ¶ 7.

38.    In 2019, three MNTC leaders, Saul Selby, Kelsey Eller and Plaintiff Walsh, visited three NUWAY outpatient clinical sites to share information with NUWAY's clinical teams about MNTC programs and services and explore the feasibility of developing a collaborative affiliation. Walsh Aff. ¶ 6.

39.    At one of these site visits, the MNTC women's Supportive Housing program director and Plaintiff Walsh were greeted in the facility by seven former MNTC Housing Program graduates who had entered NUWAY'S outpatient treatment program even though they had already completed LEVEL I licensed residential treatment, and 1 to 2 years of LEVEL II Supportive Housing programming at MNTC.[5] *Id.*

40.    Former MNTC patients had not relapsed and would therefore not be eligible for heightened outpatient treatment.[6] *Id.*

---

[5]    This confirms that NUWAY over-prescribes its high-intensity outpatient treatment with associated "free housing" without demonstrated clinical need.
[6]    This choice by these patients to attend NUWAY's outpatient treatment indicates that NUWAY's "free housing" was an unlawful inducement.

41.    NUWAY has attempted to promote their "free housing" model with sponsored marketing events targeting patients in need, such as street parties, which were attended by MNTC clients. Walsh Aff. ¶ 15.

42.    NUWAY has as its primary source of revenue services provided to patients insured under federally- and state-funded health care programs. *See* Walsh Aff. Ex. A. (Chart showing NUWAY's exponential revenue growth from government programs along with its nominal other revenue sources from 2005-2018, based on IRS Form 990's); and A-1. (Compilations of the first pages of NUWAY IRS Form 990 reports publicly available from 2005-18); and A-2 (NUWAY's 2019 Annual Report).

43.    As the Walsh Affidavit Exhibit A chart confirms, NUWAY's exponential growth started when Defendant David Vennes and other NUWAY executives developed and implemented NUWAY's "free housing" kickback.

44.    NUWAY charges the government for services it provides in two ways:

    A. First, NUWAY directly bills the Minnesota Department of Human Services for Medical Assistance,

    B. Second, NUWAY bills Health Plans (Managed Care Organizations) that administer Pre-paid Medical Assistance Programs ("PMAP"). Walsh Aff. ¶ 20.

45.    Billing for a large volume of patients and billable service hours at an industry average rate of $36/patient hour for Defendant NUWAY's intensive outpatient treatment is the motive for Defendant NUWAY to entice participation in its treatment with "free housing" kickbacks. Walsh Aff. ¶ 23.

46.     NUWAY's Government Revenue grew from $1,096,909 in 2005 (before "free housing" model was developed and implemented) to $31,138,387 in 2018 (after "free housing" model was fully implemented).  Walsh Aff. Ex. A, A-1.

47.     Patients who complete or are otherwise discharged from NUWAY's outpatient programs immediately lose their housing. *See* Jensen Aff. ¶ 4.

48.     The NUWAY "free housing" incentive shifts costs to Medicaid/Medical Assistance by the overutilization or inappropriate utilization of Medicaid-eligible services. Walsh Aff. ¶ 30.  The NUWAY free-housing arrangement creates a high risk of harm to the government as payor of services. *Id.*

49.     Minnesota Department of Human Services ("DHS") and the federal Health and Human Services ("HHS") Office of Inspector General ("OIG") or Centers for Medicare and Medicaid Services ("CMS") has never explicitly authorized the use of unlicensed "free housing" arrangements.  DHS only approves and pays for these claims for specific outpatient treatment services.

50.     The federal/state-funded Medicaid/MA rate in Minnesota incorporates the use of licensed, regulated residential treatment or supportive housing in the total costs to SUD providers providing these housing arrangements.  Walsh Aff. ¶ 35.

## APPLICABLE LAW

51.     The False Claims Act (FCA), as amended by Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009, 31 U.S.C. § 3729(a)(1)(A-C), provides in pertinent part that any person who:

a.     knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

b.     knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

c.     conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government; is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus 3 times the amount of damages which the Government sustains because of the act of that person.

*See also* 28 C.F.R. § 85.3(a)(9) (setting forth the current civil penalties level of not less than $5,500 and not more than $11,000 for violations of the FCA).

52.     The terms "knowing" and "knowingly" are defined at 31 U.S.C. § 3729(b)(1)(A) to mean a person who, with respect to relevant information:

    i. has actual knowledge of the information;
    ii. acts in deliberate ignorance of the truth or falsity of the information; or
    iii. acts in reckless disregard of the truth or falsity of the information.

No proof of specific intent to defraud is required. *See* 31 U.S.C. § 3729(b)(1)(B).

53.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of Congressional concerns involving physicians' conflicts of interest and overutilization of medical services and items. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub.L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Anti-Fraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

54.    The Anti-Kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for federally funded medical services, including services provided under the Medicare and Medicaid programs. In relevant part, 42 U.S.C. § 1320a-7b(b) provides:

> Illegal remunerations
> (1)Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
> (A)in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
> (B)in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.
> (2)Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

55.    Compliance with the AKS is a condition of payment by the Medicare/Medicaid and Medical Assistance programs. In addition, violation of the statute can subject the perpetrator to exclusion from participation in federal health care programs and, effective August 6, 1997, to civil monetary penalties of $50,000 per violation and three times the

amount of remuneration paid. *See* 42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

56.    In March 2010, Congress amended the AKS to clarify that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]." Patient Protection and Affordable Care Act of 2010, Pub.L. No. 111–148, 124 Stat. 119, codified at 42 U.S.C.§ 1320a–7b(g).

### Medical Assistance Programs

57.    In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program and Title XIX of the Social Security Act which established the Medicaid program to pay for the costs of certain healthcare services including SUD treatment services.   Within broad federal rules, each state determines eligible groups, types and range of services, payment levels for services, and administrative and operating procedures. The states directly pay providers, with the states obtaining the federal share of the payment from accounts that draw on the United States Treasury. 42 C.F.R. §§ 430.0-430.30. The federal share of Medicaid expenditures varies by state and can fluctuate annually.  Defendant NUWAY's SUD treatment programs and services are subject to Medicare/Medicaid regulations that pay for half of the cost of SUD treatment in Minnesota. *See* 42 CFR § 447.52.

58.    The state of Minnesota has entered into a contractual agreement with the federal government to administer Medicaid (known in Minnesota as the "Medical Assistance" program) and must administer Medical Assistance in conformity with specific requirements of Title XIX of the Social Security Medicare/Medicaid program. *See* 42 CFR §

447; *see also* 42 CFR § 437. The Minnesota DHS is responsible for administration and supervision of the Medical Assistance state health care program which covers SUD treatment.

59.    In Minnesota, Medicaid/MA SUD treatment providers enter into agreements with the state to establish their eligibility to participate in the program. In order to qualify for payment under Medicare/Medical Assistance, NUWAY must certify on CMS Form 855I to understanding the obligations, including but not limited to:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me . . . The Medicare laws, regulations, and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute), and on the supplier's compliance with all applicable conditions of participation in Medicare.

60.    As detailed above, Defendants NUWAY and David Vennes, individually and through Defendant NUWAY's corporate officers submitted and/or caused fraudulent claims to be submitted to the Medicaid/MA programs for benefits, services, and items that NUWAY provided to patients.

61.    As health care industry professionals, Defendants NUWAY, Vennes and other Defendant NUWAY's officers understood the Anti-Kickback statute's prohibitions and requirements, signed contracts indicating that they were aware of the prohibition on kickbacks and the law generally, and therefore had "knowledge" of the Anti-Kickback Statute within the meaning of the False Claims Act when conducting the activities discussed in this Complaint.

62.     Further, given Defendants NUWAY, Vennes and other NUWAY's officers' training and background, Defendants knew that their conduct was unlawful when they enticed patients to be housed in NUWAY's sober housing in exchange for treatment and submitted or caused to be submitted claims to Medicare/Medicaid and Medical Assistance for SUD treatment and associated billings.

### Count I—False Claims Act, 31 U.S.C. § 3729(a)(1)(A)—
**Against Defendant NUWAY for submitting and/or causing the submission of false claims to Medicaid/MA programs for services rendered as a result of kickbacks through enticements of patients to receive Defendant NUWAY's "Free Housing" as a condition of participating in NUWAY's treatment.**

63.     Plaintiff incorporates by reference paragraphs 1-62 of this Complaint herein as if fully set forth. Plaintiff seeks relief in this Count against Defendant NUWAY under the False Claims Act, 31 U.S.C. § 3729 (a)(l)(A).

64.     Beginning in 2007 and continuing to the present, Defendant NUWAY through its employees, knowingly and willfully solicited and received remuneration including any kickback directly or indirectly, overtly or covertly, when Defendant NUWAY enticed needy patients with "free housing" accommodation as a condition of receiving NUWAY's treatment regimen and in return for which Defendants received payment in whole or in part by the Medicaid/MA programs.

65.     Beginning in 2007 and continuing to the present, Defendants' submitted or caused to be submitted to Medicaid/MA programs a significant number of false billings, increasing revenues exponentially over time, and resulting in Defendant NUWAY's $38 million revenue in 2019. *See* Walsh Aff. Ex. A, A-1, A-2.

**Count II—False Claims Act, 31 U.S.C. § 3729(a)(1)(A)—
Against Defendant Vennes for submitting and/or causing the submission of false
claims to Medicaid/MA programs for services rendered as a result of kickbacks
through enticements of patients to receive NUWAY's "Free Housing" as a condition
of participating in NUWAY's treatment.**

66.    Plaintiff incorporates by reference paragraphs 1-65 of this Complaint herein as if

fully set forth. Plaintiff seeks relief in this Count against Defendant Vennes under the

False Claims Act, 31 U.S.C. § 3729 (a)(l)(A).

67.    Beginning in 2007 and continuing to the present, Defendant Vennes individually

and through NUWAY's employees, knowingly and willfully solicited and received remu-

neration, including any kickbacks directly or indirectly, overtly or covertly, when De-

fendants enticed needy patients with "free housing" accommodation as a condition of re-

ceiving needed treatment and in return for which Defendants received payment in whole

or in part by the Medicaid/MA programs.

68.    Beginning in 2007 and continuing to the present, Defendant Vennes submitted or

caused to be submitted to Medicare/Medicaid and Medical Assistance programs a signifi-

cant number of false billings, increasing revenues exponentially over time, and resulting

in Defendant NUWAY's $38 million revenue in 2019.

**Count III—Violations of the False Claims Act against Defendants NUWAY and its
corporate officers and Defendant Vennes for working collectively to violate the
False Claims Act, 31 U.S.C. § 3729(a)(l)(C)**

69.    Plaintiff incorporates by reference paragraphs 1 through 68 above as if fully set

forth in this paragraph.  Plaintiff seeks relief in this Count against Defendants NUWAY

and Vennes under the False Claims Act, 31 U.S.C. § 3729(a)(l)(C).

70.    As set forth above, Defendants NUWAY and Vennes coordinated efforts individually, and through Defendant NUWAY's corporate officers to knowingly and willfully solicit and receive kickbacks through Defendant NUWAY's "free housing" scheme in exchange for, or to induce, patients' participation in NUWAY's treatment programs in violation of the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2). Defendant NUWAY thereby submitted false and fraudulent claims to Medicaid/MA programs identified in the Walsh Affidavit attached hereto and sought reimbursement for its related SUD treatment provided in connection with the kickback scheme.

71.    Accordingly, Defendants NUWAY and Vennes coordinated efforts to defraud the United States and the state of Minnesota by submitting false or fraudulent claims and allowed false claims to be paid and accepted payment for these false claims, which are unlawful under 31 U.S.C. §§ 3729(a)(l)(A)-(C) and 31 U.S.C. § 3729(a)(3).

72.    The United States has suffered damages to be determined at trial and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## Count IV—Payment Under Mistake of Fact

73.    Plaintiff incorporates by reference paragraphs 1-72 of this Complaint as if fully set forth. This is a claim for the recovery of monies paid by the United States to Defendant NUWAY as a result of mistaken understandings of fact.

74.    The false claims which Defendants NUWAY and Vennes submitted to the United States' agents were paid by the United States based upon the United State's mistaken or erroneous understandings of material fact.

21

75.     The United States acting in reasonable reliance on the truthfulness of the claims and the truthfulness of Defendant NUWAY through its corporate officers and Defendant Vennes' certifications and representations, paid certain sums of money which Defendant NUWAY was not entitled to receive, and Defendants NUWAY and Vennes are thus liable to account and pay such amounts, which are to be determined at trial, to the United States.

### Count V—Unjust Enrichment against Defendant NUWAY

76.     Plaintiff incorporates by reference paragraphs 1-75 of this Complaint as if fully set forth. This is a claim for the recovery of monies by which Defendant NUWAY has been unjustly enriched.

77.     By directly or indirectly obtaining government funds to which it was not entitled, Defendant NUWAY was unjustly enriched, and is liable to account and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

78.     By virtue of the false and/or fraudulent claims caused by Defendants to be submitted to the Medicaid/MA programs, the United States suffered damages in an amount to be determined at trial, and therefore is entitled to treble damages under the False Claims Act, in addition to a civil penalty of $5,500 to $11,000 for each violation.

### **PRAYER**

79.     WHEREFORE, *qui tam* Plaintiff-Relator Tim Walsh prays for judgment against the Defendants as follows:

80.     That Defendants cease and desist from violating 31 U.S.C. § 3729 *et seq.*;

81.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

82.    That Plaintiff-Relater be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act;

83.    That Plaintiff-Relater be awarded all costs of this action, including attorneys' fee and expenses; and

84.    That Plaintiff-Relater recover such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relater hereby demands a trial by jury.

Respectfully submitted,

**KENNETH UBONG UDOIBOK, P.A.**

Dated: January 11, 2021

/s/Kenneth U. Udoibok
Kenneth U. Udoibok (#0262523)
Flour Exchange Building, Suite 5010
310 Fourth Avenue South
Minneapolis, MN 55415
Phone: (612) 808-6031
Fax:    (612) 808-6031
k@kenulaw.com

**HYLDEN ADVOCACY & LAW**

Dated: January 11, 2021

/s/Nancy Hylden
Nancy Hylden, Reg. # 0336300
310 4th Avenue, Suite 9200
Minneapolis, MN 55415
Telephone: 612-418-6520
nhylden@hyldenlaw.com

**ATTORNEYS FOR PLAINTIFF-RELATOR**

24

TABLE OF ATTACHMENTS

1.    Affidavit of Tim Walsh...................................................................pp. 1-12

2.    Walsh Affidavit Exhibit A ............................................................pp. 13-14

3.    Walsh Affidavit Exhibit A-1 .........................................................pp. 15-28

4.    Walsh Affidavit Exhibit A-2 ..............................................................p. 29

5.    Walsh Affidavit Exhibit B .............................................................pp. 30-33

6.    Walsh Affidavit Exhibit C .............................................................pp. 34-35

7.    Walsh Affidavit Exhibit D  ...........................................................pp. 36-39

8.    Affidavit of Tracy Ronning............................................................pp. 40-43

9.    Affidavit of Craig Dean Cassady ...................................................pp. 44-45

10.    Affidavit of Travis Rae McAlpin...................................................pp. 46-47

11.    Affidavit of Don Alan Johnson......................................................pp. 48-49

12.    Affidavit of Jon David Kittelsen....................................................pp. 50-52

13.    Affidavit of Brian John Burggraff ..................................................pp. 53-55

14.    Affidavit of Anton Christian Jensen ..............................................pp. 56-57

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| United States of America, *ex rel.* Tim Walsh; | ) | |
| | ) | CASE NO _____ |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | **AFFIDAVIT OF TIMOTHY B. WALSH** |
| NU-WAY Housing, Inc. d/b/a NUWAY, and David J. Vennes, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

I, Timothy B. Walsh, M.A., L.P.; D.P.A., being first duly sworn, depose and state as follows:

1.    I am providing this affidavit as a part of my employment at Minnesota Adult and Teen Challenge ("MNTC").

2.    I am Vice President of Long Term Recovery and Mental Health Services for Minnesota Adult and Teen Challenge ("MNTC"). I have been employed at MNTC since December, 2013. I completed my doctorate in public administration at Hamline University in 2012. I received my Master of Arts degree in counseling psychology from St. Thomas University in 1993. I completed a double Bachelor of Arts degree in Biblical Studies and Social Sciences/Psychology from the University of Northwestern, St. Paul. I have been a licensed psychologist since 1998. I have been an executive leader in the fields of substance use disorder ("SUD") and mental health treatment, health, human services and corrections for over 25 years. All my professional practice has been in the State of Minnesota, and I am familiar with the protocols and regulation for

clinical practices and SUD treatment in the state and with state/federal financing of this type of treatment.

3.      This affidavit is based on my personal knowledge of the industry and clinical practices in the field of SUD treatment, as well as research of publicly available information, and my interactions with individuals who plan to or have participated in NU-WAY House Inc. ( "NUWAY") programming and my investigation of NUWAY's practices.

4.      My role at MNTC involves every aspect of organizational leadership and management. I also serve the role of strategic relations in regards to legislative initiatives, policy, state agency relationships and leadership in professional associations such as MARRCH, CORI, the Second Chance Coalition and the Mental Health Legislative Network. In these various roles, I became aware of NUWAY's "free housing" model approximately 3 years ago. I then began to research the laws, regulations, and advisory opinions specific to Medical Assistance fraud, anti-kickback, and false claims.

5.      In the field of SUD Treatment in Minnesota, there are several levels of treatment available, and a "comprehensive assessment" or "chemical health assessment" are used at the outset to determine the medically necessary level of care for a patient (Minn. Stat. ¶ 254B; Minn. R. 9530.6615). The levels of treatment include, from highest intensity to lowest intensity:

     **I.**   **LEVEL I.  State Licensed Residential SUD Treatment:**  This level of treatment includes 30 hours or more of treatment services per week (an "intensive" level of care).  The duration of this treatment is typically from 7 to 90 days and includes licensed housing.

     **II.**  **LEVEL II. State Licensed Supportive Housing:**  This model is used by some SUD providers including MNTC.  The "supports" in Supportive Housing may

-2-

include outpatient mental health and SUD treatment but this model is not exclusively used for SUD treatment. Supportive housing is also used for numerous other disabled populations. Other supportive services may include nursing care, peer recovery support, treatment coordination, medication management, etc. Supportive Housing is defined in statute as "housing that is not time-limited." Minn. Stat. Ch. 256I.03 subd. 15.

III. **LEVEL III. State Licensed outpatient SUD Treatment (housing not included):** The setting for treatment is community-based, typically a counseling center, clinic or office. Intensity levels of care range from approximately 1 hour per week up to 30 hours per week or more. The "high" level intensity of care described in this affidavit will be referred to as "intensive outpatient SUD treatment" and is any level of care over 19 hours per week. Patients needing this level of care require a supportive living environment such as a supportive housing facility.

*NOTE: NUWAY utilizes this model with its "free housing" incentive because it is highly reimbursed by the government for services and has no burden of government regulation for providing sober housing.*

IV. **LEVEL IV. Aftercare:** Patients who have completed other licensed SUD treatment programs are often assessed to need aftercare services such as sober housing, a lower level of outpatient SUD treatment services (e.g. 9 hours or less), attendance at a recovery support group, continued outpatient mental health, psychiatric services, etc.

**MY INVESTIGATION OF NUWAY'S "FREE HOUSING" MODEL**

-3-

6.    In 2018, MNTC program directors noticed and brought to my attention a significant drop-off in transfers from our licensed residential treatment programs to our licensed Supportive Housing program for women in Minneapolis, from an approximate 40% transfer rate to 30-34%. A similar pattern appeared in the discharge data of our men's programs.

7.    My office is adjacent to the front lobby of our men's LEVEL I intensive licensed residential SUD treatment program and I speak to numerous patients as they are discharging. Based on my interactions with these patients and receiving staff and patient reports, I learned that our patients were choosing to go to NUWAY outpatient treatment so they could receive "free housing" and "have more freedom" during the day. It is important to emphasize that these patients had all just completed MNTC licensed intensive residential treatment programs and then chose to discharge to NUWAY outpatient treatment immediately following completion without a clinical basis for needing this level of care.

8.    In some of these cases, NUWAY was providing *more* care to patients than was clinically indicated; and in some cases, NUWAY was providing *less* care than was clinically indicated.

9.    Following the realization that a significant number of patients were transferring to NUWAY, MNTC conducted a "point-in-time" analysis of discharges from our LEVEL I intensive SUD licensed residential treatment programs in Minneapolis and the diversion of potential patients for our Supportive Housing programs to NUWAY outpatient treatment program with "free housing."[1]  We identified approximately 100 patients who transferred to NUWAY per year from MNTC facilities.

---

[1]    This analysis is available for review subject to patient privacy protections.

-4-

10.    Each patient leaving treatment is evaluated for their current needs.  A Discharge Summary is required of all providers who serve patients insured by federal/state health insurance programs.

11.    I discovered a second pattern whereby NUWAY provides lower levels of treatment than clinically indicated. From 2018 to present, I received reports from our MNTC admissions staff that assessments completed by NUWAY assessors demonstrated a pattern of recommending NUWAY outpatient treatment when our assessors objectively determined that the level of risk and scores on the assessment indicated the need for a higher intensity licensed residential level of care.

12.    The profile of patients who clinically need a more intense level of treatment, accountability and wholistic/wraparound care, provided by MNTC licensed Supportive Housing includes a combination of the following characteristics:

    a)  A history of prior residential treatments;

    b)  A history of numerous unsuccessful attempts at recovery (which may not include treatment);

    c)  Extensive legal issues;

    d)  Limited support by family or a dysfunctional home environment;

    e)  Homelessness;

    f)  Extensive mental health issues;

    g)  A significant history of abuse or trauma;

    h)  An extensive history of drug use;

    i)  A history IV drug use;

-5-

j)  Current unemployment and few employment opportunities; and a desire to participate in Supportive Housing with outpatient clinical services (e.g. psychiatric, medication management, nursing, mental health, SUD, peer support, treatment coordination, etc.).

13.    In 2019, three MNTC leaders, Saul Selby, Kelsey Eller and I, visited three NUWAY outpatient clinical sites to share information with their clinical teams about MNTC programs and services and explore the feasibility of developing a collaborative affiliation. At one of these site visits, the MNTC women's Supportive Housing program director and I were greeted in the facility by seven former MNTC Housing Program graduates who had entered NUWAY'S outpatient treatment program even though they had already completed LEVEL I licensed residential treatment, and 1 to 2 years of LEVEL II Supportive Housing programming at MNTC. These former MNTC patients had not relapsed and would therefore not be eligible for heightened outpatient treatment.

14.    Beginning in 2018, I received a number of reports from MNTC staff that NUWAY-affiliated staff and clients were marketing NUWAY programs to our current MNTC clients, including at client graduations and client events.

15.    NUWAY has attempted to promote their "free housing" model with sponsored marketing events targeting patients in need, such as street parties, which were attended by MNTC clients. At these street parties, NUWAY offered free food, clothing, entertainment for children, music and marketing promotional gifts to potential clients, while sharing information about "free housing" when going to NUWAY treatment.

16.    NUWAY, a charitable nonprofit, has as its primary source of revenue services provided to patients insured under federally- and state-funded health care programs.  *See* Ex. A. (Chart

-6-

showing NUWAY's exponential revenue growth from government programs along with its
nominal other revenue sources from 2005-2018, based on IRS Form 990's; *see also* Ex. A-I.
(Compilations of the first pages of NUWAY IRS Form 990 reports publicly available from 2005-
18); *see also* Ex. A-2 (NUWAY 2019 Annual Report showing the year's gross revenues, net
assets, average length of outpatient stay [at "free housing"], total of 4,135 clients, and 777,191
outpatient treatment hours. As the Exhibit A chart confirms, NUWAY's exponential growth
started when David Vennes and other NUWAY executives developed and implemented
NUWAY's "free housing" model.

17.    NUWAY provides free or subsidized housing and other free services and goods to
patients on the condition that they attend a heavy regimen of NUWAY chemical dependency
treatment, services that can be paid for through federal health care and Minnesota health care
programs. *See, e.g.,* listing of free sober homes available to patients on the NUWAY website
*available at* www.NUWAY.org.

18.    In Minnesota, the costs for services provided to Medicaid/Medical Assistance
("Medicaid/MA")-eligible individuals is split 50-50 percent between the federal and state
governments. *See* Minnesota House Research Briefing by Randall Chun, *available at*
https://www.house.leg.state.mn.us/hrd/pubs/medastib.pdf, September 2020, describing the State-
Federal shared funding of health care under Medical Assistance in Minnesota.

19.    Minnesota Health Care Program ("MHCP") contracts with all Minnesota SUD treatment
providers including, among others, NUWAY, who serve Medicaid/MA-eligible and qualifying
government-insured individuals. These contracts specifically prohibit false claims. Ex. B.
(template of Minnesota Department of Human Services Provider Agreement - current version).

-7-

20. NUWAY charges the government for services it provides in two ways:

A. First, NUWAY directly bills the Minnesota Department of Human Services for Medical Assistance,

B. Second, NUWAY bills Health Plans (Managed Care Organizations) that administer Pre-paid Medical Assistance Programs ("PMAP").

21. NUWAY bills the government for assessments, individual counseling, and group counseling, etc., in low, medium and intensive levels of outpatient services (approximately 9-30 hours per week).

22. For patients participating in NUWAY's "free housing" incentive, the patient is obligated to participate in NUWAY outpatient services in exchange for receiving housing during their treatment.

23. Billing for a large volume of patients and billable service hours at an industry average rate of $36/patient hour at its outpatient treatment centers allows NUWAY to utilize revenues generated by state/federal-funded Medicaid/MA to then remunerate independent sober home owners. This is demonstrated in NUWAY's annual IRS Form 990's: only neglible revenues are reported for anything but services provided because virtually all patients who receive "free housing" are MA-eligible or MA-insured.

24. NUWAY's Government Program Revenue grew from $1,096,909 in 2005 (before NUWAY's "free housing" scheme was developed and implemented) to $31,138,387 in 2018 (after "free housing" model was fully implemented). Ex. A. NUWAY's 2019 revenues exceed $38 million. Ex. A-2.

25. The reason NUWAY's "free housing" model is so lucrative is that one week of treatment fully covers one month of unlicensed low-cost housing at a sober house, leaving NUWAY three

-8-

weeks' worth of treatment profit. In NUWAY's "free housing" arrangement, the patient lives at an unlicensed sober home, owned independently, but is required to attend outpatient services at NUWAY in order to maintain their "free housing." For example, if NUWAY requires patients to participate in a minimum of 20 hours of outpatient services per week, and if that amount of attendance is met, they will "scholarship" up to $550 a month to contracted sober houses for the patients' housing, paid directly to the sober house, not the patient. One week of NUWAY's billable treatment services per patient would more than pay for a month of "free housing" expense. Thus, the other three weeks of billable treatment services per patient in that month are net revenue.

26.     In practice and in effect, NUWAY knowingly and willfully conditions patient eligibility for the "free housing" incentive on the receipt of the particular service—i.e. "free housing" in exchange for participation in NUWAY's outpatient program.

27.     NUWAY directly and indirectly markets "free housing" in exchange for participation in their outpatient programs to federal/state-funded health care program recipients. NUWAY offers remuneration prior to scheduling services. See Ex. C., NUWAY marketing and promotional materials. Patients who complete or are otherwise discharged from NUWAY's outpatient programs immediately lose their housing. NUWAY promotes patient inducements of free housing, transportation, food and other services via its "Recovery Residence Support" model aka "Recovery in Supportive Environments (R.I.S.E.)" to people insured under federal/state-funded health care programs. See Presentation by NUWAY executives at 2018 NAADAC Annual Conference available at https://www.naadac.org/assets/2416/kenneth_roberts_ppt.pdf.

28.     NUWAY labels the "free housing" in exchange for attending treatment "support", "scholarship", "empowerment" and other euphemisms. For example, the following quote is

-9-

taken directly from NUWAY's website:

> "Many of our recovery residence partners are temporarily reducing or eliminating deposits, and offering flexible monthly fees to ensure that supportive recovery housing remains available to those who need it. Prices listed below may not reflect these reduced rates. Please contact residences to learn more about current pricing. NUWAY provides recovery residence support up to $550.00 per month toward program fees at a Recovery Residence for treatment compliant NUWAY patients. Deposit and any difference beyond $550.00 in monthly program fees are the responsibility of the client."

Quotation available at https://www.nuway.org/provider-partners/.

29.    NUWAY markets and promotes its "collaboration" with 70+ contracted residences with an estimated total bed capacity of over 1000, with a current listing of these "sober homes" listed on NUWAY's website.

30.    The NUWAY "free housing" incentive shifts costs to Medicaid/Medical Assistance by the overutilization or inappropriate utilization of Medicaid-eligible services. The NUWAY free-housing arrangement creates a high risk of harm to the government as payor of services.

31.    I have interacted and communicated with numerous patients in my care who have previously completed licensed residential treatment, group residential housing with supports—including lower intensity outpatient SUD treatment. These same patients were assessed by NUWAY to need an intensive outpatient program for no medically necessary reason. That is, patients with a demonstrated lower need for outpatient services by virtue of their successful completion of licensed residential treatment, or completion of long term supportive housing with clinical services-are assessed by NUWAY to need 20 hours or more of outpatient treatment

-10-

services per week. This NUWAY "free-housing" arrangement is reported by patients to be an irresistible inducement to choose NUWAY as their provider.

32.    SUD providers with a residential component must be licensed and comply with numerous laws involving the housing of patients, including Minnesota Statutes Chapter 245G.21, Requirements For Licensed Residential Treatment. In contrast, NUWAY's promotes its "housing first" program as a "free housing" arrangement that uses unlicensed sober homes, rather than licensed housing via the State's Housing With Support laws outlined in Minnesota Statutes Chapter 256I. In Minnesota, providers of Housing with Support are licensed for the express purpose of serving this patient population. Sober homes are not licensed or regulated in the State of Minnesota.

33.    These laws are important for this very vulnerable population. Minnesota National Alliance on Mental Illness - Minnesota Chapter, and the Mental Health Legislative Network of Minnesota ("MHLN") have proposed "Sober Home Study" legislation to address these concerns. Ex. D. (2020 MHLN "Blue Book" legislative policy agenda, Sober Homes policy proposal to increase regulation and oversight through state legislation, at 15).

34.    DHS only approves and pays claims made for outpatient treatment services. The federal Health and Human Services Office of Inspector General and the Minnesota Department of Human Services have never explicitly authorized unlicensed "free housing" arrangements. NUWAY conditions "free housing" for patients based upon enrollment in NUWAY's outpatient programs.

35.    The federal/state-funded Medical Assistance rate in Minnesota was established with consideration of the costs to SUD providers who follow state and federal law, as well as ethics, in treating patients. A financially lower cost scheme for NUWAY is possible using unlicensed

-11-

sober homes which NUWAY pays for with outpatient treatment revenues. NUWAY uses substandard housing and labor to reduce their overhead and operational costs, and thus are able to provide an inducement to MA patients and unlicensed homes.

36.     Based on my investigation and knowledge of NUWAY's "free housing" scheme, it my opinion that NUWAY is illegally enticing patients to its treatment program by using "free housing" as an inducement.


FURTHER AFFIANT SAYETH NOT.



Timothy B. Walsh, M.A., L.P.; D.P.A.


Subscribed and sworn to me before this 28th day of December, 2020.

NOTARY PUBLIC

KIMBERLY LYNN BROWN
NOTARY PUBLIC - MINNESOTA
MY COMMISSION EXPIRES 01/31/24

-12-

# WALSH AFF. EX. A

## NUWAY Revenue Sources
*based on NUWAY's IRS annual Form 990 filings, available through 2018*



- ■ IRS Form 990 Line 9: Revenues from Government Programs
- ▨ IRS Form 990 Line 8: Revenues from Contributions
- ▨ IRS Form 990 Line 11: Other Revenue
- ■ IRS Form 990 Line 10: Investment Income

these barely appear on the chart above due to negligible amounts.
see next page for raw data.

Att. p. 13

WALSH AFF. EX. A

| IRS Form 990 Filing Year | IRS Form 990 Line 9: Revenues from Government Programs | IRS Form 990 Line 8: Revenues from Contributions | IRS Form 990 Line 11: Other Revenue | IRS Form 990 Line 10: Investment Income |
|---|---|---|---|---|
| 2005 | $ 1,096,909 | $ 4,675 | $ 3,956 | - |
| 2006 | 1,147,203 | 1,240 | 4,104 | - |
| 2007 | 861,453 | - | 4,279 | - |
| 2008 | 794,315 | 10,025 | 25,161 | $ 105,174 |
| 2009 | 945,548 | - | 1,002 | - |
| 2010 | 1,488,459 | - | 1,832 | - |
| 2011 | 3,028,400 | 36,958 | 15,051 | - |
| 2012 | 3,939,947 | 200 | 14,850 | - |
| 2013 | 4,466,368 | 13,398 | (2,907) | - |
| 2014 | 5,310,751 | 200 | 9,500 | - |
| 2015 | 8,314,812 | 3,700 | (445) | 18,461 |
| 2016 | 12,875,668 | 5,413 | (14,597) | 49,118 |
| 2017 | 19,505,762 | - | (42,559) | 15,929 |
| 2018 | 31,138,387 | 40,584 | (59,132) | 18,965 |

WALSH AFF. EX. A–1

| efile GRAPHIC print - DO NOT PROCESS | As Filed Data - | | DLN: 93490264002026 |
|---|---|---|---|

**Form 990**

Department of the Treasury
Internal Revenue Service

**Return of Organization Exempt From Income Tax**

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except black lung benefit trust or private foundation)

► The organization may have to use a copy of this return to satisfy state reporting requirements

OMB No 1545-0047

**2005**

Open to Public Inspection

**A** For the 2005 calendar year, or tax year beginning 01-01-2005 and ending 12-31-2005

**B** Check if applicable
- ☐ Address change
- ☐ Name change
- ☐ Initial return
- ☐ Final return
- ☐ Amended return
- ☐ Application pending

Please use IRS label or print or type. See Specific Instructions.

**C** Name of organization
NU-WAY HOUSE INC

Number and street (or P O box if mail is not delivered to street address) | Room/suite
2518 FIRST AVENUE SOUTH

City or town, state or country, and ZIP + 4
MINNEAPOLIS, MN 55404

**D** Employer identification number
41-6052957

**E** Telephone number
(612) 872-0506

**F** Accounting method ☐ Cash ☑ Accrual
☐ Other (specify) ►

● Section 501(c)(3) organizations and 4947(a)(1) nonexempt charitable trusts must attach a completed Schedule A (Form 990 or 990-EZ).

**G** Web site: ► WWW.NUWAYHOUSE.ORG

**J** Organization type (check only one) ► ☑ 501(c) (3) ◄ (insert no ) ☐ 4947(a)(1) or ☐ 527

**K** Check here ► ☐ if the organization's gross receipts are normally not more than $25,000 The organization need not file a return with the IRS, but if the organization received a Form 990 Package in the mail, it should file a return without financial data Some states require a complete return.

**H** and **I** are not applicable to section 527 organizations
**H(a)** Is this a group return for affiliates? ☐ Yes ☑ No
**H(b)** If "Yes" enter number of affiliates ►
**H(c)** Are all affiliates included? ☐ Yes ☐ No
(If "No," attach a list see instructions )
**H(d)** Is this a separate return filed by an organization covered by a group ruling? ☐ Yes ☑ No
**I** Group Exemption Number ►
**M** Check ► ☑ if the organization is not required to attach Sch B (Form 990, 990-EZ, or 990-PF)

**L** Gross receipts Add lines 6b, 8b, 9b, and 10b to line 12 ► 1,105,540

## Part I Revenue, Expenses, and Changes in Net Assets or Fund Balances (See the instructions.)

| | | | | | |
|---|---|---|---|---|---|
| 1 | Contributions, gifts, grants, and similar amounts received | | | | |
| a | Direct public support | 1a | 4,675 | | |
| b | Indirect public support | 1b | | | |
| c | Government contributions (grants) | 1c | | | |
| d | Total (add lines 1a through 1c) (cash $ 4,675 noncash $ ) | | | 1d | 4,675 |
| 2 | Program service revenue including government fees and contracts (from Part VII, line 93) | | | 2 | 1,096,909 |
| 3 | Membership dues and assessments | | | 3 | |
| 4 | Interest on savings and temporary cash investments | | | 4 | |
| 5 | Dividends and interest from securities | | | 5 | |
| 6a | Gross rents | 6a | | | |
| b | Less rental expenses | 6b | | | |
| c | Net rental income or (loss) (subtract line 6b from line 6a) | | | 6c | |
| 7 | Other investment income (describe ► ) | | | 7 | |
| 8a | Gross amount from sales of assets other than inventory | (A) Securities | 8a | (B) Other | |
| b | Less cost or other basis and sales expenses | | 8b | | |
| c | Gain or (loss) (attach schedule) | | 8c | | |
| d | Net gain or (loss) (combine line 8c, columns (A) and (B)) | | | 8d | |
| 9 | Special events and activities (attach schedule) If any amount is from gaming, check here ► ☐ | | | | |
| a | Gross revenue (not including $ of contributions reported on line 1a) | 9a | | | |
| b | Less direct expenses other than fundraising expenses | 9b | | | |
| c | Net income or (loss) from special events (subtract line 9b from line 9a) | | | 9c | |
| 10a | Gross sales of inventory, less returns and allowances | 10a | | | |
| b | Less cost of goods sold | 10b | | | |
| c | Gross profit or (loss) from sales of inventory (attach schedule) (subtract line 10b from line 10a) | | | 10c | |
| 11 | Other revenue (from Part VII, line 103) | | | 11 | 3,956 |
| 12 | Total revenue (add lines 1d, 2, 3, 4, 5, 6c, 7, 8d, 9c, 10c, and 11) | | | 12 | 1,105,540 |
| 13 | Program services (from line 44, column (B)) | | | 13 | 1,012,287 |
| 14 | Management and general (from line 44, column (C)) | | | 14 | 144,406 |
| 15 | Fundraising (from line 44, column (D)) | | | 15 | |
| 16 | Payments to affiliates (attach schedule) | | | 16 | |
| 17 | Total expenses (add lines 16 and 44, column (A)) | | | 17 | 1,156,693 |
| 18 | Excess or (deficit) for the year (subtract line 17 from line 12) | | | 18 | -51,153 |
| 19 | Net assets or fund balances at beginning of year (from line 73, column (A)) | | | 19 | 343,498 |
| 20 | Other changes in net assets or fund balances (attach explanation) | | | 20 | |
| 21 | Net assets or fund balances at end of year (combine lines 18, 19, and 20) | | | 21 | 292,345 |

*(handwritten annotations: "GOV'T PROGRAM REVENUE" next to line 2; "TOTAL REVENUE" next to line 12)*

For Privacy Act and Paperwork Reduction Act Notice, see the separate instructions.    Cat No 11282Y    Form 990 (2005)

Att. p. 15

WALSH AFF. EX. A-1

| efile GRAPHIC print - DO NOT PROCESS | As Filed Data - | | DLN: 93490319017557 |
|---|---|---|---|

**Form 990**

Department of the Treasury
Internal Revenue Service

### Return of Organization Exempt From Income Tax

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except black lung benefit trust or private foundation)

► The organization may have to use a copy of this return to satisfy state reporting requirements

OMB No 1545-0047

**2006**

Open to Public Inspection

**A** For the 2006 calendar year, or tax year beginning 01-01-2006 and ending 12-31-2006

**B** Check if applicable
☐ Address change
☐ Name change
☐ Initial return
☐ Final return
☐ Amended return
☐ Application pending

Please use IRS label or print or type. See Specific Instructions.

**C** Name of organization
NU-WAY HOUSE INC

Number and street (or P O box if mail is not delivered to street address) Room/suite
2518 FIRST AVENUE SOUTH

City or town, state or country, and ZIP + 4
MINNEAPOLIS, MN 55404

**D** Employer identification number
41-6052957

**E** Telephone number
(612) 872-0506

**F** Accounting method ☐ Cash ☑ Accrual
☐ Other (specify) ►

● **Section 501(c)(3) organizations and 4947(a)(1) nonexempt charitable trusts must attach a completed Schedule A (Form 990 or 990-EZ).**

**G** Web site: ► WWW.NUWAYHOUSE.ORG

**J** Organization type (check only one) ► ☑ 501(c) ( 3 ) ◄ (insert no ) ☐ 4947(a)(1) or ☐ 527

**K** Check here ► ☐ if the organization is not a 509(a)(3) supporting organization and its gross receipts are normally not more than 25,000 A return is not required, but if the organization chooses to file a return, be sure to file a complete return

**H and I** are not applicable to section 527 organizations
**H(a)** Is this a group return for affiliates? ☐ Yes ☐ No
**H(b)** If "Yes" enter number of affiliates ►
**H(c)** Are all affiliates included? ☐ Yes ☐ No
(If "No," attach a list See instructions )
**H(d)** Is this a separate return filed by an organization covered by a group ruling? ☐ Yes ☑ No

**I** Group Exemption Number ►

**L** Gross receipts Add lines 6b, 8b, and 10b to line 12 ► 1,152,547

**M** Check ► ☑ if the organization is not required to attach Sch B (Form 990, 990-EZ, or 990-PF)

### Part I Revenue, Expenses, and Changes in Net Assets or Fund Balances (See the instructions.)

| | | | |
|---|---|---|---|
| **1** | Contributions, gifts, grants, and similar amounts received | | |
| a | Contributions to donor advised funds | 1a | |
| b | Direct public support (not included on line 1a) | 1b | 1,240 |
| c | Indirect public support (not included on line 1a) | 1c | |
| d | Government contributions (grants) (not included on line 1a) | 1d | |
| e | Total (add lines 1a through 1d) (cash $ 1,240 noncash $ ) | **1e** | 1,240 |
| **2** | Program service revenue including government fees and contracts (from Part VII, line 93) | **2** | 1,147,203 ✶ GOV'T PROGRAM REVENUE |
| **3** | Membership dues and assessments | **3** | |
| **4** | Interest on savings and temporary cash investments | **4** | |
| **5** | Dividends and interest from securities | **5** | |
| **6a** | Gross rents | 6a | |
| b | Less rental expenses | 6b | |
| c | Net rental income or (loss) subtract line 6b from line 6a | **6c** | |
| **7** | Other investment income (describe ► ) | **7** | |
| **8a** | Gross amount from sales of assets other than inventory | (A) Securities / 8a | (B) Other |
| b | Less cost or other basis and sales expenses | 8b | |
| c | Gain or (loss) (attach schedule) | 8c | |
| d | Net gain or (loss) Combine line 8c, columns (A) and (B) | **8d** | |
| **9** | Special events and activities (attach schedule) If any amount is from gaming, check here ► ☐ | | |
| a | Gross revenue (not including $ of contributions reported on line 1b) | 9a | |
| b | Less direct expenses other than fundraising expenses | 9b | |
| c | Net income or (loss) from special events Subtract line 9b from line 9a | **9c** | |
| **10a** | Gross sales of inventory, less returns and allowances | 10a | |
| b | Less cost of goods sold | 10b | |
| c | Gross profit or (loss) from sales of inventory (attach schedule) Subtract line 10b from line 10a | **10c** | |
| **11** | Other revenue (from Part VII, line 103) | **11** | 4,104 |
| **12** | Total revenue Add lines 1e, 2, 3, 4, 5, 6c, 7, 8d, 9c, 10c, and 11 | **12** | 1,152,547 ✶ TOTAL REVENUE |
| **13** | Program services (from line 44, column (B)) | **13** | 1,174,927 |
| **14** | Management and general (from line 44, column (C)) | **14** | |
| **15** | Fundraising (from line 44, column (D)) | **15** | |
| **16** | Payments to affiliates (attach schedule) | **16** | |
| **17** | Total expenses Add lines 16 and 44, column (A) | **17** | 1,174,927 |
| **18** | Excess or (deficit) for the year Subtract line 17 from line 12 | **18** | -22,380 |
| **19** | Net assets or fund balances at beginning of year (from line 73, column (A)) | **19** | 292,345 |
| **20** | Other changes in net assets or fund balances (attach explanation) | **20** | |
| **21** | Net assets or fund balances at end of year Combine lines 18, 19, and 20 | **21** | 269,965 |

For Privacy Act and Paperwork Reduction Act Notice, see the separate instructions.    Cat No 11282Y    Form **990** (2006)

Att.p. 16

WALSH AFF. EX. A-1

| Form **990** | **Return of Organization Exempt From Income Tax** | OMB No 1545 0047 |
|---|---|---|
| | Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code | **2007** |
| | (except black lung benefit trust or private foundation) | |
| Department of the Treasury Internal Revenue Service | ▶ The organization may have to use a copy of this return to satisfy state reporting requirements | Open to Public Inspection |

**A** For the 2007 calendar year, or tax year beginning _____ , 2007, and ending _____

| **B** Check if applicable | | **C** | | **D** Employer Identification Number |
|---|---|---|---|---|
| ☐ Address change | Please use IRS label or print or type. See specific Instruc- tions. | NU-WAY HOUSE, INC. 2518 FIRST AVENUE SOUTH MINNEAPOLIS, MN 55404 | | 41-6052957 |
| ☐ Name change | | | | **E** Telephone number |
| ☐ Initial return | | | | 612-872-0506 |
| ☐ Termination | | | | **F** Accounting method: ☐ Cash ☒ Accrual |
| ☐ Amended return | | | | ☐ Other (specify) ▶ |
| ☐ Application pending | ● **Section 501(c)(3) organizations and 4947(a)(1) nonexempt charitable trusts must attach a completed Schedule A (Form 990 or 990-EZ).** | | | H and I are not applicable to section 527 organizations |

**H (a)** Is this a group return for affiliates? ☐ Yes ☐ No

**G** Web site: ▶ WWW.NUWAY-HOUSE.ORG

**H (b)** If 'Yes,' enter number of affiliates ▶

**H (c)** Are all affiliates included? ☐ Yes ☐ No
(If 'No,' attach a list See instructions)

**J** Organization type (check only one) ▶ ☒ 501(c) 3 ◀ (insert no ) ☐ 4947(a)(1) or ☐ 527

**H (d)** Is this a separate return filed by an organization covered by a group ruling? ☐ Yes ☒ No

**K** Check here ▶ ☐ if the organization is not a 509(a)(3) supporting organization and its gross receipts are normally not more than $25,000. A return is not required, but if the organization chooses to file a return, be sure to file a complete return

**I** Group Exemption Number ▶

**M** Check ▶ ☒ if the organization is not required to attach Schedule B (Form 990, 990-EZ, or 990-PF)

**L** Gross receipts. Add lines 6b, 8b, 9b, and 10b to line 12 ▶ 866,182.

## Part I  Revenue, Expenses, and Changes in Net Assets or Fund Balances *(See the instructions.)*

| | | | | |
|---|---|---|---|---|
| 1 | Contributions, gifts, grants, and similar amounts received. | | | |
| a | Contributions to donor advised funds | 1a | | |
| b | Direct public support (not included on line 1a) | 1b | | |
| c | Indirect public support (not included on line 1a) | 1c | | |
| d | Government contributions (grants) (not included on line 1a) | 1d | | |
| e | Total (add lines 1a through 1d) (cash $ _____ noncash $ _____ ) | | 1e | 0. ✱ GOV'T PROGRAM REVENUE |
| 2 | Program service revenue including government fees and contracts (from Part VII, line 93) | | 2 | 861,453. ✱ |
| 3 | Membership dues and assessments | | 3 | |
| 4 | Interest on savings and temporary cash investments | | 4 | |
| 5 | Dividends and interest from securities | | 5 | |
| 6a | Gross rents | 6a | | |
| b | Less. rental expenses | 6b | | |
| c | Net rental income or (loss) Subtract line 6b from line 6a | | 6c | |
| 7 | Other investment income (describe ▶ _____ ) | | 7 | |
| 8a | Gross amount from sales of assets other than inventory | (A) Securities 8a | (B) Other | |
| b | Less. cost or other basis and sales expenses | 8b | | |
| c | Gain or (loss) (attach schedule) | 8c | | |
| d | Net gain or (loss) Combine line 8c, columns (A) and (B) | | 8d | |
| 9 | Special events and activities (attach schedule) If any amount is from gaming, check here ▶ ☐ | | | |
| a | Gross revenue (not including $ _____ of contributions reported on line 1b) | 9a | | |
| b | Less. direct expenses other than fundraising expenses | 9b | | |
| c | Net income or (loss) from special events Subtract line 9b from line 9a | | 9c | |
| 10a | Gross sales of inventory, less returns and allowances | 10a | | |
| b | Less. cost of goods sold | 10b | | |
| c | Gross profit or (loss) from sales of inventory (attach schedule) Subtract line 10b from line 10a | | 10c | |
| 11 | Other revenue (from Part VII, line 103) | | 11 | 4,729. |
| 12 | Total revenue. Add lines 1e, 2, 3, 4, 5, 6c, 7, 8d, 9c, 10c, and 11 | | 12 | 866,182. ✱ TOTAL REVENUE |
| 13 | Program services (from line 44, column (B)) | | 13 | 817,095. |
| 14 | Management and general (from line 44, column (C)) | | 14 | 116,321. |
| 15 | Fundraising (from line 44, column (D)) | | 15 | |
| 16 | Payments to affiliates (attach schedule) | | 16 | |
| 17 | Total expenses. Add lines 16 and 44, column (A) | | 17 | 933,416. |
| 18 | Excess or (deficit) for the year. Subtract line 17 from line 12 | | 18 | -67,234. |
| 19 | Net assets or fund balances at beginning of year (from line 73, column (A)) | | 19 | 272,754. |
| 20 | Other changes in net assets or fund balances (attach explanation) | | 20 | |
| 21 | Net assets or fund balances at end of year. Combine lines 18, 19, and 20 | | 21 | 205,520. |

SCANNED OCT 0 7 2009

(stamp) SEP 21 2009 OGDEN, UT

**BAA** For Privacy Act and Paperwork Reduction Act Notice, see the separate instructions.    TEEA0109L 12/27/07    Form **990** (2007)

917

WALSH AFF. EX. A–1

CISLTVHKGW

*amended*

Form **990**

### Return of Organization Exempt From Income Tax

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code
(except black lung benefit trust or private foundation)

► The organization may have to use a copy of this return to satisfy state reporting requirements.

OMB No 1545-0047

**2008**

Open to Public Inspection

Department of the Treasury
Internal Revenue Service

**A** For the 2008 calendar year, or tax year beginning _____ 2008, and ending _____

**B** Check if applicable.

- ☐ Address change
- ☐ Name change
- ☐ Initial return
- ☐ Termination
- ☐ Amended return
- ☐ Application pending

**C** NU-WAY HOUSE INC
2515 FIRST AVE S
MINNEAPOLIS, MN 55404

**D** Employer Identification Number
41-6052957

**E** Telephone number
(612) 872-0506

**F** Name and address of principal officer: DAVID VENNES
SAME AS C ABOVE

**G** Gross receipts $ 1,029,301.

H(a) Is this a group return for affiliates? ☐ Yes ☒ No
H(b) Are all affiliates included? ☐ Yes ☐ No
If 'No,' attach a list. (see instructions)

**I** Tax-exempt status ☒ 501(c) ( 3 ) ◄ (insert no.) ☐ 4947(a)(1) or ☐ 527

**J** Website: ► WWW.NUWAY-HOUSE.ORG

H(c) Group exemption number ►

**K** Type of organization ☒ Corporation ☐ Trust ☐ Association ☐ Other ► | **L** Year of Formation: 1966 | **M** State of legal domicile: MN

### Part I | Summary

**1** Briefly describe the organization's mission or most significant activities: TO PROVIDE A TEMPORARY HOME FOR ALCOHOLIC & OTHERWISE CHEMICALLY DEPENDENT MEN USING COUNSELING, TEACHING, CLASSES, LECTURES & MEETINGS TO HELP THEM ATTAIN SOBRIETY

**2** Check this box ► ☐ if the organization discontinued its operations or disposed of more than 25% of its assets.

| | | Number |
|---|---|---|
| **3** | Number of voting members of the governing body (Part VI, line 1a) | **3** | 11 |
| **4** | Number of independent voting members of the governing body (Part VI, line 1b) | **4** | 11 |
| **5** | Total number of employees (Part V, line 2a) | **5** | 39 |
| **6** | Total number of volunteers (estimate if necessary) | **6** | 0 |
| **7a** | Total gross unrelated business revenue from Part VIII, line 12, column (C) | **7a** | 0. |
| **b** | Net unrelated business taxable income from Form 990-T, line 34 | **7b** | 0. |

| | | Prior Year | Current Year |
|---|---|---|---|
| **8** | Contributions and grants (Part VIII, line 1h) | | 10,025. |
| **9** | Program service revenue (Part VIII, line 2g) | 861,453. | 794,315. |
| **10** | Investment income (Part VIII, column (A), lines 3, 4, and 7d) | | 105,174. |
| **11** | Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 4,729. | 25,161. |
| **12** | Total revenue – add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 866,182. | 934,675. |
| **13** | Grants and similar amounts paid (Part IX, column (A), lines 1-3) | | |
| **14** | Benefits paid to or for members (Part IX, column (A), line 4) | | |
| **15** | Salaries, other compensation, employee benefits (Part IX, column (A), lines 5-10) | 567,430. | 908,339. |
| **16a** | Professional fundraising fees (Part IX, column (A), line 11e) | | |
| **b** | Total fundraising expenses (Part IX, column (D), line 25) ► | | |
| **17** | Other expenses (Part IX, column (A), lines 11a-11d, 11f-24f) | 365,986. | 352,693. |
| **18** | Total expenses. Add lines 13-17 (must equal Part IX, column (A), line 25) | 933,416. | 1,261,032. |
| **19** | Revenue less expenses. Subtract line 18 from line 12 | -67,234. | -326,357. |

| | | Beginning of Year | End of Year |
|---|---|---|---|
| **20** | Total assets (Part X, line 16) | 267,154. | 192,095. |
| **21** | Total liabilities (Part X, line 26) | 61,634. | 69,951. |
| **22** | Net assets or fund balances. Subtract line 21 from line 20 | 205,520. | 122,144. |

GOV'T PROGRAM REVENUE
TOTAL REVENUE

RECEIVED JUN 28 2010 OGDEN, UT

### Part II | Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge.

**Sign Here**

► Signature of officer / DAVID VENNES / Date 6/00/10
Type or print name and title / EXECUTIVE DIRECTOR

**Paid Pre-parer's Use Only**

Preparer's signature ► Stacy R. Peterson CPA / Date 6/22/10 / Check if self-employed ☐ / Preparer's identifying number (see instructions) N/A

Firm's name (or yours if self-employed), address, and ZIP + 4 ► ROMER & COMPANY, PC
2318 FIRST AVENUE SOUTH
MINNEAPOLIS, MN 55404

EIN ► N/A
Phone no. ► (612) 872-0012

May the IRS discuss this return with the preparer shown above? (see instructions) ☒ Yes ☐ No

**BAA** For Privacy Act and Paperwork Reduction Act Notice, see the separate instructions. TEEA0112L 12/22/08 Form 990 (2008)

SCANNED AUG 1 9 2010

efile GRAPHIC print - DO NOT PROCES

# WALSH AFF. EX. A-1

**Form 990**

**Return of Organization Exempt From Income Tax**

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except black lung benefit trust or private foundation)

► The organization may have to use a copy of this return to satisfy state reporting requirements

**2009**

**Open to Public Inspection**

Department of the Treasury
Internal Revenue Service

**A** For the 2009 calendar year, or tax year beginning 01-01-2009 and ending 12-31-2009

| **B** Check if applicable | **C** Name of organization NU-WAY HOUSE INC | **D** Employer Identification number |
|---|---|---|
| ☐ Address change | Please use IRS label or print or type. See Specific Instructions. | 41-6052957 |
| ☐ Name change | Doing Business As | **E** Telephone number |
| ☐ Initial return | Number and street (or P O box if mail is not delivered to street address)  Room/suite  2518 FIRST AVE S | (612) 872-0506 |
| ☐ Terminated | City or town, state or country, and ZIP + 4  MINNEAPOLIS, MN 55404 | **G** Gross receipts $ 946,550 |
| ☐ Amended return | | |
| ☐ Application pending | | |

**F** Name and address of principal officer
DAVID VENNES
2518 1ST AVE S
MINNEAPOLIS, MN 55404

**H(a)** Is this a group return for affiliates? ☐ Yes ☑ No

**H(b)** Are all affiliates included? ☐ Yes ☑ No
If "No," attach a list (see instructions)

**I** Tax-exempt status ☑ 501(c) ( 3 ) ◄ (insert no ) ☐ 4947(a)(1) or ☐ 527

**H(c)** Group exemption number ►

**J** Website: ► WWW NUWAY-HOUSE ORG

**K** Form of organization ☑ Corporation ☐ Trust ☐ Association ☐ Other ►

**L** Year of formation 1966  **M** State of legal domicile MN

## Part I  Summary

**Activities & Governance**

1 Briefly describe the organization's mission or most significant activities
TO PROVIDE A TEMPORARY HOME FOR ALCOHOLIC & OTHERWISE CHEMICALLY DEPENDENT MEN USING COUNSELING, TEACHING, CLASSES, LECTURES & MEETINGS TO HELP THEM ATTAIN SOBRIETY

2 Check this box ► ☐ if the organization discontinued its operations or disposed of more than 25% of its net assets

| | | | |
|---|---|---|---|
| 3 Number of voting members of the governing body (Part VI, line 1a) | 3 | 11 |
| 4 Number of independent voting members of the governing body (Part VI, line 1b) | 4 | 11 |
| 5 Total number of employees (Part V, line 2a) | 5 | 37 |
| 6 Total number of volunteers (estimate if necessary) | 6 | |
| 7a Total gross unrelated business revenue from Part VIII, column (C), line 12 | 7a | 0 |
| b Net unrelated business taxable income from Form 990-T, line 34 | 7b | |

**Revenue**

| | | Prior Year | Current Year |
|---|---|---|---|
| 8 Contributions and grants (Part VIII, line 1h) | | 10,025 | 0 |
| 9 Program service revenue (Part VIII, line 2g) | | 794,315 | 945,548 |
| 10 Investment income (Part VIII, column (A), lines 3, 4, and 7d) | | 105,174 | 0 |
| 11 Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | | 25,161 | 1,002 |
| 12 Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) | | 934,675 | 946,550 |

*GOV'T ✕ PROGRAM REVENUE*

*✕ TOTAL REVENUE*

**Expenses**

| | | | |
|---|---|---|---|
| 13 Grants and similar amounts paid (Part IX, column (A), lines 1–3) | | | 0 |
| 14 Benefits paid to or for members (Part IX, column (A), line 4) | | | 0 |
| 15 Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10) | | 908,339 | 761,028 |
| 16a Professional fundraising fees (Part IX, column (A), line 11e) | | | 0 |
| b Total fundraising expenses (Part IX, column (D), line 25) ► 0 | | | |
| 17 Other expenses (Part IX, column (A), lines 11a–11d, 11f–24f) | | 352,693 | 401,466 |
| 18 Total expenses Add lines 13–17 (must equal Part IX, column (A), line 25) | | 1,261,032 | 1,162,494 |
| 19 Revenue less expenses Subtract line 18 from line 12 | | -326,357 | -215,944 |

**Net Assets or Fund Balances**

| | | Beginning of Current Year | End of Year |
|---|---|---|---|
| 20 Total assets (Part X, line 16) | | 192,095 | 162,072 |
| 21 Total liabilities (Part X, line 26) | | 69,951 | 255,872 |
| 22 Net assets or fund balances Subtract line 21 from line 20 | | 122,144 | -93,800 |

## Part II  Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete  Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge

**Sign Here**

****** Signature of officer  2010-06-22 Date

DAVID VENNES Executive Director
Type or print name and title

**Paid Preparer's Use Only**

| Preparer's signature STACEY R PETERSEN | Date | Check if self-employed ► ☐ | Preparer's identifying number (see instructions) |
|---|---|---|---|
| Firm's name (or yours if self-employed), address, and ZIP + 4 | Romer & Company PC  2318 First Avenue South  Minneapolis, MN 55404 | | EIN ► |
| | | | Phone no ► (612) 872-0012 |

May the IRS discuss this return with the preparer shown above? (see instructions) ☐ Yes ☐ No

Att. p. 19

WALSH AFF. EX. A-1

| Form **990** | **Return of Organization Exempt From Income Tax** | | OMB No 1545-0047 |
|---|---|---|---|
| | Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except black lung benefit trust or private foundation) | | **2010** |
| Department of the Treasury Internal Revenue Service | ► The organization may have to use a copy of this return to satisfy state reporting requirements | | Open to Public Inspection |

**A** For the 2010 calendar year, or tax year beginning _____, 2010, and ending _____

| **B** Check if applicable | **C** | **D** Employer identification number |
|---|---|---|
| ☐ Address change | MUWAY HOUSE | 41-6052957 |
| ☐ Name change | 2518 FIRST AVENUE SOUTH | **E** Telephone number |
| ☐ Initial return | MINNEAPOLIS, MN 55404 | 612-872-0506 |
| ☐ Terminated | | |
| ☐ Amended return | | **G** Gross receipts $   1,490,381. |
| ☐ Application pending | **F** Name and address of principal officer: DAVID VENNES | H(a) Is this a group return for affiliates? ☐ Yes ☒ No |
| | SAME AS C ABOVE | H(b) Are all affiliates included? ☐ Yes ☐ No If 'No,' attach a list (see instructions) |
| **I** Tax-exempt status ☒ 501(c)(3) ☐ 501(c) ( ) ◄ (insert no) ☐ 4947(a)(1) or ☐ 527 | | |
| **J** Website: ► N/A | | H(c) Group exemption number ► |
| **K** Form of organization ☐ Corporation ☒ Trust ☐ Association ☐ Other ► | **L** Year of Formation 1966 | **M** State of legal domicile MN |

**Part I** | **Summary**

1 Briefly describe the organization's mission or most significant activities: _TO PROVIDE A TEMPORARY HOME OR HOMES_
_FOR THE HOMELESS ALCOHOLIC WITH A SINCERE DESIRE TO ARREST HIS DISEASE_
_(ALCOHOLISM) TO RETURN TO A USEFUL LIFE, AND FIND CONTENMENT IN SOBRIETY._

2 Check this box ► ☐ if the organization discontinued its operations or disposed of more than 25% of its net assets

| | | | |
|---|---|---|---|
| 3 Number of voting members of the governing body (Part VI, line 1a) | **3** | | 7 |
| 4 Number of independent voting members of the governing body (Part VI, line 1b) | **4** | | 7 |
| 5 Total number of individuals employed in calendar year 2010 (Part V, line 2a) | **5** | | 45 |
| 6 Total number of volunteers (estimate if necessary) | **6** | | 0 |
| 7a Total unrelated business revenue from Part VIII, column (C), line 12 | **7a** | | 0. |
| b Net unrelated business taxable income from Form 990-T, line 34 | **7b** | | 0. |

| | | Prior Year | Current Year |
|---|---|---|---|
| 8 | Contributions and grants (Part VIII, line 1h) | | |
| 9 | Program service revenue (Part VIII, line 2g) | 945,548. | 1,488,549. |
| 10 | Investment income (Part VIII, column (A), lines 3, 4, and 7d) | | |
| 11 | Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 1,002. | 1,832. |
| 12 | Total revenue – add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 946,550. | 1,490,381. |
| 13 | Grants and similar amounts paid (Part IX, column (A), lines 1-3) | | |
| 14 | Benefits paid to or for members (Part IX, column (A), line 4) | | |
| 15 | Salaries, other compensation, employee benefits (Part IX, column (A), lines 5-10) | 761,028. | 841,846. |
| 16a | Professional fundraising fees (Part IX, column (A), line 11e) | | |
| b | Total fundraising expenses (Part IX, column (D), line 25) ► | | |
| 17 | Other expenses (Part IX, column (A), lines 11a-11d, 11f-24f) | 401,466. | 567,771. |
| 18 | Total expenses. Add lines 13-17 (must equal Part IX, column (A), line 25) | 1,162,494. | 1,409,617. |
| 19 | Revenue less expenses. Subtract line 18 from line 12 | -215,944. | 80,764. |

| | | Beginning of Current Year | End of Year |
|---|---|---|---|
| 20 | Total assets (Part X, line 16) | 162,072. | 233,676. |
| 21 | Total liabilities (Part X, line 26) | 255,872. | 289,084. |
| 22 | Net assets or fund balances. Subtract line 21 from line 20 | -93,800. | -55,408. |

*[Handwritten annotations in right margin: "GOV'T PROGRAM REVENUE" pointing to line 9; "TOTAL REVENUE" pointing to line 12]*

*[Left margin stamp: SCANNED AUG 2 2 2011]*

**Part II** | **Signature Block**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge.

| **Sign Here** | ► Signature of officer | Date |
|---|---|---|
| | ► X David J. Vennes | 8/4/11 |
| | Type or print name and title | |

| **Paid Preparer Use Only** | Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|---|
| | J. DONOVAN CARPENTER | W. Carpenter | 7/11/11 | | P00041280 |
| | Firm's name ► CARPENTER EVERT & ASSOCIATES | | | Firm's EIN ► 41-1534805 | |
| | Firm's address ► 7760 FRANCE AVE S. #940 | | | Phone no (952) 831-0085 | |
| | BLOOMINGTON, MN 55435 | | | | |

May the IRS discuss this return with the preparer shown above? (see instructions) ☒ Yes ☐ No

BAA For Paperwork Reduction Act Notice, see the separate instructions.   TEEA0113L 12/21/10   Form **990** (2010)

WALSH AFF. EX. A-1

| Form **990** | **Return of Organization Exempt From Income Tax** | OMB No. 1545-0047 |
|---|---|---|
| | Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except black lung benefit trust or private foundation) | **2011** |
| Department of the Treasury Internal Revenue Service | ► The organization may have to use a copy of this return to satisfy state reporting requirements. | **Open to Public Inspection** |

**A** For the 2011 calendar year, or tax year beginning _____, 2011, and ending _____

**B** Check if applicable:
- [ ] Address change
- [ ] Name change
- [ ] Initial return
- [ ] Terminated
- [ ] Amended return
- [ ] Application pending

**C**
NUWAY HOUSE
2518 FIRST AVENUE SOUTH
MINNEAPOLIS, MN 55404

**D** Employer Identification Number
41-6052957

**E** Telephone number
612-872-0506

**G** Gross receipts $ 3,080,409.

**F** Name and address of principal officer: DAVID VENNES
SAME AS C ABOVE

**H(a)** Is this a group return for affiliates? [ ] Yes [X] No
**H(b)** Are all affiliates included? [ ] Yes [ ] No
If 'No,' attach a list. (see instructions)

**I** Tax-exempt status [X] 501(c)(3) [ ] 501(c) ( )◄ (insert no.) [ ] 4947(a)(1) or [ ] 527

**J** Website: ► WWW.NUWAYHOUSE.ORG

**H(c)** Group exemption number ►

**K** Form of organization [X] Corporation [ ] Trust [ ] Association [ ] Other ►
**L** Year of Formation 1966
**M** State of legal domicile MN

### Part I  Summary

**1** Briefly describe the organization's mission or most significant activities: TO PROVIDE A TEMPORARY HOME OR HOMES FOR THE HOMELESS ALCOHOLIC WITH A SINCERE DESIRE TO ARREST HIS DISEASE (ALCOHOLISM) TO RETURN TO A USEFUL LIFE, AND FIND CONTENTMENT IN SOBRIETY

**2** Check this box ► [ ] if the organization discontinued its operations or disposed of more than 25% of its net assets.

| | | |
|---|---|---|
| **3** Number of voting members of the governing body (Part VI, line 1a) | **3** | 11 |
| **4** Number of independent voting members of the governing body (Part VI, line 1b) | **4** | 11 |
| **5** Total number of individuals employed in calendar year 2011 (Part V, line 2a) | **5** | 56 |
| **6** Total number of volunteers (estimate if necessary) | **6** | 0 |
| **7a** Total unrelated business revenue from Part VIII, column (C), line 12 | **7a** | 0. |
| **b** Net unrelated business taxable income from Form 990-T, line 34 | **7b** | 0. |

| | Prior Year | Current Year | |
|---|---|---|---|
| **8** Contributions and grants (Part VIII, line 1h) | | 36,958. | |
| **9** Program service revenue (Part VIII, line 2g) | 1,488,549. | 3,028,400. | * GOV'T PROGRAM REVENUE |
| **10** Investment income (Part VIII, column (A), lines 3, 4, and 7d) | | | |
| **11** Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 1,832. | 15,051. | |
| **12** Total revenue — add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 1,490,381. | 3,080,409. | * TOTAL REVENUE |
| **13** Grants and similar amounts paid (Part IX, column (A), lines 1-3) | | | |
| **14** Benefits paid to or for members (Part IX, column (A), line 4) | | | |
| **15** Salaries, other compensation, employee benefits (Part IX, column (A), lines 5-10) | 841,846. | 1,061,611. | |
| **16a** Professional fundraising expenses (Part IX, column (D), line 25) | | | |
| **b** Total fundraising expenses (Part IX, column (D), line 25) ► | | | |
| **17** Other expenses (Part IX, column (A), lines 11a-11d, 11f-24e) | 567,771. | 846,407. | |
| **18** Total expenses. Add lines 13-17 (must equal Part IX, column (A), line 25) | 1,409,617. | 1,908,018. | |
| **19** Revenue less expenses. Subtract line 18 from line 12 | 80,764. | 1,172,391. | |

| | Beginning of Current Year | End of Year |
|---|---|---|
| **20** Total assets (Part X, line 16) | 233,676. | 1,297,724. |
| **21** Total liabilities (Part X, line 26) | 289,084. | 90,851. |
| **22** Net assets or fund balances. Subtract line 21 from line 20 | -55,408. | 1,206,873. |

### Part II  Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge.

**Sign Here**

Signature of officer / Date 4/25/12

Type or print name and title: David J. Vennes  ED

**Paid Preparer Use Only**

| Print/Type preparer's name | Preparer's signature | Date | Check [ ] if self-employed | PTIN |
|---|---|---|---|---|
| J. DONOVAN CARPENTER | | 4/5/12 | | P00041280 |

Firm's name ► CARPENTER EVERT & ASSOCIATES
Firm's address ► 7760 FRANCE AVE. S. #940
BLOOMINGTON, MN 55435

Firm's EIN ► 41-1534805
Phone no. (952) 831-0085

May the IRS discuss this return with the preparer shown above? (see instructions) [X] Yes [ ] No

BAA For Paperwork Reduction Act Notice, see the separate instructions.    TEEA0113L 08/18/11    Form 990 (2011)

90-17   23

SCANNED JUN 15 2012

Att. p. 21

WALSH AFF. EX. A-1

efile GRAPHIC print - DO NOT PROCES

**Return of C**

Form **990**

Department of the Treasury
Internal Revenue Service

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except black lung
benefit trust or private foundation)

► The organization may have to use a copy of this return to satisfy state reporting requirements

**2012**

Open to Public
Inspection

**A** For the 2012 calendar year, or tax year beginning 01-01-2012 , 2012, and ending 12-31-2012

| B Check if applicable | C Name of organization NU-WAY HOUSE INC | D Employer identification number |
|---|---|---|
| ☐ Address change | | 41-6052957 |
| ☐ Name change | Doing Business As | |
| ☐ Initial return | Number and street (or P O box if mail is not delivered to street address) Room/suite 2516 FIRST AVENUE SOUTH | E Telephone number (612) 872-0506 |
| ☐ Terminated | | |
| ☐ Amended return | City or town, state or country, and ZIP + 4 MINNEAPOLIS, MN 55404 | |
| ☐ Application pending | | G Gross receipts $ 3,954,997 |

**F** Name and address of principal officer

**H(a)** Is this a group return for affiliates? ☐ Yes ☑ No

**H(b)** Are all affiliates included? ☐ Yes ☑ No
If "No," attach a list (see instructions)

**I** Tax-exempt status ☑ 501(c)(3) ☐ 501(c) ( ) ◄ (insert no ) ☐ 4947(a)(1) or ☐ 527

**J** Website: ► www.nuwayhouse.org

**H(c)** Group exemption number ►

**K** Form of organization ☑ Corporation ☐ Trust ☐ Association ☐ Other ►

**L** Year of formation 1966  **M** State of legal domicile MN

## Part I   Summary

| | | | | |
|---|---|---|---|---|
| Activities & Governance | 1 | Briefly describe the organization's mission or most significant activities To provide a temporary home or homes for the homeless alcoholic with a sincere desire to arrest his disease (Alcoholism) to return to a useful life, and find contentment in sobriety | | |
| | 2 | Check this box ► ☐ if the organization discontinued its operations or disposed of more than 25% of its net assets | | |
| | 3 | Number of voting members of the governing body (Part VI, line 1a) . . . . . | **3** | 9 |
| | 4 | Number of independent voting members of the governing body (Part VI, line 1b) . . . . | **4** | 9 |
| | 5 | Total number of individuals employed in calendar year 2012 (Part V, line 2a) . . | **5** | 79 |
| | 6 | Total number of volunteers (estimate if necessary) . . . . . . . . . | **6** | |
| | 7a | Total unrelated business revenue from Part VIII, column (C), line 12 . . . . . | **7a** | 0 |
| | b | Net unrelated business taxable income from Form 990-T, line 34 . . . . . . | **7b** | |

| | | Prior Year | Current Year | |
|---|---|---|---|---|
| Revenue | 8 Contributions and grants (Part VIII, line 1h) . . . . . | 36,958 | 200 | GOV'T |
| | 9 Program service revenue (Part VIII, line 2g) . . . . . | 3,028,400 | 3,939,947 | ✳ PROGRAM REVENUE |
| | 10 Investment income (Part VIII, column (A), lines 3, 4, and 7d ) . . . | | | |
| | 11 Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) . | 15,051 | 14,850 | |
| | 12 Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) . . . . . . . . . . . . . | 3,080,409 | 3,954,997 | ✳ TOTAL REVENUE |
| Expenses | 13 Grants and similar amounts paid (Part IX, column (A), lines 1–3 ) . . . | | 0 | |
| | 14 Benefits paid to or for members (Part IX, column (A), line 4 ) . . . | | 0 | |
| | 15 Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10) | 1,061,611 | 1,811,605 | |
| | 16a Professional fundraising fees (Part IX, column (A), line 11e) . . . . | | 0 | |
| | b Total fundraising expenses (Part IX, column (D), line 25) ► | | | |
| | 17 Other expenses (Part IX, column (A), lines 11a–11d, 11f–24e) . . . | 846,407 | 826,355 | |
| | 18 Total expenses Add lines 13–17 (must equal Part IX, column (A), line 25) | 1,908,018 | 2,637,960 | |
| | 19 Revenue less expenses Subtract line 18 from line 12 . . . . . | 1,172,391 | 1,317,037 | |

| | | Beginning of Current Year | End of Year |
|---|---|---|---|
| Net Assets or Fund Balances | 20 Total assets (Part X, line 16) . . . . . . . . . | 1,297,724 | 2,707,825 |
| | 21 Total liabilities (Part X, line 26) . . . . . . . . | 90,851 | 160,947 |
| | 22 Net assets or fund balances Subtract line 21 from line 20 . . . | 1,206,873 | 2,546,878 |

## Part II   Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge

| Sign Here | ****** Signature of officer | 2013-08-12 Date |
|---|---|---|
| | David Vennes Executive Director Type or print name and title | |

| Paid Preparer Use Only | Print/Type preparer's name J Donovan Carpenter | Preparer's signature | Date | Check ☐ if self-employed | PTIN P00041280 |
|---|---|---|---|---|---|
| | Firm's name ► Carpenter Evert & Associates | | | Firm's EIN ► | |
| | Firm's address ► 7760 France Ave S 940 Bloomington, MN 55435 | | | Phone no (952) 831-0085 | |

May the IRS discuss this return with the preparer shown above? (see instructions) . . . . . . . . . . . . . . ☑ Yes ☐ No

Att. p. 22

**WALSH AFF. EX. A-1**

| efile GRAPHIC print - DO NOT PROCESS | | |
|---|---|---|

Form **990**

**Return of Org**

**2013**

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)

► Do not enter Social Security numbers on this form as it may be made public  By law, the IRS generally cannot redact the information on the form

► Information about Form 990 and its instructions is at *www.IRS.gov/form990*

Department of the Treasury
Internal Revenue Service

**Open to Public Inspection**

**A** For the 2013 calendar year, or tax year beginning 01-01-2013 , 2013, and ending 12-31-2013

**B** Check if applicable

☐ Address change
☑ Address change
☐ Name change
☐ Initial return
☐ Terminated
☐ Amended return
☐ Application pending

**C** Name of organization
NU-WAY HOUSE INC

Doing Business As

Number and street (or P O  box if mail is not delivered to street address) | Room/suite
2217 Nicollet Avenue South

City or town, state or province, country, and ZIP or foreign postal code
MINNEAPOLIS, MN  55404

**D** Employer identification number
41-6052957

**E** Telephone number
(612) 872-0506

**G** Gross receipts $ 4,476,859

**F** Name and address of principal officer
David Vennes
2217 Nicollet Avenue South
Minneapolis, MN  55404

**H(a)** Is this a group return for subordinates? ☐ Yes ☑ No

**H(b)** Are all subordinates included? ☐ Yes ☑ No
If "No," attach a list (see instructions)

**I** Tax-exempt status ☑ 501(c)(3)  ☐ 501(c) ( ) ◄ (insert no )  ☐ 4947(a)(1) or ☐ 527

**J** Website: ► www.nuwayhouse.org

**H(c)** Group exemption number ►

**K** Form of organization ☑ Corporation ☐ Trust ☐ Association ☐ Other ► | **L** Year of formation 1966 | **M** State of legal domicile MN

## Part I — Summary

**1** Briefly describe the organization's mission or most significant activities
To provide a temporary home or homes for the homeless alcoholic with a sincere desire to arrest his disease (Alcoholism) to return to a useful life, and find contentment in sobriety

**2** Check this box ► ☐ if the organization discontinued its operations or disposed of more than 25% of its net assets

| | | |
|---|---|---|
| **3** Number of voting members of the governing body (Part VI, line 1a) . . . . . . . . | **3** | 11 |
| **4** Number of independent voting members of the governing body (Part VI, line 1b) . . . . . | **4** | 11 |
| **5** Total number of individuals employed in calendar year 2013 (Part V, line 2a) . . . . . | **5** | 84 |
| **6** Total number of volunteers (estimate if necessary) . . . . . . . . . . . . . | **6** | |
| **7a** Total unrelated business revenue from Part VIII, column (C), line 12 . . . . . . . | **7a** | 0 |
| **b** Net unrelated business taxable income from Form 990-T, line 34 . . . . . . . | **7b** | |

| | Prior Year | Current Year | |
|---|---|---|---|
| **8** Contributions and grants (Part VIII, line 1h) . . . . . . . . . | 200 | 13,398 | GOV'T PROGRAM ✱ REVENUE |
| **9** Program service revenue (Part VIII, line 2g) . . . . . . . . | 3,939,947 | 4,466,368 | |
| **10** Investment income (Part VIII, column (A), lines 3, 4, and 7d ) . . . . | | 0 | |
| **11** Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 14,850 | -2,907 | |
| **12** Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) . . . . . . . . . . . . . . . . . . | 3,954,997 | 4,476,859 | ✱ TOTAL REVENUE |
| **13** Grants and similar amounts paid (Part IX, column (A), lines 1–3 ) . . . | | 0 | |
| **14** Benefits paid to or for members (Part IX, column (A), line 4) . . . . | | 0 | |
| **15** Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10 ) | 1,811,605 | 2,337,190 | |
| **16a** Professional fundraising fees (Part IX, column (A), line 11e) . . . . | | 0 | |
| **b** Total fundraising expenses (Part IX, column (D), line 25) ►0 | | | |
| **17** Other expenses (Part IX, column (A), lines 11a–11d, 11f–24e) . . . . | 826,355 | 1,371,211 | |
| **18** Total expenses  Add lines 13–17 (must equal Part IX, column (A), line 25) | 2,637,960 | 3,708,401 | |
| **19** Revenue less expenses  Subtract line 18 from line 12 . . . . . | 1,317,037 | 768,458 | |

| | Beginning of Current Year | End of Year |
|---|---|---|
| **20** Total assets (Part X, line 16) . . . . . . . . . . . . | 2,707,825 | 3,714,715 |
| **21** Total liabilities (Part X, line 26) . . . . . . . . . . . | 160,947 | 399,379 |
| **22** Net assets or fund balances  Subtract line 21 from line 20 . . . . | 2,546,878 | 3,315,336 |

## Part II — Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete  Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge

| Sign Here | Signature of officer ****** | 2014-09-08 Date |
|---|---|---|
| | David Vennes Executive Director | |
| | Type or print name and title | |

| Paid Preparer Use Only | Print/Type preparer's name J Donovan Carpenter | Preparer's signature | Date | Check ☐ if self-employed | PTIN P00041280 |
|---|---|---|---|---|---|
| | Firm's name ► Carpenter Evert & Associates | | | Firm's EIN ► | |
| | Firm's address ► 7760 France Ave S 940 Bloomington, MN  55435 | | | Phone no  (952) 831-0085 | |

May the IRS discuss this return with the preparer shown above? (see instructions) . . . . . . . . . . . ☑ Yes ☐ No

Att. p. 23

# WALSH AFF. EX. A-1

Form **990**

Department of the Treasury
Internal Revenue Service

**Return of Organization Exempt From Income Tax**

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)

▶ Do not enter social security numbers on this form as it may be made public
▶ Information about Form 990 and its instructions is at *www.IRS.gov/form990*

**2014**

Open to Public Inspection

**A** For the 2014 calendar year, or tax year beginning 01-01-2014 , and ending 12-31-2014

| **B** Check if applicable | **C** Name of organization NU-WAY HOUSE INC | | **D** Employer identification number |
|---|---|---|---|
| ☐ Address change | | | 41-6052957 |
| ☐ Name change | Doing business as | | |
| ☐ Initial return | Number and street (or P O box if mail is not delivered to street address) Room/suite 2217 Nicollet Avenue South | | **E** Telephone number (612) 872-0506 |
| ☐ Final return/terminated | | | |
| ☐ Amended return | City or town, state or province, country, and ZIP or foreign postal code MINNEAPOLIS, MN 55404 | | **G** Gross receipts $ 5,320,451 |
| ☐ Application pending | **F** Name and address of principal officer | | |

**H(a)** Is this a group return for subordinates? ☐ Yes ☑ No

**H(b)** Are all subordinates included? ☐ Yes ☑ No
If "No," attach a list (see instructions)

**I** Tax-exempt status ☑ 501(c)(3)  ☐ 501(c) ( ) ◀ (insert no )  ☐ 4947(a)(1) or  ☐ 527

**J** Website: ▶ www.nuwayhouse.org

**H(c)** Group exemption number ▶

**K** Form of organization ☑ Corporation ☐ Trust ☐ Association ☐ Other ▶    **L** Year of formation 1966   **M** State of legal domicile MN

## Part I   Summary

**1** Briefly describe the organization's mission or most significant activities
To provide a temporary home or homes for the homeless alcoholic with a sincere desire to arrest his disease (Alcoholism) to return to a useful life, and find contentment in sobriety

**2** Check this box ☐ if the organization discontinued its operations or disposed of more than 25% of its net assets

| | | | |
|---|---|---|---|
| **3** Number of voting members of the governing body (Part VI, line 1a) | | **3** | 9 |
| **4** Number of independent voting members of the governing body (Part VI, line 1b) | | **4** | 9 |
| **5** Total number of individuals employed in calendar year 2014 (Part V, line 2a) | | **5** | 84 |
| **6** Total number of volunteers (estimate if necessary) | | **6** | |
| **7a** Total unrelated business revenue from Part VIII, column (C), line 12 | | **7a** | 0 |
| **b** Net unrelated business taxable income from Form 990-T, line 34 | | **7b** | |

| | | Prior Year | Current Year | |
|---|---|---|---|---|
| Revenue | **8** Contributions and grants (Part VIII, line 1h) | 13,398 | 200 | GOV'T |
| | **9** Program service revenue (Part VIII, line 2g) | 4,466,368 | 5,310,751 ✱ PROGRAM REVENUE |
| | **10** Investment income (Part VIII, column (A), lines 3, 4, and 7d ) | | | |
| | **11** Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | -2,907 | 9,500 | |
| | **12** Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 4,476,859 | 5,320,451 ✱ TOTAL REVENUE |
| Expenses | **13** Grants and similar amounts paid (Part IX, column (A), lines 1-3 ) | | 0 | |
| | **14** Benefits paid to or for members (Part IX, column (A), line 4) | | 0 | |
| | **15** Salaries, other compensation, employee benefits (Part IX, column (A), lines 5-10) | 2,337,190 | 2,661,802 | |
| | **16a** Professional fundraising fees (Part IX, column (A), line 11e) | | 0 | |
| | **b** Total fundraising expenses (Part IX, column (D), line 25) ▶ 0 | | | |
| | **17** Other expenses (Part IX, column (A), lines 11a-11d, 11f-24e) | 1,371,211 | 1,657,254 | |
| | **18** Total expenses Add lines 13-17 (must equal Part IX, column (A), line 25) | 3,708,401 | 4,319,056 | |
| | **19** Revenue less expenses Subtract line 18 from line 12 | 768,458 | 1,001,395 | |

| | | Beginning of Current Year | End of Year |
|---|---|---|---|
| Net Assets or Fund Balances | **20** Total assets (Part X, line 16) | 3,714,715 | 4,619,770 |
| | **21** Total liabilities (Part X, line 26) | 399,379 | 303,039 |
| | **22** Net assets or fund balances Subtract line 21 from line 20 | 3,315,336 | 4,316,731 |

## Part II   Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge

| Sign Here | Signature of officer ****** | Date 2015-10-14 |
|---|---|---|
| | David Vennes Executive Director | |
| | Type or print name and title | |

| Paid Preparer Use Only | Print/Type preparer's name J Donovan Carpenter | Preparer's signature J Donovan Carpenter | Date | Check ☐ if self-employed | PTIN P00041280 |
|---|---|---|---|---|---|
| | Firm's name ▶ Carpenter Evert & Associates | | | Firm's EIN ▶ | |
| | Firm's address ▶ 7760 France Ave S 940 Bloomington, MN 55435 | | | Phone no (952) 831-0085 | |

May the IRS discuss this return with the preparer shown above? (see instructions)   ☑ Yes ☐ No

For Paperwork Reduction Act Notice, see the separate instructions.

Att. p. 24

efile GRAPHIC print - DO NOT PROCESS

**WALSH AFF. EX. A-1**

Form **990**

**Return of Org...**

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)

▶ Do not enter social security numbers on this form as it may be made public

▶ Information about Form 990 and its instructions is at www.IRS.gov/form990

Department of the Treasury
Internal Revenue Service

**2015**

Open to Public Inspection

**A** For the 2015 calendar year, or tax year beginning 01-01-2015 , and ending 12-31-2015

| **B** Check if applicable | **C** Name of organization NU-WAY HOUSE INC | **D** Employer identification number |
|---|---|---|
| ☐ Address change | | 41-6052957 |
| ☐ Name change | Doing business as | |
| ☐ Initial return | Number and street (or P O box if mail is not delivered to street address) Room/suite 2217 Nicollet Avenue South | **E** Telephone number (612) 872-0506 |
| ☐ Final return/terminated | | |
| ☐ Amended return | City or town, state or province, country, and ZIP or foreign postal code | |
| ☐ Application pending | MINNEAPOLIS, MN 55404 | **G** Gross receipts $ 8,356,065 |

**F** Name and address of principal officer
David Vennes
2217 Nicollet Avenue South
Minneapolis, MN 55404

**H(a)** Is this a group return for subordinates? ☐ Yes ☑ No

**H(b)** Are all subordinates included? ☐ Yes ☐ No
If "No," attach a list (see instructions)

**I** Tax-exempt status ☑ 501(c)(3)  ☐ 501(c) ( ) ◀ (insert no )  ☐ 4947(a)(1) or  ☐ 527

**H(c)** Group exemption number ▶

**J** Website: ▶ www.nuwayhouse.org

**K** Form of organization ☑ Corporation ☐ Trust ☐ Association ☐ Other ▶

**L** Year of formation 1966

**M** State of legal domicile MN

## Part I  Summary

**1** Briefly describe the organization's mission or most significant activities
To provide a temporary home or homes for the homeless alcoholic with a sincere desire to arrest his disease (Alcoholism) to return to a useful life, and find contentment in sobriety

**2** Check this box ▶ ☐ if the organization discontinued its operations or disposed of more than 25% of its net assets

| | | | |
|---|---|---|---|
| **3** Number of voting members of the governing body (Part VI, line 1a) | **3** | 11 |
| **4** Number of independent voting members of the governing body (Part VI, line 1b) | **4** | 11 |
| **5** Total number of individuals employed in calendar year 2015 (Part V, line 2a) | **5** | 130 |
| **6** Total number of volunteers (estimate if necessary) | **6** | |
| **7a** Total unrelated business revenue from Part VIII, column (C), line 12 | **7a** | -1,441 |
| **b** Net unrelated business taxable income from Form 990-T, line 34 | **7b** | -1,441 |

| | | Prior Year | Current Year | |
|---|---|---|---|---|
| **8** Contributions and grants (Part VIII, line 1h) | | 200 | 3,700 | |
| **9** Program service revenue (Part VIII, line 2g) | | 5,310,751 | 8,293,096 | GOV'T PROGRAM REVENUE ✱ |
| **10** Investment income (Part VIII, column (A), lines 3, 4, and 7d) | | | 18,461 | |
| **11** Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | | 9,500 | -445 | |
| **12** Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) | | 5,320,451 | 8,314,812 ✱ | ✱ TOTAL REVENUE |
| **13** Grants and similar amounts paid (Part IX, column (A), lines 1–3 ) | | | 0 | |
| **14** Benefits paid to or for members (Part IX, column (A), line 4) | | | 0 | |
| **15** Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10) | | 2,661,802 | 3,730,749 | |
| **16a** Professional fundraising fees (Part IX, column (A), line 11e) | | | 0 | |
| **b** Total fundraising expenses (Part IX, column (D), line 25) ▶ | | | | |
| **17** Other expenses (Part IX, column (A), lines 11a–11d, 11f–24e) | | 1,657,254 | 2,405,365 | |
| **18** Total expenses Add lines 13–17 (must equal Part IX, column (A), line 25) | | 4,319,056 | 6,136,114 | |
| **19** Revenue less expenses Subtract line 18 from line 12 | | 1,001,395 | 2,178,698 | |

| | | Beginning of Current Year | End of Year |
|---|---|---|---|
| **20** Total assets (Part X, line 16) | | 4,619,770 | 7,408,204 |
| **21** Total liabilities (Part X, line 26) | | 303,039 | 912,775 |
| **22** Net assets or fund balances Subtract line 21 from line 20 | | 4,316,731 | 6,495,429 |

## Part II  Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge

| Sign Here | ****** Signature of officer | 2016-08-05 Date |
|---|---|---|
| | David Vennes Executive Director Type or print name and title | |

| Paid Preparer Use Only | Print/Type preparer's name Marc Colin | Preparer's signature Marc Colin | Date | Check ☐ if self-employed | PTIN P00560855 |
|---|---|---|---|---|---|
| | Firm's name ▶ Carpenter Evert & Associates | | | Firm's EIN ▶ | |
| | Firm's address ▶ 7760 France Ave S 940 Bloomington, MN 55435 | | | Phone no (952) 831-0085 | |

May the IRS discuss this return with the preparer shown above? (see instructions) . . . . . . ☑ Yes ☐ No

For Paperwork Reduction Act Notice, see the separate instructions. Cat No 11282Y Form **990** (2015)

Att. p. 25

# WALSH AFF. EX. A–1

| efile GRAPHIC print - DO NOT PROCESS | As Filed Data - | DLN: 93493312024108 |
|---|---|---|

**Form 990**

Department of the Treasury
Internal Revenue Service

### Return of Organization Exempt From Income Tax

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)
▶ Do not enter social security numbers on this form as it may be made public
▶ Information about Form 990 and its instructions is at www.IRS.gov/form990

OMB No 1545-0047

**2016**

Open to Public Inspection

**A** For the 2016 calendar year, or tax year beginning 01-01-2016 , and ending 12-31-2016

**B** Check if applicable
☐ Address change
☐ Name change
☐ Initial return
☐ Final Return/terminated
☑ Amended return
☐ Application pending

**C** Name of organization
Nu-way House inc

Doing business as

Number and street (or P.O. box if mail is not delivered to street address)    Room/suite
2217 Nicollet Avenue South

City or town, state or province, country, and ZIP or foreign postal code
Minneapolis, MN  55404

**D** Employer identification number
41-6052957

**E** Telephone number
(612) 767-0309

**G** Gross receipts $ 13,153,232

**F** Name and address of principal officer
David Vennes
2217 Nicollet Avenue South
Minneapolis, MN  55404

**I** Tax-exempt status ☑ 501(c)(3) ☐ 501(c) ( ◀ ) ◀ (insert no) ☐ 4947(a)(1) or ☐ 527

**J** Website: ▶ www nuwayhouse org

**K** Form of organization ☑ Corporation ☐ Trust ☐ Association ☐ Other ▶

**H(a)** Is this a group return for subordinates?  ☐ Yes ☑ No
**H(b)** Are all subordinates included?  ☐ Yes ☐ No
If "No," attach a list (see instructions)
**H(c)** Group exemption number ▶

**L** Year of formation 1966  **M** State of legal domicile MN

## Part I   Summary

**Activities & Governance**

1 Briefly describe the organization's mission or most significant activities
TO PROVIDE A TEMPORARY HOME OR HOMES FOR THE HOMELESS ALCOHOLIC WITH A SINCERE DESIRE TO ARREST HIS DISEASE (ALCOHOLISM) TO RETURN TO A USEFUL LIFE, AND FIND CONTENTMENT IN SOBRIETY

2 Check this box ▶ ☐ if the organization discontinued its operations or disposed of more than 25% of its net assets

| | | |
|---|---|---|
| 3 Number of voting members of the governing body (Part VI, line 1a) | 3 | 9 |
| 4 Number of independent voting members of the governing body (Part VI, line 1b) | 4 | 9 |
| 5 Total number of individuals employed in calendar year 2016 (Part V, line 2a) | 5 | 162 |
| 6 Total number of volunteers (estimate if necessary) | 6 | 10 |
| 7a Total unrelated business revenue from Part VIII, column (C), line 12 | 7a | -10,013 |
| b Net unrelated business taxable income from Form 990-T, line 34 | 7b | -10,013 |

| | Prior Year | Current Year | |
|---|---|---|---|
| **Revenue** | | | |
| 8 Contributions and grants (Part VIII, line 1h) | 3,700 | 5,413 | |
| 9 Program service revenue (Part VIII, line 2g) | 8,293,096 | 12,875,668 | GOV'T ✱ PROGRAM REVENUE |
| 10 Investment income (Part VIII, column (A), lines 3, 4, and 7d) | 18,461 | 49,118 | |
| 11 Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | -445 | -14,597 | |
| 12 Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 8,314,812 | 12,915,602 | ✱ TOTAL REVENUE |
| **Expenses** | | | |
| 13 Grants and similar amounts paid (Part IX, column (A), lines 1-3 ) | 0 | 0 | |
| 14 Benefits paid to or for members (Part IX, column (A), line 4) | 0 | 0 | |
| 15 Salaries, other compensation, employee benefits (Part IX, column (A), lines 5-10) | 3,730,749 | 5,696,320 | |
| 16a Professional fundraising fees (Part IX, column (A), line 11e) | 0 | 0 | |
| b Total fundraising expenses (Part IX, column (D), line 25) ▶ 0 | | | |
| 17 Other expenses (Part IX, column (A), lines 11a-11d, 11f-24e) | 2,405,365 | 5,187,110 | |
| 18 Total expenses Add lines 13-17 (must equal Part IX, column (A), line 25) | 6,136,114 | 10,883,430 | |
| 19 Revenue less expenses Subtract line 18 from line 12 | 2,178,698 | 2,032,172 | |

| **Net Assets or Fund Balances** | Beginning of Current Year | End of Year |
|---|---|---|
| 20 Total assets (Part X, line 16) | 7,408,204 | 10,255,702 |
| 21 Total liabilities (Part X, line 26) | 912,775 | 1,723,503 |
| 22 Net assets or fund balances Subtract line 21 from line 20 | 6,495,429 | 8,532,199 |

## Part II   Signature Block

Under penalties of perjury, I declare that I have examined this return, inclu[...] knowledge and belief, it is true, correct, and complete  Declaration of prepa[...] any knowledge

**Sign Here**

Signature of officer

John Harston Chief Financial Officer
Type or print name and title

**Paid Preparer Use Only**

| Print/Type preparer's name | Preparer's signature |
|---|---|
| Lawrence H Mohr CPA | Lawrence H Mohr CPA |

Firm's name ▶ Baker Tilly Virchow Krause LLP

Firm's address ▶ 225 S 6th St 2300
Minneapolis, MN  55402

May the IRS discuss this return with the preparer shown above? (see instru[...]
For Paperwork Reduction Act Notice, see the separate instructions.

# WALSH AFF. EX. A-1

| efile GRAPHIC print - DO NOT PROCESS | As Filed Data - | | DLN: 93493319033168 |
|---|---|---|---|

**Form 990**

**Return of Organization Exempt From Income Tax**

OMB No 1545-0047

**2017**

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)

Department of the Treasury
Internal Revenue Service

▶ Do not enter social security numbers on this form as it may be made public
▶ Information about Form 990 and its instructions is at www.IRS.gov/form990

Open to Public Inspection

**A** For the 2017 calendar year, or tax year beginning 01-01-2017 , and ending 12-31-2017

**B** Check if applicable
- ☐ Address change
- ☐ Name change
- ☐ Initial return
- ☐ Final return/terminated
- ☐ Amended return
- ☐ Application pending

**C** Name of organization
NU-WAY HOUSE INC

Doing business as

Number and street (or P O box if mail is not delivered to street address) Room/suite
2217 NICOLLET AVENUE SOUTH

City or town, state or province, country, and ZIP or foreign postal code
MINNEAPOLIS, MN 55404

**D** Employer identification number
41-6052957

**E** Telephone number
(612) 767-0309

**G** Gross receipts $ 19,579,831

**F** Name and address of principal officer
DAVID VENNES
2217 NICOLLET AVENUE SOUTH
MINNEAPOLIS, MN 55404

**H(a)** Is this a group return for subordinates? ☐ Yes ☑ No
**H(b)** Are all subordinates included? ☐ Yes ☐ No
If "No," attach a list (see instructions)
**H(c)** Group exemption number ▶

**I** Tax-exempt status ☑ 501(c)(3)   ☐ 501(c) ( ) ◀ (insert no )   ☐ 4947(a)(1) or   ☐ 527

**J** Website: ▶ WWW NUWAY ORG

**K** Form of organization ☑ Corporation ☐ Trust ☐ Association ☐ Other ▶

**L** Year of formation 1966   **M** State of legal domicile MN

## Part I    Summary

**1** Briefly describe the organization's mission or most significant activities
TO PROVIDE A TEMPORARY HOME OR HOMES FOR THE HOMELESS ALCOHOLIC AND ADDICT WITH A SINCERE DESIRE TO ARREST THIS DISEASE (ALCOHOLISM) TO RETURN TO A USEFUL LIFE, AND FIND CONTENTMENT IN SOBRIETY

**2** Check this box ▶ ☐ if the organization discontinued its operations or disposed of more than 25% of its net assets

| | | |
|---|---|---|
| **3** Number of voting members of the governing body (Part VI, line 1a) | **3** | 8 |
| **4** Number of independent voting members of the governing body (Part VI, line 1b) | **4** | 8 |
| **5** Total number of individuals employed in calendar year 2017 (Part V, line 2a) | **5** | 204 |
| **6** Total number of volunteers (estimate if necessary) | **6** | |
| **7a** Total unrelated business revenue from Part VIII, column (C), line 12 | **7a** | -32,841 |
| **b** Net unrelated business taxable income from Form 990-T, line 34 | **7b** | -32,841 |

| | Prior Year | Current Year |
|---|---|---|
| **8** Contributions and grants (Part VIII, line 1h) | 5,413 | 0 |
| **9** Program service revenue (Part VIII, line 2g) | 12,875,660 | 19,505,762 |
| **10** Investment income (Part VIII, column (A), lines 3, 4, and 7d ) | 49,118 | 15,929 |
| **11** Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | -14,597 | -42,559 |
| **12** Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 12,915,602 | 19,479,132 |
| **13** Grants and similar amounts paid (Part IX, column (A), lines 1-3 ) | 0 | 0 |
| **14** Benefits paid to or for members (Part IX, column (A), line 4) | 0 | 0 |
| **15** Salaries, other compensation, employee benefits (Part IX, column (A), lines 5-10) | 5,696,320 | 7,889,203 |
| **16a** Professional fundraising fees (Part IX, column (A), line 11e) | 0 | 0 |
| **b** Total fundraising expenses (Part IX, column (D), line 25) ▶ 0 | | |
| **17** Other expenses (Part IX, column (A), lines 11a-11d, 11f-24e) | 5,187,110 | 8,103,787 |
| **18** Total expenses Add lines 13-17 (must equal Part IX, column (A), line 25) | 10,883,430 | 15,992,990 |
| **19** Revenue less expenses Subtract line 18 from line 12 | 2,032,172 | 3,486,142 |

| | Beginning of Current Year | End of Year |
|---|---|---|
| **20** Total assets (Part X, line 16) | 10,255,702 | 15,074,144 |
| **21** Total liabilities (Part X, line 26) | 1,723,503 | 15,992,990 |
| **22** Net assets or fund balances Subtract line 21 from line 20 | 8,532,199 | 12,030,909 |

*(handwritten annotations:)* GOV'T ✱ PROGRAM REVENUE ✱ TOTAL REVENUE

## Part II    Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge

**Sign Here**

| Signature of officer | 2018-11-09 Date |
|---|---|
| JOHN MARSTON CHIEF FINANCIAL OFFICER | |
| Type or print name and title | |

**Paid Preparer Use Only**

| Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|
| LAWRENCE H MOHR CPA | LAWRENCE H MOHR CPA | | | P00447603 |
| Firm's name ▶ BAKER TILLY VIRCHOW KRAUSE LLP | | | Firm's EIN ▶ 39-0859910 | |
| Firm's address ▶ 225 S 6TH ST 7300 | | | Phone no (612) 876-4500 | |
| MINNEAPOLIS, MN 55402 | | | | |

May the IRS discuss this return with the preparer shown above? (see instructions)  ☑ Yes ☐ No

**For Paperwork Reduction Act Notice, see the separate instructions.**    Cat No 11282Y    Form **990** (2017)

Att. p. 27

# WALSH AFF. EX. A-1

| efile GRAPHIC print - DO NOT PROCESS | As Filed Data - | DLN: 93493318020519 |
|---|---|---|

| Form **990** | **Return of Organization Exempt From Income Tax** | OMB No 1545-0047 |
|---|---|---|
| | Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations) | **2018** |
| Department of the Treasury Internal Revenue Service | ► Do not enter social security numbers on this form as it may be made public ► Go to *www.irs.gov/Form990* for instructions and the latest information. | Open to Public Inspection |

**A** For the 2019 calendar year, or tax year beginning 01-01-2018 , and ending 12-31-2018

**B** Check if applicable
- ☐ Address change
- ☐ Name change
- ☐ Initial return
- ☐ Final return/terminated
- ☐ Amended return
- ☐ Application pending

**C** Name of organization
NU-WAY HOUSE INC

Doing business as

Number and street (or P O box if mail is not delivered to street address)   Room/suite
2217 NICOLLET AVENUE SOUTH

City or town, state or province, country, and ZIP or foreign postal code
MINNEAPOLIS, MN  55404

**D** Employer identification number
41-6052957

**E** Telephone number
(612) 767-0309

**G** Gross receipts $ 31,335,940

**F** Name and address of principal officer
DAVID VENNES
2217 NICOLLET AVENUE SOUTH
MINNEAPOLIS, MN  55404

**H(a)** Is this a group return for subordinates? ☐Yes ☑No
**H(b)** Are all subordinates included? ☐Yes ☐No
If "No," attach a list (see instructions)

**I** Tax-exempt status ☑ 501(c)(3)  ☐ 501(c) (  ) ◄ (insert no )  ☐ 4947(a)(1) or  ☐ 527
**J** Website: ► WWW NUWAY ORG
**H(c)** Group exemption number ►

**K** Form of organization ☑ Corporation ☐ Trust ☐ Association ☐ Other ►    **L** Year of formation 1966  **M** State of legal domicile MN

## Part I   Summary

**Activities & Governance**

1 Briefly describe the organization's mission or most significant activities
TO PROVIDE A TEMPORARY HOME OR HOMES FOR THE HOMELESS ALCOHOLIC AND ADDICT WITH A SINCERE DESIRE TO ARREST HIS DISEASE (ALCOHOLISM) TO RETURN TO A USEFUL LIFE, AND FIND CONTENTMENT IN SOBRIETY

2 Check this box ► ☐ if the organization discontinued its operations or disposed of more than 25% of its net assets

| | | |
|---|---|---|
| 3 Number of voting members of the governing body (Part VI, line 1a) | **3** | 9 |
| 4 Number of independent voting members of the governing body (Part VI, line 1b) | **4** | 9 |
| 5 Total number of individuals employed in calendar year 2018 (Part V, line 2a) | **5** | 261 |
| 6 Total number of volunteers (estimate if necessary) | **6** | 10 |
| 7a Total unrelated business revenue from Part VIII, column (C), line 12 | **7a** | -31,739 |
| b Net unrelated business taxable income from Form 990-T, line 34 | **7b** | -28,139 |

| | Prior Year | Current Year | |
|---|---|---|---|
| **Revenue** | | | |
| 8 Contributions and grants (Part VIII, line 1h) | 0 | 40,584 | GOV'T |
| 9 Program service revenue (Part VIII, line 2g) | 19,505,762 | 31,138,387 | * PROGRAM REVENUE |
| 10 Investment income (Part VIII, column (A), lines 3, 4, and 7d) | 15,929 | 18,965 | |
| 11 Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | -42,559 | -59,132 | |
| 12 Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 19,479,132 | 31,138,804 | * TOTAL REVENUE |
| **Expenses** | | | |
| 13 Grants and similar amounts paid (Part IX, column (A), lines 1-3 ) | 0 | 1,300,000 | |
| 14 Benefits paid to or for members (Part IX, column (A), line 4) | 0 | | |
| 15 Salaries, other compensation, employee benefits (Part IX, column (A), lines 5-10) | 7,889,203 | 11,976,242 | |
| 16a Professional fundraising fees (Part IX, column (A), line 11e) | 0 | | |
| b Total fundraising expenses (Part IX, column (D), line 25) ► 0 | | | |
| 17 Other expenses (Part IX, column (A), lines 11a-11d, 11f-24e) | 8,103,787 | 13,791,685 | |
| 18 Total expenses Add lines 13-17 (must equal Part IX, column (A), line 25) | 15,992,990 | 27,067,927 | |
| 19 Revenue less expenses Subtract line 18 from line 12 | 3,486,142 | 4,070,877 | |

| **Net Assets or Fund Balances** | Beginning of Current Year | End of Year |
|---|---|---|
| 20 Total assets (Part X, line 16) | 15,074,144 | 20,355,109 |
| 21 Total liabilities (Part X, line 26) | 3,043,235 | 4,249,084 |
| 22 Net assets or fund balances Subtract line 21 from line 20 | 12,030,909 | 16,106,025 |

## Part II   Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge

| Sign Here | Signature of officer | 2019-11-05 Date |
|---|---|---|
| | JOHN MARSTON CHIEF FINANCIAL OFFICER Type or print name and title | |

| Paid Preparer Use Only | Print/Type preparer's name | Preparer's signature | Date 2019-11-05 | Check ☐ if self-employed | PTIN P00447503 |
|---|---|---|---|---|---|
| | Firm's name ► BAKER TILLY VIRCHOW KRAUSE LLP | | | Firm's EIN ► 39-0859910 | |
| | Firm's address ► 225 S 6TH ST 2300 MINNEAPOLIS, MN  55402 | | | Phone no (612) 876-4500 | |

May the IRS discuss this return with the preparer shown above? (see instructions)  ☑ Yes ☐ No

For Paperwork Reduction Act Notice, see the separate instructions.    Cat No 11282Y    Form **990** (2018)



WALSH AFF. EX. A-2





WALSH AFF. EX. B

 **DEPARTMENT OF HUMAN SERVICES**

DHS-4138-ENG                    7-18

MINNESOTA HEALTH CARE PROGRAMS (MHCP)

# Provider Agreement

As a participating provider in Minnesota Health Care Programs (MHCP) administered by the Minnesota Department of Human Services (DHS), the provider agrees to:

1. Furnish DHS, the Secretary of the U.S. Department of Health and Human Services (DHHS), or the Minnesota Medicaid Fraud Control Unit (MFCU) with such information as it may request regarding payments claimed for services provided under these programs.

2. Comply with all federal and state statutes and rules relating to the delivery of services to individuals and to the submission of claims for such services.

3. Provide to DHS its National Provider Identifier (NPI) and include its NPI on all claims, if Provider is eligible for an NPI.

4. Comply with all provisions of Minnesota Statutes 62J.536, which requires electronic transmission of claims, eligibility and other transactions, using DHS' secure, HIPAA-compliant, automated transaction tool MN-ITS.

5. Accept as payment in full, amounts paid in accordance with schedules established by DHS, except where payment by the recipient has been authorized by DHS.

6. Enroll in electronic funds transfer (EFT) if Provider is a pay-to provider and if requested by DHS.

7. Ensure, when required by law, that a health service program administered by DHS is the payer of last resort by ascertaining the legal and financial liabilities of third parties to pay for covered services, and pursuing such third party payments.

8. Assume full responsibility for the accuracy of claims submitted to DHS in accordance with the certification requirements of 42 CFR 455.18 and Minnesota Statutes 256B.27, subd. 2.

9. Submit claims at no more than Provider's usual and customary fee to the general public and only after the medical care or service has been provided, in accordance with Minnesota Rules 9505.0450, subp. 1.

10. Except for claims for services under a waiver program, submit claims only for services, supplies, and equipment that are medically necessary as defined at Minnesota Rules 9505.0175, subp. 25, and that meet professionally recognized standards of health care, that Provider knows or has reason to know are properly reimbursable under federal and state statutes and rules.

11. Make full disclosure of ownership and control information as required by 42 CFR 455.100 - 455.106, and upon request, full disclosure of business transactions, as is required by 42 CFR 455.105.

12. Make full disclosure of persons convicted of program crimes as required by 42 CFR 455.106.

13. Ensure that Provider, all of its owners, managers, employees and contractors are not excluded from participation in Medicare, Medicaid or other federal health care programs, by searching the Office of Inspector General List of Excluded Individuals/Entities (LEIE) at the time of enrollment, before hiring new employees or entering into a contract with a contractor, and monthly to see changes since the last search. Provider must immediately report any exclusion information discovered to DHS.

14. Verify recipient eligibility before rendering services.

| PROVIDER NAME | AUTHORIZED INITIALS | NPI/UMPI | PROVIDER TYPE |
|---|---|---|---|
| | | | |

Att. p. 30

WALSH AFF. EX. B

15. Comply with all federal statutes, implementing regulations and guidance prohibiting discrimination on the basis of race, color, national origin, sex, age, religion and disability in any program or activity receiving federal financial assistance from DHHS.

16. Render to recipients services of the same scope and quality as would be provided to the general public, within MHCP guidelines, in accordance with Section 1902(a)(10)(B) – (E) of the Social Security Act.

17. Comply with the provisions of any fully executed addendum required by DHS, which is incorporated with the provider agreement (that is, the addendum becomes part of the original provider agreement).

18. Ensure that its employees and contractors comply with all MHCP requirements, including any requirements added post-enrollment.

19. Comply with the advance directive requirements if provider is a hospital, nursing facility, provider of home health care, personal care assistance services, hospice, or managed care organization (MCO), as required by 42 CFR 489.102 and 417.436.

20. Maintain records that fully disclose the extent of services provided to MHCP recipients for a period of five years after the initial date of billing DHS, in accordance with Minnesota Rules 9505.2160 – 9505.2245, or for the duration of contested case proceedings, whichever is longer.

21. Ensure proper handling and safeguarding by provider employees, contractors, and authorized agents of protected information collected, created, used, maintained, or disclosed on behalf of DHS. For the purposes of this Agreement, "protected information" means data subject to any of the laws described below in 21.A. This responsibility includes:

A. Ensuring that employees and agents of the provider comply with and are properly trained about:

(1) The Minnesota Government Data Practices Act (MGDPA), Minnesota Statutes Chapter 13, in particular 13.46 Welfare Data;

(2) The Minnesota Medical Records Act, Minnesota Statutes 144.291 – 144.298;

(3) The federal Health Insurance Portability and Accountability Act (HIPAA), including but not limited to the requirements of the Privacy Rule and Security Regulations, 45 CFR 160 and 164;

(4) Federal law and regulations that govern the use and disclosure of substance abuse treatment records, 42 USC Sec.290dd-2 and 42 CFR 2.1 – 2.67; and

(5) Any other applicable state and federal statutes, rules, and regulations affecting the collection, storage, use and dissemination of private or confidential information.

B. Ensuring, consistent with the laws stated in 21.A, that the provider's employees, contractors, and authorized agents:

(1) Do not use or further disclose protected information created, collected, received, stored, used, maintained or disseminated in the course or performance of this Agreement other than as necessary to perform their obligations under this Agreement, or as required by law, either during the period of this Agreement or thereafter (respectively, 45 CFR 164.502(b) and 164.514(d), and Minnesota Statutes 13.05, subd. 3).

(2) Use appropriate administrative, physical, and technical safeguards to prevent use or disclosure of the protected information other than as provided for by this Agreement and to ensure the confidentiality, integrity, and availability of any protected health information that it creates, receives, maintains, or transmits on behalf of DHS.

(3) Do not transmit PHI over the internet or any other unsecure or open communication channel unless such information is encrypted or otherwise safeguarded using procedures no less stringent than those described in 45 CFR 164.312. If the provider stores or maintains PHI in encrypted form, provider shall, at DHS' request,

| PROVIDER NAME | AUTHORIZED INITIALS | NPI/UMPI | PROVIDER TYPE |
|---|---|---|---|
| | | | |

WALSH AFF. EX. B

promptly provide DHS with the key or keys to decrypt such information. Provider shall not forward previously encrypted data to any other party, unless otherwise required by this Agreement.

(4) Mitigate, to the extent practicable, any harmful effects known to provider of a use, disclosure, or breach of security with respect to protected information by provider in violation of this Agreement.

(5) Make the required notifications upon discovery of a breach, as defined in 45 CFR 164.402, of unsecured PHI to DHS, to each individual whose unsecured PHI has been breached, and, when the breach involves the unsecured PHI of more than 500 people, to the media of a state or jurisdiction. See 45 CFR 164.400 – 414.

22. Accept and be bound by the terms and conditions of DHS' EDI Trading Partner Agreement when billing electronically. Provider acknowledges that any organization or individual that submits claims on its behalf will abide by the EDI Trading Partner Agreement as an agent of provider. Provider authorizes the agent to bind provider to the terms of the EDI Trading Partner Agreement. Provider will give each EDI trading partner an individual login ID and password.



23. For provider entities receiving or making Medicaid payments totaling at least $5 million annually, establish written policies and procedures for the education of all employees, contractors and agents, that includes information about the False Claims Act and other provisions named in Section 1902(a)(68)(A) of the Social Security Act.

24. Determine the applicability to provider of any other state or federal laws and ensure compliance with those laws.

25. Cooperate with DHS audit procedures.

26. Execute any required Assurance Statements and provide certification or licensure information if required by DHS for a particular provider type. Provider also agrees to notify DHS of any changes to its certification or licensure status.

27. Comply with Minnesota Statutes 256B.0644 as a requirement of participation in other state health care programs. Provider agrees to provide active caseload data upon DHS' request and at least 10 days before limiting acceptance of new MHCP recipients.

28. Refund any overpayments made to provider by DHS, including those resulting from payments made by Medicare, third party payers, billing errors, fraudulent billing, and from increased interim payments made pursuant to DHS' plan for continuity of operations during times of pandemic and crisis.

29. Notify DHS no later than 30 days before the effective dater of a sale, merger, or transfer of an enrolled entity, in accordance with Minnesota Rules 9505.0195, subp. 8. Failure to notify DHS may result in the sale or transfer not becoming effective with DHS for any purpose, including claims processing, payment of claims and claims adjustments. Provider also agrees to notify DHS whether it intends to transfer its National Provider Identifier (NPI) or its Federal Employer Identification Number (FEIN) to the new owner and to complete any documentation or addenda DHS requires, including a Provider Entity Sale or Transfer Addendum. Provider acknowledges that upon sale, merger or transfer of the enrolled entity, DHS will recognize the effective date of the sale or transfer as the date from which all claims payments or adjustments will be assigned to the new owner, without regard to date of service, date of submission to DHS, or adjudication date, including those resulting from a later audit or reprocessed claims. Any intent on the part of the provider or purchaser to the contrary must be addressed in the purchase agreement and transfer documents and is the responsibility of provider and purchaser to enforce. DHS retains the right to pursue monetary recovery, or civil or criminal actions against the seller or transferor. Nothing in this Agreement negates the obligation of the new owner to contact DHS by the effective date of sale, merger or transfer.

30. Accept that this Agreement may be immediately terminated for either of the following:

| PROVIDER NAME | AUTHORIZED INITIALS | NPI/UMPI | PROVIDER TYPE |
|---|---|---|---|
| | | | |

DHS-4138-ENG  7-18

Att. p. 32

WALSH AFF. EX. B

A. At the discretion of DHS if it determines that provider has violated a material term of the agreement, including but not limited to:

    (1) Noncompliance by provider with the HIPAA Privacy Rule and Security Standards. If termination is not feasible, DHS shall report the breach to the secretary of DHHS.

    (2) Failure of Provider to sign a new Agreement within 30 days of a request from DHS, in accordance with Minnesota Rules 9505.0195, subp. 5.

B. Upon sale or transfer of the enrolled Provider.

31. Ensure that upon termination of this Agreement, provider shall continue to:

A. Extend all of the protections of this Agreement to all of the protected information DHS provides to the provider, or created or received by provider on behalf of DHS, that provider still maintains in any form, including information that is in the hands of the contractors and agents of the provider, and limit its further use and disclosure.

B. Maintain all other records of claims submitted for a minimum of five years, consistent with paragraph 20 of this Agreement.

32. Accept that any ambiguity in this Agreement will be resolved to permit DHS to comply with HIPAA, MDGPA, and other applicable state and federal statutes, rules, and regulations affecting the collection, storage, use and dissemination of private or confidential information and other state and federals laws and regulations.

## Signature requirements for this provider agreement

- All individual and organizational applicants: Type your provider name, the NPI or UMPI, and the provider type on the first page of this agreement. This will carry over to pages 2 and 3.
- Individual applicants: Initial each page of this provider agreement. Write the name and title of person signing and sign the last page of this agreement.
- Organizational applicants: An administrator, manager, director or other person authorized to sign must initial each page, write the name and title of the person signing, and sign the last page of this agreement. This person must also be disclosed on the Disclosure of Ownership and Control Interest of an Entity (DHS-5259) (PDF).

**Digitally entered initials are not acceptable on pages 1 to 3.**

**Digital signatures or typed name, title and date are not acceptable on the last page of the agreement.**

| NAME OF PERSON SIGNING (Please print) | TITLE | |
|---|---|---|
| SIGNATURE | | |
| | DATE (m/d/yyyy) | |

Fax the signed Provider Agreement with all other required documentation.

If the applicant is submitting additional or supporting documentation, use the fax number shown on the applicable addendum.

The following providers must fax the signed Provider Agreement as follows:

- Personal care provider organizations, fax to 651-431-7465.
- Home and community-based waiver providers, fax to 651-431-7493.
- All other provider types, fax to 651-431-7462.

DHS-413B-ENG  7-18

WALSH AFF. EX. C



Call Us Today

Treatment Services    Admissions    Partners    Careers    Events    About    Contact Us

## RECOVERY RESIDENCES

NUWAY's recovery residence partners are easily accessible and located near our outpatient counseling centers. Our model of outpatient with recovery residence support removes the housing barrier many in early recovery face. Additionally, upon completion of treatment at NUWAY, clients have the ability to remain in their recovery residence, further reducing barriers to long-term recovery.

COVID-19 RECOVERY RESIDENCE LOCATION & PRICING INFORMATION:

In acknowledgment of the unique circumstances and needs resulting from COVID-19, NUWAY is working dynamically to identify and facilitate support in new recovery supportive environments aligned with the geographic needs of those seeking care outside of our currently established service areas.

Please contact a member of our admissions team at any NUWAY location to discuss your circumstances and needs.

The COVID-19 outbreak is a threat to health as well as economic security. NUWAY and its recovery residence partners know that safe, supportive recovery housing is a crucial resource. Many of our recovery residence partners are temporarily reducing or eliminating deposits, and offering flexible monthly fees to ensure that supportive recovery housing remains available to those who need it. Prices listed below may not reflect these reduced rates. Please contact residences to learn more about current pricing.

Att. p. 34

WALSH AFF. EX. C

Read COVID-19 guidance for individuals and operators provided by the National Alliance for Recovery Residences (NARR).

 NUWAY provides recovery residence support up to $550.00 per month toward program fees at a Recovery Residence for treatment compliant NUWAY clients. 

Deposit and any difference beyond $550.00 in monthly program fees are the responsibility of the client.

Please use the options below to filter the list of recovery residences.

You can print your filtered selection (or the entire list) by clicking the Print button below.

**Gender**
- ☐ Men (58)
- ☐ Women (37)
- ☐ LGBTQIA (8)

**City**
- ☐ Minneapolis (45)
- ☐ St Paul (42)
- ☐ S Minneapolis (10)
- ☐ Rochester (8)
- ☐ Columbia Heights (6)
- ☐ Duluth (6)

See 25 more

**Within 5 Miles of**
- ☐ 3R's NUWAY Counseling Center (36)
- ☐ NUWAY – University Counseling Center (36)
- ☐ 2118 NUWAY Counseling Center (32)
- ☐ NUWAY – Duluth Counseling Center (4)
- ☐ NUWAY – Rochester Counseling Center (4)
- ☐ St. Paul NUWAY Counseling Center (1)

**More Info**
- ☐ Suboxone supportive (80)
- ☐ MASH member (70)
- ☐ Methadone supportive (44)
- ☐ Felon friendly (30)
- ☐ Faith based (11)

 Print

1 Village Housing
(Amaris/Atlas/Oakland Homes)
**Contact:** Tamuno or Stacy
**Email:** oaklandhouse612@gmail.com
**Phone:** 612.272.6659

2nd Chances Housing
**Contact:** Skeeter Scanlon
**Email:** 2ndchanceshousingllc@gmail.com
**Phone:** 651.458.0097
**Program Fees/Deposit:** $600/$200

A Way Out Sober Living
**Contact:** Derrick Haase
**Email:** derrick@awayoutsoberliving.com
**Phone:** 612.916.8770
**Program Fees/Deposit:** $700/$500

WALSH AFF. EX. D

# 2020 LEGISLATIVE ISSUES



# MENTAL HEALTH LEGISLATIVE NETWORK OF MINNESOTA

**1919 University Ave. W., Suite 400, St. Paul, MN 55104**

1

WALSH AFF. EX. D

# MENTAL HEALTH LEGISLATIVE NETWORK 2019

The Mental Health Legislative Network (MHLN) is a broad coalition that advocates for a statewide mental health system that is of high quality, accessible and has stable funding. The organizations in the MHLN all work together to create visibility on mental health issues, act as a clearinghouse on public policy issues and to pool our knowledge, resources and strengths to create change.

This booklet provides important information for legislators and other elected officials on how to improve the lives of children and adults with mental illnesses and their families and how to build Minnesota's mental health system.

The following organizations are members of the Mental Health Legislative Network:

Allina Health
Amherst H. Wilder Foundation
AspireMN
Barbara Schneider Foundation
Canvas Health
Catholic Charities of St. Paul and Minneapolis
Children's HealthCare Minnesota
Community Involvement Programs
Emily Program Foundation
Fraser
Goodwill Easter Seals
Guild Incorporated
Hennepin HealthCare
Lutheran Social Service of Minnesota
Mental Health Minnesota
Mental Health Providers Association of Minnesota
Mental Health Resources
MMLA/Minnesota Disability Law Center
Minnesota Association for Children's Mental Health
Minnesota Association of Community Mental Health Programs
Minnesota Coalition of Licensed Social Workers
Minnesota Association of Marriage and Family Therapy
Minnesota Behavioral Health Network

MN Office of Ombudsman for Mental Health and Developmental Disabilities
Minnesota PROOF Alliance, formerly MOFAS
Minnesota Psychiatric Society
Minnesota Psychological Association
Minnesota Recovery Connection
Minnesota Society for Clinical Social Work
Minnesota School Social Workers Association
NAMI Minnesota
National Association of Social Workers, Minnesota Chapter
NUWAY
People Incorporated
Resource, Inc.
Rise
State Advisory Council on Mental Health
Subcommittee on Children's Mental Health
Touchstone Mental Health
Vail Place
Wellness in the Woods

If you have questions about the Mental Health Legislative Network or about policies related to the mental health system, please feel free to contact NAMI Minnesota at 651-645-2948 or Mental Health Minnesota at 651-493-6634. These two organizations co-chair the Mental Health Legislative Network.

Att. p. 37

WALSH AFF. EX. D

# TABLE OF CONTENTS

Mental Illnesses -------------------------------------------------- 4

The Mental Health System --------------------------------------- 5

Key Issues for the 2019 Legislative Session --------------------- 6

System Issues ---------------------------------------------------- 7—10
- Reimbursement Rates
- Telemedicine
- USS
- Network Adequacy
- Certified Community Behavioral Health Clinics
- MA Waivers
- Direct Care and Treatment
- Hospital Beds

Adult Mental Health Services and Supports --------------------- 11—15
- Flow Issues
- Housing
- Crisis Response
- Peer Respite
- Clubhouse or Community Support Programs
- First Episode
- Employment
- Behavioral Health Homes
- Sober Homes

Children's Mental Health ---------------------------------------- 16—18
- Early Childhood Consultation
- School-Linked Mental Health Grants
- Children's Mental Health Supports
- Education
- Conversion Therapy

Access to Mental Health Treatment ----------------------------- 19—20
- Workforce
- Suicide Prevention
- Community Mental Health Treatment
- Racial Disparities and Mental Health Equity

Criminal Justice ------------------------------------------------- 21—22
- Criminal Justice
- Prisons

Other Issues ----------------------------------------------------- 23—24
- Civil Commitment
- Provision of Care in Integrated and Culturally Diverse Settings
- Cannabis Legalization

3

WALSH AFF. EX. D

## Sober Homes

**Issue:** Minnesota should encourage all recovery residences in the state to adhere to quality standards to ensure consistent, high-quality support for people with substance use disorders living in recovery residences.

**Background:** Recovery Housing refers to safe, healthy, and substance-free living environments that support individuals in recovery. The intent of recovery housing is to provide peer support and a connection to services that promote long-term recovery. Individuals with histories of addiction generally lack essential recovery capital such as; low or no income; poor rental history; poor credit; limited education; and limited work history.

As a result, many of these individuals have difficulty accessing private or public housing. Some federal policies do not classify addiction as a disability; therefore, individuals with histories of addiction cannot access the same income, employment, and housing benefits available to people with mental illness or other disabilities. For example, people in addiction recovery cannot access Medicaid coverage through the Aged, Blind, and Disabled category, nor can they access disability income, vocational rehabilitation services, and Section 8 rental assistance.

Because Sober Home residents are not tenants, they also have very few protections under the law. Rule violations or a relapse can lead to immediate discharge—often in the middle of the night—placing them in a very vulnerable situation where continued relapse is likely.

In October 2019 the Substance Abuse and Mental Health Services Administration announced their recovery housing best practices suggestions. These recommendations mirror the National Alliance of Recovery Residences. Minnesota's affiliate to the national alliance is the Minnesota Association of Sober Homes.

Minnesota does not know how many recovery residences are operating in the state. This is problem is exacerbated by confusion with other programs like halfway houses. Other than passing the city requirements for operating there is no mandate for recovery residences to participate in other quality standards. It should be noted however, that the Minnesota Association of Sober Homes (MASH) has fully adopted the SAMHSA/NARR best practices standards and is currently implementing these comprehensive standards for all of its 186 member recovery homes in the State of Minnesota.

**Policy Recommendations:** There are policy considerations the legislature can consider to encourage recovery residences to adopt the SAMHSA recommended standards.
- Fund a study to establish a baseline of standards and consistent quality in the operation of recovery residences

15

Att. p. 39

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, *ex rel.* Tim Walsh; | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| NuWay Housing, Inc. d/b/a NUWAY, David J. | ) |
| Vennes, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |

CASE NO _____

**AFFIDAVIT OF TRACY RONNING**

I, Tracy Ronning, being first duly sworn, depose and state as follows:

1.    I am a Licensed Marriage and Family Therapist ("LMFT"). I am a Minnesota Board of Marriage and Family Therapy approved supervisor and a Minnesota Board approved supervisor of Behavioral Health and Therapy ("BBHT") Licensed Drug and Alcohol Counselor ("LADC") and Licensed Professional Clinical Counselor ("LPCC"). I have been a licensed mental health professional for six years and have focused my training and practice totalling nine years on chemical dependency and mental health counseling.

2.    I am currently employed at Minnesota Adult and Teen Challenge ("MNTC") as the Director of Outpatient Clinical Services. In this role I work with patients who live in state-licensed supportive housing at MNTC and need outpatient mental health and substance use disorder treatment. I also clinically supervise treatment providers.

3.    The appropriate level of care needed by a patient is determined using an objective assessment set forth in Minnesota Statutes Chapter 245G.05 and Minnesota Rules Part 9530.6622 based on a particular patient's history, chronicity, and the severity of their addiction.

This comprehensive assessment is evidence-based and analyzes six dimensions of patient risk to determine the appropriate level of care the patient needs.

4.      Over the past two years, I have personally witnessed 15-20 patients making a decision to attend NUWAY outpatient treatment in order to receive free housing and associated freedoms that are not the clinically appropriate level of care based on assessments.

5.      The general pattern for patients seeking treatment is that they start in state-licensed residential treatment (2 weeks to 90 days) and move to long-term state-licensed supportive housing as they realize the degree of their addiction and their need for stabilization. However, based on my review of our intake and discharge records, up to 70% of women in MNTC licensed residential treatment program have transferred to NUWAY high-intensity outpatient treatment over the last year (one point-in-time analysis demonstrated a 70% transfer rate). Typically, about 40% of these patients would transfer in to MNTC's licensed long-term supportive housing programs.

6.      I have also observed men leaving MNTC long term supportive housing, wherein they were receiving only 4 hours of low intensity outpatient treatment, and who have been sober for nearly one year, transferring to NUWAY high intensity outpatient program due to the lure of free housing and associated freedoms.

7.      Based on our discharge records and evaluations, these transfers to high-intensity outpatient treatment descibed in paragraphs 5 and 6 above are inappropriately providing either less or more care to these patients.

**Pattern 1: Patients needing higher levels of supports and care are shifting to what is, in reality, a lower level of care and support at NUWAY.**

-2-

8.      In consultation and supervision with LADC's and assessing patients current risk ratings, I have witnessed a pattern where a patient has been residing in long-term supportive housing, with high levels of care, and outpatient mental health and substance use disorder treatments due to a demonstrated need for on-going high levels of mental health and chemical dependency stability in a controlled environment. But these patients discharge prematurely, before the treatment duration is complete, in order to attend NUWAY outpatient treatment with free housing.

**Pattern 2:  Patients needing a lower level of care being admitted to NUWAY high-intensity outpatient treatment at NUWAY.**

9.      The second pattern I have witnessed involves patients with current risk ratings (referred to colloquially as "Rule 25" or "Comprehensive assessments") showing that they are (1) stabilized with respect to chemical dependency and mental health, (2) compliant with medications, and (3) substance-free and are clinically ready for a lower level of care. Low-intensity treatment is comprised of an average of four hours per week of chemical dependency counseling services. These patients are nonetheless being admitted to NUWAY high-intensity outpatient treatment with "free housing".

10.      Patients receiving unnecessary treatment in order to access NUWAY's "free housing" is a burden of cost born by the federal and state governments and takes limited funds away from others needing treatment.

11.      When patients leave treatment, a "discharge summary" is required by law and prepared and remains a part of a patient's records. These discharge summaries indicate the status of the patient and the assessment recommendation for on-going treatment and care. These discharge summaries, which report progress and risks along the objective six dimensions, can and should be used by NUWAY in accompaniment with their own chemical health Rule 25 assessment to

-3-

determine the appropriate level of care. The appropriate level of care should align with the discharge report if there have been no significant changes in the patient's life.

12.    In conclusion, based on my repeated clinical consultation and supervision of LADC's over multiple years with patients choosing to transfer to NUWAY, I believe that NUWAY's model of enticing patients with "free housing" when they attend NUWAY treatment is unethical self-dealing and unlawful. In addition I have serious ethical concerns that NUWAY's model capitalizes on the basic human need of shelter with little regard to following industry standards of care.


FURTHER AFFIANT SAYETH NOT.



Tracy Ronning


Subscribed and sworn to me before this 28th day of December, 2020.

NOTARY PUBLIC

KIMBERLY LYNN BROWN
NOTARY PUBLIC - MINNESOTA
MY COMMISSION EXPIRES 01/31/24

-4-

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, *ex rel.* Tim Walsh,    ) <br>    ) <br> Plaintiff,    ) <br>    ) <br> v.    ) <br>    ) <br> NU-WAY House, Inc. d/b/a NUWAY, and    ) <br> David J. Vennes,    ) <br>    ) <br> Defendants.    ) <br>    ) <br>    ) <br>    ) | CASE NO _____ <br><br> **AFFIDAVIT OF CRAIG DEAN** <br> **CASSADY** |

I, Craig Dean Cassady, being first duly sworn, depose and state as follows:

1.      I was born on August 25, 1985; I am 35 years old and grew up in Elk River, Minnesota. I started using methamphetamine when I was 11 years old, and used steadily until I was 30 years old.

2.      In 2015, I was convicted of a fifth degree drug offense in Sherburne County. I had a Rule 25 assessment and learned that NUWAY offered free housing and free food as long as I would attend treatment four hours/day, for three days/week.

3.      I had a lot of freedom to do what I wanted. Outside of treatment, my only obligation was to attend one house meeting per week. I started using methamphetamine about two months in to my stay at the sober home. After three months at the NUWAY program, I had relapsed multiple times and was kicked out of the program.

4.      I tried a 30-day intensive inpatient treatment at New Beginnings in Waverly, Minnesota, followed by a 60-day stay at a halfway house in St. Cloud. I relapsed at the end of

my stay and went to Sherburne County Jail for four months. I received treatment services during my time in jail. I started using again when I got out.

5.    In 2017, I was charged with drug offenses in Hennepin County. I was offered the option to either go to treatment or jail. I learned that NUWAY provided free housing, free food, and free time as long as I attended their outpatient treatment for four hours per day, three days a week. NUWAY arranged for my sober housing. They pushed the housing so that your insurance would get you treatment. I was left to do what I chose after I attended the required treatment, and I was able to continue using methamphetamine the entire time.

FURTHER AFFIANT SAYETH NOT.


_____
Craig Dean Cassady

Subscribed and sworn to me before this ___9___ day of ~~October,~~ 2020.
                                        *November*

_____   11-9-20
NOTARY PUBLIC

LARA SOLVEIG NEWMAN
Notary Public
Minnesota
My Commission Expires
Jan 31, 2025

2

Att. p. 45

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| United States of America, *ex rel.* Tim Walsh, | ) | |
| | ) | CASE NO _____ |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **AFFIDAVIT OF TRAVIS RAE** |
| NU-WAY Housing, Inc. d/b/a NUWAY, and | ) | **MCALPIN** |
| David J. Vennes, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

I, Travis Rae McAlpin, being first duly sworn, depose and state as follows:

1.      I was born on March 22, 1985; I am 35 years old and a lifelong resident of Crystal, Minnesota.  I have struggled with alcoholism for eight years.

2.      In February 2015, I entered a 30-day inpatient treatment program at Fairview Health Services in Minneapolis.

3.      In December 2016, I entered New Beginnings licensed residential treatment for 30 days.

4.      In July 2018 I entered the Salvation Army Inpatient Program for Men for five months until December.

5.      In December 2018, I relapsed again.  I had heard about NUWAY paying for rent and decided to try their outpatient services.  In January 2019 I signed paperwork requiring that I attend NUWAY's treatment for four hours per day, five days per week.  In exchange, I would get free housing.  I believe that I needed more intense treatment at the time, but the free housing

--

1

made this option very attractive. I got sober housing at Christ Satisfies in Columbia Heights, one of NUWAY's housing partners. Other than the treatment requirement, I was free to do what I wanted. I started using alcohol almost immediately. The conditions at the sober home were not condusive to long-term sobriety because many residents were using, there were many house rules that I didn't follow and there was no consequence, no accountability. I stayed for one month and relapsed. I decided this model wasn't working for me.

6.      After leaving NUWAY, I went back to the Salvation Army inpatient treatment and completed treatment. I started working and had my own housing and for a time, seemed to be on a good track. Then I relapsed.

7.      I tried other treatment and relapsed.

8.      In January 2020 I attended a 30-day program through NUWAY again, with free housing provided by Serenity Village sober housing in Crystal. I had to attend outpatient treatment at NUWAY in order to have free housing Serenity Village, just like before. This model with so much freedom was not working for me and I relapsed.

FURTHER AFFIANT SAYETH NOT.

_____
Travis Rae McAlpin

Subscribed and sworn to me before this ___9___ day of November, 2020.

_____
NOTARY PUBLIC

LARA SOLVEIG NEWMAN
Notary Public
Minnesota
My Commission Expires
Jan 31, 2025

2

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, *ex rel.* Tim Walsh, | ) |
| | ) |
| Plaintiff, | ) CASE NO _____ |
| | ) |
| v. | ) |
| | ) **AFFIDAVIT OF DON ALAN JOHNSON** |
| NU-WAY Housing, Inc. d/b/a NUWAY, and | ) |
| David J. Vennes, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |

I, Don Alan Johnson, being first duly sworn, depose and state as follows:

     1.    I was born in Minneapolis, in 1971.

     2.    In 2018, I was arrested for vehicle theft and possession of methamphetamine. While I was in Dakota County jail, a staff person who was formerly an employee at NUWAY recommended that I look into NUWAY treatment.

     3.    I explored several options for where to go after leaving jail. Only NUWAY offered free housing. NUWAY had several sober housing options offering $500/month toward housing. I decided to go to Spirit House sober housing, which NUWAY covered up to $500.

     4.    The paperwork I completed for intake required that I agree to attend intensive out-patient treatment at NUWAY for between 90 days and six months. The paperwork described the treatment as four hours/day, five days/week. If I didn't attend treatment, I understood that I would lose the housing.

1

5.      I needed and wanted to have treatment but I also needed housing. The reason I chose NUWAY was because of the free housing. If it wasn't for the housing option at NUWAY, I would not have gone there.

6.      The treatment I received at NUWAY was only touching the surface of my dependency and mental health issues, not really delving in to the core substance. I knew at the time that I needed more intensive treatment.


FURTHER AFFIANT SAYETH NOT.


Don Alan Johnson

Subscribed and sworn to me before this __7__ day of November, 2020.

NOTARY PUBLIC

LARA SOLVEIG NEWMAN
Notary Public
Minnesota
My Commission Expires
Jan 31, 2025

2

Att. p. 49

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| United States of America, *ex rel.* Tim Walsh, | ) | CASE NO _____ |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| NU-WAY Housing, Inc. d/b/a NUWAY, and David J. Vennes, | ) ) ) | **AFFIDAVIT OF JON DAVID KITTELSEN** |
| Defendants. | ) ) ) ) ) | |

I, Jon David Kittelsen, being first duly sworn, depose and state as follows:

1.     I am currently a Minnesota resident, originally from Madison, Wisconsin. I was born there in 1966. I have struggled with drugs and/or alcohol addiction for approximately 40 years.

2.     On or about March 2017, I completed two back-to-back, 60-day licensed residential treatment program regimens at Minnesota Adult & Teen Challenge ("MNTC"). This treatment included 30+ hours of treatment per week, both 1-on-1 drug and mental health counseling as well as group sessions. At the end of the treatment, I was clean, stable and ready to take next steps toward stable, independent living.

3.     As part of completing treatment, my MNTC counselor recommended that I participate in after-care programming comprised of participating in two group sessions each week, and possibly a one-on-one session each week.

4.      I did not have a vehicle or housing at the time, so I explored options where I could remain sober and begin my life anew, with some support until I was back on my feet with a job and a place to live.

5.      I found a place to stay at BSM Sober House ("BSM") in Crystal, Minnesota. The arrangement for my housing there was that NUWAY would pay for my stay there if I attended NUWAY's intensive outpatient treatment. This was more treatment than my counselor recommended but the housing arrangement was enticing. I was required to attend four hours of NUWAY's counseling (both one-on-one and group) for four hours per day, five days per week, far exceeding the aftercare recommended by my counselor at MNTC.

6.      As a condition of receiving free housing, food and transportation to treatment, I understood that if I did not participate in the treatment at NUWAY, I would lose my housing at BSM Sober House or would have to pay for it myself.

7.      Living conditions at BSM were very flexible. As long as I attended the NUWAY treatment for four hours/day, five days/week, the rest of my time was my own. Other residents were using on site and there were several residents who relapse during my approximately 90-day stay.

8.      After completing the 90-day treatment, NUWAY encouraged me to stay longer, but I decided that I had had enough treatment.

2

FURTHER AFFIANT SAYETH NOT.

Jon David Kittelsen

Subscribed and sworn to me before this 9th day of ~~October,~~ 2020.

November

NOTARY PUBLIC          11-9-20

LARA SOLVEIG NEWMAN
Notary Public
Minnesota
My Commission Expires
Jan 31, 2025

3

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, *ex rel.* Tim Walsh,    ) | CASE NO _____ |
| Plaintiffs,    ) | |
| ) | |
| v.    ) | |
| ) | **AFFIDAVIT OF BRIAN JOHN** |
| NU-WAY Housing, Inc. d/b/a NUWAY, and    ) | **BURGGRAFF** |
| David J. Vennes,    ) | |
| ) | |
| Defendants.    ) | |
| ) | |
| ) | |
| ) | |

I, Brian John Burggraff, being first duly sworn, depose and state as follows:

1. I was born in Minneapolis on December 31, 1973, and have been a lifelong resident of Minnesota. I have suffered with drug addiction for much of my life and have been a resident at NUWAY on two separate occasions: first in 1996, and then in 2007. My first experience at NUWAY occurred before they required my attending treatment in order to have free housing and my second experience occurred during the time when they started requiring treatment in order to have free housing.

2. **My 1996 experience at NUWAY.** I was convicted of felony drug charges in 1992 when I was 18 years old and I went to prison in St. Cloud until June of 1996. Shortly after my release in 1996, as part of my parole and condition of release, I went to a NUWAY halfway house in South Minneapolis for 90 days. As part my re-entry, the Department of Corrections

Att. p. 53

paid for my stay. This was before NUWAY offered free housing for its intensive outpatient treatment programming.

There was very little structure at NUWAY. In a typical day, I, along with my two or three roommates would get up, eat breakfast, do a chore, and also attend a weekly house meeting. I also had to attend a weekly AA meeting of my choice off site. There was no treatment required and no controls on where I went or who I interacted with for the remainder of the time. The house was dirty and damp, especially the kitchen and dining hall. The house was very old and beat-up. I stayed at the NUWAY house for approximately three months.

3.    **My 2007 experience at NUWAY.** In 2007, I again found myself in legal trouble due to my addiction, including felony drug offenses. I attended two months of licensed intensive residential treatment at Twin Town Treatment Center in St. Paul, which required that I participate in 30-40 hours of treatment per week and I had significant restrictions put on my activities.

Because I already knew of NUWAY, when I completed my Twin Towns treatment, I looked into the possibility of moving in to a NUWAY halfway house. Based on my Rule 25 assessment, I was qualified for public funding to attend NUWAY. Half way through my stay at the NUWAY sober halfway house, I learned that I could only have free housing at a NUWAY sober house if I attended four hours per day, five days per week, of NUWAY's intensive outpatient treatment programming. Other than attending the NUWAY treatment, I was free to do what I wanted with my days. This was exactly what I wanted, even though it was not what I needed. I had free housing, free food and freedom. I stayed for four months.

--

2

FURTHER AFFIANT SAYETH NOT.

Brian John Burggraff

Subscribed and sworn to me before this _9_ day of November, 2020.

NOTARY PUBLIC

> LARA SOLVEIG NEWMAN
> Notary Public
> Minnesota
> My Commission Expires
> Jan 31, 2025

--

3

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, *ex rel.* Tim Walsh ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> NU-WAY Housing, Inc. d/b/a NUWAY, and ) <br> David J. Vennes, ) <br> ) <br> Defendants. ) <br> ) <br> ) <br> _____) | CASE NO _____ <br><br> **AFFIDAVIT OF ANTON CHRISTIAN JENSEN** |

I, Anton Christian Jensen, being first duly sworn, depose and state as follows:

1.      I was born on July 7, 1989; I am 31 years old.  My parents are drug addicts, and I started using methamphetamine when I was 17 years old and had been using steadily since then until I started residential treatment at Minnesota Adult & Teen Challenge ("MNTC") in August 2019.

2.      In 2008, when I was 19 years old, I went to Regions Hospital Alcohol and Drug Abuse Program ("ADAP") in St. Paul for two months of outpatient treatment.  This treatment included 1-2 hours of sessions each week and I stayed with my mother during this time.  I continued using the entire time.

3.      About three years ago, I went to Lake Shore Treatment Center in Mahtomedi for a 30-day licensed residential program.  I graduated and fell back to using.

4.      Shortly after, and in the fall of 2017, I learned about NUWAY and that I could get free housing paid for by NUWAY.  I signed paperwork that indicated I would get free housing at

1

Oakland House, a sober house partner of NUWAY's in Minneapolis at the time. As a condition of getting the free housing, I had to agree to show up for NUWAY's intensive outpatient treatment. If you missed 3-4 treatment days, you would lose your housing. Aside from attending NUWAY treatment, I could do what I wanted at the sober house. I was using on site and relapsed two times at Oakland House and was kicked out after 30 days.

5.    I then went back to Lake Shore residential treatment for 30 days and returned to NUWAY upon completing that treatment in the fall of 2018. Again I signed an agreement and understood that my sober housing in North Minneapolis was free as a condition of attending NUWAY treatment. The conditions were the same in this new sober house: aside from attending NUWAY treatments 4 hours/day, five days/week, I was free to do what I wanted. My roommate was using and I soon started using again as well on site. I was kicked out again after two months. FURTHER AFFIANT SAYETH NOT.

_____

Anton Christian Jensen

Subscribed and sworn to me before this _10_ day of November, 2020.

_____

NOTARY PUBLIC



LARA SOLVEIG NEWMAN
Notary Public
Minnesota
My Commission Expires
Jan 31, 2025

2

Att. p. 57