**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| UNITED STATES OF AMERICA, the STATE of MINNESOTA *ex rel*. JOHN MARSTON,<br><br>      Plaintiffs,<br><br>vs.<br><br>NUWAY ALLIANCE, NUWAY HOUSE, INC., DAVID J. VENNES, and KENNETH L. ROBERTS,<br><br>      Defendants. | Civil Action No. _____<br><br><br>**FILED UNDER SEAL** |

<u>**COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**</u>

# **TABLE OF CONTENTS**

I.  INTRODUCTION ........................................................................................................1

II.  JURISDICTION AND VENUE ....................................................................................3

III.  PARTIES .....................................................................................................................3

IV.  APPLICABLE FEDERAL AND STATE LAWS AND REGULATIONS ......................7

    A.  United States and Minnesota Government Health Care Programs .........................7

        1.  Government Health Care Program Documentation Requirements............11

        2.  Waiver Program Documentation and Level of Care Requirements ..........14

        3.  Billing for IOP SUD Treatment Services ..................................................16

        4.  Provider Certification to Government Health Care Programs of
            Compliance with Applicable Law .............................................................19

    B.  The Federal and State False Claims Acts ..........................................................21

V.  FACTS AND ALLEGATIONS...................................................................................25

    A.  The NuWay Model: Systematically Maximize Billing, While Minimizing
       the Amount and Quality of Care, Violating Medical Necessity and
       Program Rules.......................................................................................................26

        1.  NuWay Fraudulently Bills for the Maximum Number of Hours of
            Treatment Its Level of Care Designation Permits, Regardless of the
            Needs of Individual Clients ......................................................................27

        2.  Defendants Implemented a Scheme to Falsely Bill Government
            Health Care Programs for Nearly Double the Amount of Care
            Actually Provided .....................................................................................29

    B.  Defendants Knowingly Violated Documentation Requirements Necessary
       for Reimbursement of SUD Treatment Services .................................................31

        1.  A 2018 SIRS Audit and Correction Order Identifies Severe and
            Systematic Documentation Failures at NuWay .........................................31

        2.  BCBS/Anthem Identify Severe and Systematic Documentation
            Failures and Duplicative Billing by NuWay During a 2021 Desk
            Audit .........................................................................................................34

3.     MDHS Identifies Additional Documentation and Service Failures at Cochran Recovery Services in a December 2021 Correction Order ...................................................................................38

4.     NuWay Receives a CID from U.S. DOJ in April 2022 Relating to an Alleged Kick-Back Scheme and Marston Engages His Own Counsel ......................................................................................39

C.     HMA Warns NuWay in August 2022 That NuWay Is Facing Serious Fraud, Waste, and Abuse Liability for Their Clinical Documentation Failures .......................................................................39

D.     Marston Notifies NuWay Management That NuWay Has Billed Government Health Care Programs for More Than $30 Million in Duplicate Services and Suspends Billing of Fraudulent Claims ..........................42

1.     Defendants Ignore Marston When He Urges Defendants to Address Their Fraudulent and Abusive Practices ......................................44

2.     Defendants Fire Kluender for Refusing to Bill Fraudulent Claims and Begin to Retaliate Against and Falsely Blame Marston When He Alerts Law Enforcement to NuWay's Fraud .......................................54

3.     Defendants Terminate Marston's Employment at NuWay and Deprive Him of Employment Benefits Due to Him ................................58

4.     Defendants Continue to Breach Plaintiff's Employment Agreement with NuWay and Applicable Law ...............................................59

E.     Financial Harms to the Government and NuWay Clients .....................................63

VI.     CLAIMS FOR RELIEF ..................................................................................64

VII.     PRAYERS FOR RELIEF ...............................................................................75

## I.    **<u>INTRODUCTION</u>**

1.      This is an action by Plaintiff-Relator John Marston ("Marston") to recover

damages, civil penalties, and other relief on behalf of the United States and the State of

Minnesota arising from the actions of Defendants NuWay Alliance, NuWay House, Inc.

("NuWay House"),[1] David J. Vennes, and Kenneth L. Roberts, who each knowingly presented,

or caused to be presented, false and fraudulent claims, statements and records to the State of

Minnesota and the United States' health care programs, and who also failed to return known

overpayments received from Minnesota and federal health care programs, and engaged in

conspiracy, all in violation of the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq*., and the

Minnesota False Claims Act, Minn. Stat. §§ 15C *et seq*.  In addition, Marston seeks to recover

damages for personal claims of retaliation in violation of federal and Minnesota whistleblower

statutes, and wrongful termination of employment, breach of contract, and other statutory or

common law claims.

2.      Defendants have been committing and continue to commit health care fraud

through their chain of outpatient drug and alcohol addiction treatment centers, at which

thousands of clients suffering from addiction seek treatment each year.  Through these schemes,

the Defendants defrauded the federal and state governments of substantially well over

$30 million dollars since at least 2018.

3.      Defendants accomplished this multi-million dollar fraud on the State of

Minnesota and the United States through four, inter-related schemes designed to fraudulently

maximize reimbursement for substance use disorder ("SUD") treatment services by falsely

---

[1] Defendants routinely ignored corporate formalities in the operations of NuWay Alliance and NuWay House.  For purposes of this complaint "NuWay" refers to NuWay Alliance, Inc. and NuWay House, Inc. jointly and interchangeably.

exaggerating the quality and amount of such services.  First, Defendants manipulated government-required client assessments and falsely certified that all clients who requested outpatient services required both the level of care offered by NuWay House's intensive outpatient program ("IOP") and the weekly maximum hours of care that could be billed under that level of care, regardless of the client's actual medical needs.  Through this scheme, Defendants admitted clients into NuWay House's IOP who did not require IOP care, billed for medically unnecessary services, and provided inappropriate care to clients whose needs were too acute for NuWay House to properly serve.  Second, having ensured all clients' assessments called for precisely the same level of care, Defendants then billed for 20 hours of therapy per IOP patient, per week—the maximum number of hours of therapy for which they reasoned NuWay House could be reimbursed—regardless of a clients' medical needs.  Defendants incentivized NuWay's counselors to meet this artificial goal by paying bonuses to counselors when they consistently and falsely certified that clients required and received 20 hours of therapy per week without regard to the clients' actual medical needs.  Third, Defendants falsely claimed NuWay House provided about 20 hours of therapy each week in its IOP, when NuWay House actually provided about 10 hours and 20 minutes of therapy per week.  Defendants disguised this fact by knowingly and fraudulently manipulating reported units of service in submitted claims in violation of government coding rules.  Fourth, Defendants caused NuWay House and NuWay Alliance to submit claims, knowing the claims did not have medical record documentation to support the claim, in violation of requirements promulgated by government health care programs.

4.      Beyond swindling the State of Minnesota and the United States of substantially in excess of $30 million in taxpayer dollars, the Defendants' systematic failure to provide care at a

level and frequency that it claimed and that is appropriate for its clients, based on an individualized assessment of client need, placed at risk the recovery of the population that Defendants claim to serve. Such deception and commoditization of client care frustrates the careful design of the State of Minnesota's SUD treatment and reimbursement model and preys on some of Minnesota's most vulnerable citizens.

## II.    <u>JURISDICTION AND VENUE</u>

5.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345 and 31 U.S.C. § 3732, which confer jurisdiction over actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. This Court has original and supplemental jurisdiction over the state law claims pursuant to 31 U.S.C. § 3732(b) and 28 U.S.C. § 1367 because this action is brought under state laws to recover funds paid by Minnesota and arises from the same transaction or occurrence as the claims brought on behalf of the United States under 31 U.S.C. § 3730. This Court also has original and supplemental jurisdiction over Marston's personal claims for retaliation in violation of federal and state law and other claims comprising the same case or controversy pursuant to 28 U.S.C. §§ 3732 and 1367(a).

6.    This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because one or more Defendants can be found in, resides in, and transacts substantial business in this district, including business related to Defendants' misconduct.

7.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1391, and 28 U.S.C. § 1395(a), because one or more of the Defendants reside in and/or transact business in this District by, among other things, organizing and operating drug and alcohol addiction treatment facilities that engage in the misconduct alleged herein.

## III.    <u>PARTIES</u>

8.    Defendant NuWay Alliance is a non-profit corporation headquartered in

Minneapolis, Minnesota. NuWay Alliance was created in 2019 to manage the NuWay-umbrella family of companies.  Pursuant to management services contracts under which NuWay Alliance provides all non-clinical management and administrative services and personnel necessary to operate addiction treatment centers, NuWay Alliance manages and operates NuWay House, The Gables Treatment Center, Inc. ("The Gables"), and Cochran Recovery Services, Inc. ("Cochran"), all of which provide addiction treatment services in Minnesota.  NuWay Alliance prepared claims for reimbursement for services provided by NuWay House and related entities and caused those claims to be submitted to government health care programs.  Also, under these management services contracts, virtually all surplus revenue from NuWay House, The Gables, and Cochran was funneled to NuWay Alliance, in payment for management services and distributions of excessive compensation to NuWay officers.  As of 2021, the net annual revenue of NuWay Alliance, including its subsidiaries, was approximately $60 million, with approximately 90% of that net annual revenue coming from government health care programs, including Medicaid.  NuWay Alliance also manages and funds NuWay Recovery Foundation, created in 2018 to liaise with third-party providers of supportive housing for NuWay House clients.  NuWay Alliance funds NuWay Recovery Foundation by reimbursing all expenditures.

9.     Defendant NuWay House, Inc. is a non-profit corporation headquartered in Minneapolis, Minnesota.  NuWay House was organized in Minnesota on May 10, 1966 to provide outpatient and residential substance abuse treatment.  In 2019, NuWay House became wholly owned by NuWay Alliance.  NuWay House owns and operates eight outpatient treatment and three residential treatment centers in Minnesota, including two outpatient treatment centers in Minneapolis and three residential treatment centers in Minneapolis.  According to NuWay Alliance's website, NuWay House's residential treatment centers offer medium intensity, co-

occurring residential treatment for men, women and transgender individuals.  NuWay House's outpatient treatment centers offer intensive co-occurring outpatient treatment with optional recovery residence support for women and men and/or outpatient continuing care (virtual and hybrid options).  Each of NuWay House (including each of its eight outpatient treatment centers and three residential treatment centers), Cochran, and Gables participates in Minnesota's Medicaid Assistance program, the Behavioral Health Fund, the Waiver Program, and MinnesotaCare (each as defined below) and submits claims for reimbursement under those programs, both directly to those programs and to PMAPs (as defined below).

10.    Defendant David J. Vennes, of Minneapolis, Minnesota, served as the Chief Executive Officer ("CEO") (formerly referred to as the "Executive Director") of NuWay House from 2008 until 2019 when NuWay House moved under NuWay Alliance, at which time Vennes's employment moved to NuWay Alliance.  Vennes continued serving as the CEO, overseeing the operation of all NuWay-umbrella entities, including NuWay House.  Prior to becoming NuWay House's CEO, Vennes was convicted for felony drug trafficking and firearms crimes.  During Vennes's tenure, Vennes oversaw growth of NuWay from under one million dollars in annual revenue in 2008 to over 60 million dollars in annual revenue in 2021.  Vennes achieved this dramatic growth by fraudulently maximizing the admission and treatment of clients regardless of client medical needs and in knowing violation of government health care program rules.  Under Vennes's leadership, NuWay's aggressive growth strategy has accelerated in recent years, with NuWay Alliance acquiring Cochran in 2018 and The Gables in 2020, and with NuWay Alliance forming the NuWay Recovery Foundation in 2018.

11.    Defendant Kenneth L. Roberts has served as NuWay's Chief Clinical Officer since approximately 2018.  Prior to that date, Roberts served as the top-ranking clinician for

NuWay's IOP.  In his role as Chief Clinical Officer, Roberts is responsible for all services provided by clinicians and all of the business operations that support clinical services.  He is responsible for admissions staff (*e.g.*, intake of new clients, diagnosis of clients, and documentation of client treatment).  He is also responsible for NuWay's Compliance Department.  Roberts is NuWay House's agent of record for all contracts with the Minnesota Department of Human Services ("MDHS").

12.     Plaintiffs United States of America and the State of Minnesota are the real parties in interest with respect to the United States and Minnesota False Claims Act qui tam claims herein.  Marston is pursuing certain causes of action on behalf of the named Plaintiffs the United States and Minnesota on the FCA *qui tam* claims set forth herein pursuant to 31 U.S.C. § 3730(b) and Minn. Stat. § 15C.  He is also pursuing personal claims under the anti-retaliation provisions of the False Claims Act, 31 U.S.C. § 3730(h), and the state law analogue, Minn. Stat. § 15C.145 and other claims related to his employment.

13.     Plaintiff-Relator John Marston is a resident of Minneapolis, Minnesota.  Vennes hired Marston to serve as NuWay House's Chief Financial Officer ("CFO") on December 30, 2015, and Marston served in that position until he was placed on administrative leave by NuWay on September 20, 2022 and terminated by NuWay Alliance on October 5, 2022.  He also served as a director of NuWay House during that time, and as treasurer of the NuWay House Board from 2013 through 2015, when he was hired by NuWay House.  As CFO of NuWay House and then NuWay Alliance, Marston reported to the CEO, Defendant Vennes, who each year assigned Marston the highest possible performance rating until retaliating against Marston for disclosing Defendants' fraud to the NuWay Alliance Board of Directors (the "Board") and law enforcement.  As CFO, Marston was a senior executive responsible for managing the financial

actions of NuWay, including supervising employees responsible for sending claims to government health care programs, subject to sign-off by Chief Clinical Officer, Defendant Roberts, who was responsible for the clinical documentation for these claims. Marston is familiar with and has direct, independent, and material knowledge of the NuWay's business operations and the allegations herein.

## IV. APPLICABLE FEDERAL AND STATE LAWS AND REGULATIONS

### A. United States and Minnesota Government Health Care Programs

14. The Medicaid program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v ("Medicaid"), is a health insurance program administered jointly by the United States Government, through the Center for Medicare and Medicaid Services ("CMS") of the U.S. Department of Health and Human Services ("HHS"), and individual states. Medicaid is jointly funded jointly by state and federal taxpayer revenue.

15. Under the Medicaid program, states provide medical and laboratory services, medical equipment, and prescription drugs to needy individuals who qualify for Medicaid. Using both state funds and federal financial contribution drawn from the United States Treasury, states directly, or through contracted managed care organizations, reimburse healthcare providers for the cost of covered items and services rendered to Medicaid beneficiaries. 42 C.F.R. §§ 430.0, *et seq.* Federal Medicaid statutes, regulation, and guidance set forth minimum requirements that state Medicaid programs must meet to qualify for federal funding, including, among other things, requirements related to payment for services, contracts with participating providers and managed care organizations, Medicaid program integrity, and oversight of quality of care. *See, e.g.*, 42 C.F.R., Chapter IV, Subchapter C; Centers for Medicare and Medicaid Services, Pub. 100-15, Medicaid Program Integrity Manual. In accordance with federal requirements and each State's respective CMS-approved Medicaid state plan, each State has

adopted its own statutes, regulations, and guidance that govern administration of, and participation in, the State's Medicaid program. 42 U.S.C. § 1396a; 42 C.F.R. § 430.10 ("[t]he State plan is a comprehensive written statement submitted by the agency describing the nature and scope of its Medicaid program and giving assurance that it will be administered in conformity with the specific requirements of [federal law] . . . and other applicable official issuances of the Department [of Health and Human Services]. The State plan contains all information necessary for CMS to determine whether the plan can be approved to serve as a basis for Federal financial participation (FFP) in the State program").

16.     Medical Assistance is Minnesota's Medicaid program for low-income individuals. MDHS administers Medical Assistance and has promulgated administrative rules governing Medical Assistance, *see generally*, Minn. R. 9505.0010, *et seq.* Medical Assistance enrollees may receive their benefits directly from MDHS or through Minnesota's Prepaid Medical Assistance Program ("PMAP"), under which the beneficiary may receive Medicaid benefits from one of nine managed care organizations with whom MDHS has contracted to provide Medicaid benefits, using Medicaid funds. *See generally*, Minn. Stat. §§ 256B.69, *et seq.*

17.     MinnesotaCare is a program for Minnesotans who do not meet standard Medicaid eligibility requirements, but who have low incomes and lack access to affordable health care coverage. Like PMAP beneficiaries, MinnesotaCare beneficiaries receive health benefits from managed care organizations contracted by MDHS to administer MinnesotaCare plans. MinnesotaCare is funded through federal funding, state taxes on hospitals and healthcare providers, and beneficiary premiums charged based on household size and income. *See generally*, Minn. Stat. §§ 256L.01, *et seq.* With limited exceptions, MinnesotaCare reimburses for those services covered under the standard Medical Assistance program, at the same rates and

under the same conditions as apply to Medical Assistance-reimbursed services.  Minn. Stat.
§§ 256L.03, 256L.11.

18.    Minnesota operates a Behavioral Health Fund through which MDHS provides
local social service agencies with funds to cover the costs of behavioral health services,
including SUD treatment services, for low-income residents who are not yet enrolled in
Medicaid or who have exhausted MinnesotaCare behavioral health benefits.  The Behavioral
Health Fund also covers room and board costs for residential SUD services, which are not
covered by Medical Assistance.  The Behavioral Health Fund is funded through state and federal
Medicaid funds, in addition to other government sources of funding, such as the U.S. Substance
Abuse and Mental Health Services Administration.  Minn. Stat. §§ 256L.03, 254B.01, *et seq.*;
Minn. R. 9530.7000-7030.

19.    Under Section 1115(a) of the Social Security Act (42 U.S.C. § 1315), HHS may
grant waivers to states of certain federal Medicaid requirements to permit states the flexibility
necessary to use federal Medicaid funds for Medicaid "demonstration projects."  Minnesota has
obtained such a waiver to administer a SUD treatment demonstration project (the "Waiver
Program") that is designed to "[support] access to a full continuum of care with a focus on
ensuring that individuals are matched to an appropriate level of care."  CTRS. FOR MEDICARE &
MEDICAID SRVS., MINNESOTA SUBSTANCE USE DISORDER SYSTEM REFORM 1115
DEMONSTRATION, NO. 11-W-00320/5 at Attachment C (appr. Jul, 28, 2021),
https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-
Topics/Waivers/1115/downloads/mn/mn-sud-reform-ca.pdf.  Specifically, under the Waiver
Program, Medical Assistance-enrolled SUD treatment providers who meet additional
requirements tied to level of care criteria published by the American Society of Addition

Medicine (ASAM) are entitled to increased reimbursement amounts of 10% for IOPs and 15% for residential programs.  MINN. DEP'T OF HUMAN SERVS., PROVIDER MANUAL, SUBSTANCE USE DISORDER (SUD) SERVICES (rev. Oct. 18, 2022), https://www.dhs.state.mn.us/main/idcplg?IdcService=GET_DYNAMIC_CONVERSION&Revis ionSelection Method=LatestReleased&dDocName=ID_008949.

20.    Together, the programs described above, and any other government-funded healthcare programs, are referred to as "government health care programs."

21.    Reimbursement practices under all government health care programs are similar. The most basic reimbursement requirement is that the service provided must be reasonable and medically necessary.  *See, e.g.*, 42 U.S.C. §§ 1396, *et seq.* (Medicaid); 42 C.F.R. Part 456 (Medicaid utilization control).

22.    Medical Assistance regulations provide that, to be eligible for payment, a health service covered under the Medical Assistance program must:  "(1) be medically necessary; (2) be appropriate and effective for the medical needs of the recipient; (3) meet quality and timeliness standards; (4) be the most cost-effective health service available for the medical needs of the recipient."  Minn. R. 9505.0210.  To be reimbursed, such services must also "represent an effective and appropriate use of medical assistance funds."  *Id.  See also* Minn. R. 9505.0220, 9505.2165; MINN. DEP'T OF HUMAN SERVS., PROVIDER MANUAL, PROVIDER BASICS:  HEALTH CARE PROGRAMS AND SERVICES (rev. Mar. 4, 2022), https://www.dhs.state.mn.us/main/idcplg?IdcService=GET_DYNAMIC_CONVERSION&Revis ionSelectionMethod=LatestReleased&dDocName=ID_008922 ("MHCP does not cover . . . [health services] of a lower standard of quality than the prevailing community standards of the provider's professional peers").

23.     Health care providers must certify that services or items ordered or provided to clients will be provided "economically and only when, and to the extent, medically necessary" and "will be of a quality which meets professionally recognized standards of health care" and "will be supported by evidence of medical necessity and quality." 42 U.S.C. § 1320c-5.

### 1.     Government Health Care Program Documentation Requirements

24.     All government health care programs require that adequate documentation exist in client medical records. *See, e.g.*, 42 USC § 1396(a)(27) (Medicaid); *U.S. ex rel. Trim v. McKean*, 31 F. Supp. 2d 1308 (W.D. Okla. 1998); *cf. Lama v. Borras*, 16 F.3d 473, 480-81 (1st Cir. 1994); *Valendon Martinez v. Hosp. Presbiterano*, 806 F.2d 1128, 1134 (1st Cir. 1986); *Garcia v. United States*, 697 F. Supp. 1570, 1573-74 (D. Colo. 1988) (part of the duty of care owed to a patient by his clinician is proper record keeping and poor record keeping can give rise to an inference of negligence). Federal Medicaid statutes and guidance require documentation as a prerequisite for Medicaid reimbursement. *See, e.g.* 42 U.S.C. § 1396a(27) (requiring state plans to provide for agreements with participating providers in which the provider agrees to "keep such records as are necessary fully to disclose the extent of the services provided to individuals receiving assistance under the State plan"); CTRS. FOR MEDICARE & MEDICAID SRVS., PROGRAM INTEGRITY GUIDANCE: MEDICAID DOCUMENTATION FOR MEDICAL PROFESSIONALS (Dec. 2015), https://www.cms.gov/Medicare-Medicaid-Coordination/Fraud-Prevention/Medicaid-Integrity-Education/Downloads/docmatters-medicalprof-factsheet.pdf (requiring compliance with State documentation requirements and maintenance of "accurate, clear, and concise medical records"); CTRS. FOR MEDICARE & MEDICAID SRVS., PROGRAM INTEGRITY GUIDANCE: MEDICAID DOCUMENTATION FOR BEHAVIORAL HEALTH PRACTITIONERS (Dec. 2015), https://www.cms.gov/Medicare-Medicaid-Coordination/Fraud-Prevention/Medicaid-Integrity-Education/Downloads/docmatters-behavioralhealth-factsheet.pdf

("never bill undocumented services").

25.     Medical Assistance regulations provide that insufficiently or improperly documented services are not eligible for reimbursement.  Minn. R. 9505.0220.[2]  *See also* Minn. R. 9505.2175 ("[a]s a condition for payment by a program, a vendor must document each occurrence of a health service provided to a recipient. . . . Program funds paid for a health service not documented in a recipient's health service record shall be recovered by the department"); Minn. R. 9505.0195 ("[a] provider who fails to comply with the terms of participation in the provider agreement or parts 9505.0170 to 9505.0475 or 9505.2160 to 9505.2245 is subject to monetary recovery, sanctions, or civil or criminal action"); MINN. DEP'T OF HUMAN SERVS., PROVIDER MANUAL, PROVIDER BASICS:  HEALTH CARE PROGRAMS AND SERVICES, *supra* ¶ 22 ("[Minnesota government health care programs] do[] not cover . . . [health services] not documented in the member's health or medical record . . . or not in the member's plan of care, individual treatment plan, IEP, or individual service plan").

26.     Under MDHS statutes and regulations, SUD treatment providers must maintain, at a minimum, the following documentation for each patient:

- An initial services plan that is "person-centered" and "client-specific" and "[addresses] the client's immediate health and safety concerns" Minn. Stat. § 245G.04.  "'Person Centered' means a client actively participates in the client's treatment planning of services.  This includes a client making meaningful and informed choices about the client's own goals, objectives, and

---

[2] Minn. R. 9505.0220 references documentation requirements set forth at Minn. R. 9505.1800.  After promulgation of Minn. R. 9505.0220, Minn. R. 9505.1800 was stricken, and documentation requirements application to MDHS-administered health care programs were moved to Minn. R. 9505.2175. 15 S.R. 2563, 2565, 2568 (June 3, 1991).

the services the client receives in collaboration with the client's identified natural supports." Minn. Stat. § 245G.01.

- A comprehensive assessment of the client's substance use disorder that is "administered face-to-face by an alcohol and drug counselor . . . The comprehensive assessment must include information about the client's needs that relate to substance use and personal strengths that support recovery. . ." Minn. Stat. § 245G.05. An alcohol and drug counselor must also complete an assessment summary that is used to authorize services and that contains information specific to the client's risks and diagnosis. *Id*. MDHS does not cover services that are delivered before the completion of a comprehensive assessment. MINN. DEP'T OF HUMAN SERVS., PROVIDER MANUAL, SUBSTANCE USE DISORDER (SUD) SERVICES, *supra* ⁋ 19.

- A person-centered, individualized treatment plan. Minn. R. 9505.2175, 9505.0175, 9505.0370; Minn. Stat. § 245G.06. Documentation of the client's involvement in development of a person-centered individual treatment plan developed by an alcohol and drug counselor." Minn. Stat. § 245G.06. Treatment plans must be reviewed weekly (or after each treatment services, whichever is less frequent), and "[t]reatment planning must include ongoing assessment of client needs. An individual treatment plan must be updated based on new information gathered about the client's condition, the client's level of participation, and on whether methods identified have the intended effect." Minn. Stat. § 245G.06.

- Documentation of treatment services, including, without limitation, any
  significant events and treatment plan reviews.  Minn. Stat. § 245G.06.

*See also*, Minn. Stat. §§ 245G.09 (requiring that all required elements be maintained in patient records), 254B.05, 245B.25, 256B.0759 (requiring compliance with MDHS licensure standards, including those at § 254G, for participation in MDHS health benefit programs); Minn. Dep't of Human Servs., 1115 Level of Care Requirements, DHS-7326, https://edocs.dhs.state.mn.us/lfserver/Public/DHS-7326-ENG ("providers participating in the demonstration are subject to all applicable standards governing Substance Use Disorder Treatment Services defined in Chapters 256B, 245F, 245G, 254A, 254B. . .").

### 2.    Waiver Program Documentation and Level of Care Requirements

27.    The Waiver Program is based on the principle that:

> patients who are routed to levels of care not suited to their needs, or patients who are denied services because of shortages in providers or lack of reimbursement, are likely to suffer poor outcomes and may consume more resources in the form of repeated emergency admissions for detoxification and patient stabilization. Improper, ineffective, or lack of adequate services contributes to the so-called 'revolving door' of detox admissions.

Ctrs. for Medicare & Medicaid Srvs., Minnesota Substance Use Disorder System Reform 1115 Demonstration, *supra* ¶ 19.

28.    Under the Waiver Program, SUD treatment facilities are certified to provide one or more levels of care, corresponding with the intensity of treatment provided to patients.  Levels of care are as follows:

- Level 1.0 – Outpatient Services:  8 hours of skilled treatment services per week

- Level 2.1 – Intensive Outpatient Program:  9-19 hours of skilled treatment services per week

- Level 3.1 – Clinically Managed Low-Intensity Residential:  at least five hours of skilled treatment, peer recovery, and treatment coordination per week

- Level 3.3 – Clinically Managed Population – Specific High-Intensity Residential:  at least 30 hours of skilled treatment services, peer recovery and treatment coordination provided to individuals with traumatic brain injury or cognitive impairment

- Level 3.5 – Clinically Managed High-Intensity Residential:  at least 30 hours of skilled treatment services, peer recovery and treatment coordination provided to individuals; 24-hour care with trained counselors to stabilize multidimensional imminent danger and prepare for outpatient treatment for patients who are able to tolerate and use the full therapeutic community

Under the Waiver Program, to ensure that patients receive an appropriate level of care, SUD treatment providers must use an MDHS patient assessment grid to assess patients against the ASAM level of care criteria before initiating a course of treatment.  MINN. DEP'T OF HUMAN SERVS., 1115 LEVEL OF CARE REQUIREMENTS, *supra* ⁋ 26; MINN. DEP'T OF HUMAN SERVS., PROVIDER MANUAL, PROVIDER BASICS, SUBSTANCE USER DISORDER (SUD) SERVICES ENROLLMENT CRITERIA AND FORMS (rev. July 8, 2022), https://www.dhs.state.mn.us/main/idcplg?IdcService=GET_DYNAMIC_CONVERSION&RevisionSelectionMethod=LatestReleased&dDocName=ENROLL-62.  A copy of the level of care assessment grid that must be used for all patients of Waiver Program providers is included as Exhibit A.

29.    Individualized assessment of client needs against ASAM level of care criteria and adherence to level of care criteria is material to claims made under the Waiver Program.  CTRS.

FOR MEDICARE & MEDICAID SRVS., MINNESOTA SUBSTANCE USE DISORDER SYSTEM REFORM 1115 DEMONSTRATION, *supra* ⁋ 19. Waiver Program providers must comply with additional documentation requirements, including comprehensive assessments of clients using ASAM level of care criteria, treatment planning and review, and documentation of services. If the client is provided a level of care that differs from their assessed level of care needs, the justification for such deviation must also be documented. MINN. DEP'T OF HUMAN SERVS., 1115 LEVEL OF CARE REQUIREMENTS, *supra* ⁋ 26.

30.    NuWay's residential programs are certified under ASAM criteria as Level 3.1 (clinically managed low-intensity residential), and all but one of its outpatient programs are certified under ASAM criteria as Level 2.1 (intensive outpatient program). NuWay operates one outpatient program certified under ASAM Criteria as Level 1.0 (outpatient services). As a Waiver Program participant, therefore, NuWay's IOP can serve clients that require up to 19 hours of therapy per week.

### 3.    Billing for IOP SUD Treatment Services

31.    All billing for health care services in the United States occurs using common sets of codes used to identify diagnoses, items, and services. *See* 42 U.S.C. § 130d-2. The standard transaction code sets include, among others, the Health Care Common Procedure System ("HCPCS") codes. 45 C.F.R. § 162.1002. HCPCS codes are developed by CMS and published by the American Medical Association. HCPCS codes comprise two categories of codes: "Level I" CPT Codes are developed by the American Medical Association, and "Level II" HCPCS codes are developed by CMS, based on the CPT codes. Basic coding principles published by the American Medical Association in its CPT Codebook apply to all HCPCS codes, unless otherwise expressly provided by state law. AMERICAN MEDICAL ASSOCIATION, HCPCS LEVEL II CODEBOOK, 441 (2020); CTRS. FOR MEDICARE & MEDICAID SRVS., NATIONAL CORRECT CODING

INITIATIVE POLICY MANUAL FOR MEDICAID SERVICES, GENERAL CORRECT CODING POLICIES at

I-22 (rev. Jan. 1, 2022), https://www.cms.gov/files/document/medicaid-ncci-policy-manual-

2022-chapter-1.pdf [hereinafter *NCCI Medicaid Policy Manual*].

32.    Each HCPCS code is defined to cover a specific unit of service, such as a single

item, procedure, or a unit of time, with a unit of time being defined as "face-to-face time with the

patient." AMERICAN MEDICAL ASSOCIATION, CPT PROFESSIONAL CODEBOOK, at xvii (2020).

Under basic coding principles, providers are expected to accurately report units of service and

may not manipulate reported units of service to inflate reimbursement. AMERICAN MEDICAL

ASSOCIATION, HCPCS LEVEL II CODEBOOK, 434 (2020) ("[p]hysicians must not unbundle the

services described by a HCPCS/CPT code . . . a physician shall not report multiple

HCPCS/CPTS codes when a single comprehensive HCPCS/CPT code describes these services . .

. a physician shall not fragment a procedure into component parts . . . physicians must avoid

upcoding . . . physicians must report units of service correctly").[3]

33.    Regarding timed units, "[a] unit of time is obtained when the mid-point is passed.

For example, an hour is attained when 31 minutes have elapsed (more than midway between zero

and sixty minutes)." AMERICAN MEDICAL ASSOCIATION, CPT PROFESSIONAL CODEBOOK, at xvii

(2020). Per federal Medicaid coding policies, where multiple units of timed services are

rendered in the same day:

> ". . . the total time is calculated for all related timed services performed. ***The
> number of reportable UOS [units of service] is based on the total time. . . the
> practitioner is not permitted to perform multiple services, each for the minimum
> reportable time, and report each of these as separate UOS***. (e.g., A physician or
> therapist performs 8 minutes of neuromuscular reeducation (CPT code 97112) and
> 8 minutes of therapeutic exercises (CPT code 97110). Since the physician or

---

[3] The HCPCS Level II Codebook clarifies: "in this Manual, many policies are described utilizing the term 'physician.' Unless indicated differently the usage of this term does not restrict the policies to physicians only but applies to all practitioners, hospitals, providers, or suppliers eligible to bill the relevant HCPCS/CPT codes . . ." AMERICAN MEDICAL ASSOCIATION, HCPCS LEVEL II CODEBOOK, 433 (2020).

therapist performed 16 minutes of related timed services, only 1 unit of service may be reported for 1, not each, of these codes)"

*NCCI Medicaid Policy Manual*, *supra* ⸿ 31, at I-19 (emphasis added); *see also* CTRS. FOR MEDICARE & MEDICAID SRVS., MEDICARE CLAIMS PROCESSING MANUAL, PUB. 100-04, Ch. 5, § 20.2 (rev. Nov. 22, 2021), https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c05.pdf (". . . the total number of minutes of service . . . determines the number of timed units billed . . . [e]xample 1 –24 minutes of neuromuscular reeducation, code 97112, 23 minutes of therapeutic exercise, code 97110, Total timed code treatment time was 47 minutes"); AMERICAN MEDICAL ASSOCIATION, CPT PROFESSIONAL CODEBOOK, at xvii (2020) ("a second hour is obtained when 91 minutes has elapsed"); *Realhab*, D.A.B. No. 2542 (Nov. 19, 2013) ("[t]he manual makes clear, however, that if a practitioner bills Medicare for more than one timed code for 'a single calendar day, then the total number of timed units that can be billed is constrained by the total treatment minutes for that day.' . . . To bill for two [fifteen-minute] units of any one-on-one service for a patient on the same day, the practitioner must have furnished at least 23 minutes (*i.e.* 15 minutes for the first unit and at least 8 minutes for the second unit) of any timed, one-on-one service to the patient").

34.    IOP SUD therapy services are billed using HCPS code H2035. H2035 is a timed code, defined as one hour of alcohol and/or drug counseling. Consistent with HCPCS coding principles and federal Medicaid policy, MDHS instructs that "[t]he code is defined by a unit of time. Unit of time is attained when the mid-point is passed, and more than half of the time must be spent performing the service for reporting a specific code, excluding any breaks." MINN. DEP'T OF HUMAN SERVS., PROVIDER MANUAL, SUBSTANCE USE DISORDER (SUD) SERVICES, *supra* ⸿ 19.

### 4. Provider Certification to Government Health Care Programs of Compliance with Applicable Law

35.     Health care providers seeking reimbursement from government health care programs must apply for enrollment in these programs.  The Minnesota Health Programs Provider Enrollment Application includes a signed provider statement that provides:  "I acknowledge that any misrepresentations in the information submitted to MHCP, including false claims, statements, documents or concealment of a material fact, may be cause for denial or termination of participation as a Medicaid provider."  MINN. DEP'T OF HUMAN SERVS., MINNESOTA HEALTH CARE PROGRAMS (MHCP), ORGANIZATION– PROVIDER ENROLLMENT APPLICATION, Form DHS-4016A, DHS-4016A, https://edocs.dhs.state.mn.us/lfserver/Public/DHS-4016A-ENG; *see also* 42 C.F.R. § 455.18 (". . . the [state Medicaid agency] must provide that all provider claims forms be imprinted in boldface type with the following statements, or with alternate wording that is approved by the Regional CMS Administrator: (1) 'This is to certify that the foregoing information is true, accurate, and complete.' (2) 'I understand that payment of this claim will be from Federal and State funds, and that any falsification, or concealment of a material fact, may be prosecuted under Federal and State laws.'")

36.     Such health care providers must also enter into Provider Agreements with MDHS to establish their eligibility to seek reimbursement under government health care programs.  As part of those agreements, the provider must sign the following certification:

> As a participating provider in Minnesota Health Care Programs (MHCP) administered by the Minnesota Department of Human Services (DHS), the provider agrees to: . . . . 2. Comply with all federal and state statutes and rules relating to the delivery of services to individuals and to the submission of claims for such services . . . 8. Assume full responsibility for the accuracy of claims submitted to DHS in accordance with the certification requirements of the Code of Federal Regulations, title 42, section 455.18 and Minnesota Statutes, 256B.  27, subdivision 2. . . 10. Except for claims for services under a waiver program, submit claims only for services, supplies, and equipment that are

-19-

medically necessary as defined at Minnesota Rules, 9505.0175, subpart 25, and that meet professionally recognized standards of health care that the provider knows or has reason to know are properly reimbursable under federal and state statutes and rules. . . 20. Maintain records that fully disclose the extent of services provided to MHCP members for a period of five years after the initial date of billing DHS, in accordance with Minnesota Rules, 9505.2160 – 9505.2245. . . 24. Determine the applicability to the provider of any other state or federal laws and ensure compliance with those laws. . . 28. Refund any overpayments made to the provider by DHS, including those resulting from payments made by Medicare, third party payers, billing errors, fraudulent billing . . .

MINN. DEP'T HUMAN SERVS., MINNESOTA HEALTH CARE PROGRAMS (MHCP) PROVIDER

AGREEMENT, DHS-4138, https://edocs.dhs.state.mn.us/lfserver/Public/DHS-4138-ENG.  Claims

submitted by health care providers to government health care programs contain similar

representations and certifications.  *See, e.g.*, Forms CMS-1500 (paper provider claim form used

for Medicare and Medicaid); 837P (electronic version of form 1500); 1450 (UB04 – institutional

provider paper claim form used for Medicare and Medicaid); 837I (electronic version of

form 1450).  When submitting a claim for payment, a provider is subject to and under the terms

of his certification to the United States that the services were delivered in accordance with

federal law, including Medicaid laws and regulations.  Government health care programs require

compliance with these certifications as a material condition of payment and claims that violate

these certifications are false or fraudulent claims under the FCA.  CMS, its fiscal agents, and

MDHS (whether itself or through local social service agencies and PMAPs) will not pay claims

for medically unnecessary services or claims for services provided in violation of relevant state

or federal laws.  42 U.S.C. § 1395y(a)(1)(A).

37.    Providers who wish to receive payment from the Behavioral Health Fund must

also submit an Assurance Statement that is an addendum to the Minnesota Health Care Programs

Provider Agreement and provides:

> Signing this form assures the Minnesota Department of Human Services (DHS) that the provider holds the appropriate licensure or certification to participate with

the Behavioral Health Fund (BHF) program as it is defined under Minnesota Statutes 254B.03, subdivision 2; Minnesota Statutes 254B.05 or the appropriate tribal license.  All Minnesota substance use disorder providers must attest to all items listed under All Substance Use Disorder providers and to the items listed under the heading of their specific license. . . As an MHCP-enrolled provider, the substance use disorder provider agrees to the terms and conditions as stated by initialing each requirement (electronic initials accepted) and signing this form.  I, the named provider, attest that I will . . . Comply with the provisions of Minnesota Statutes 254B.03, subdivision 2, regarding payments for services. . .

38.     Likewise, providers who wish to enroll in the Waiver Program must submit a 1115 Substance Use Disorder System Reform Enrollment Checklist in which the provider details how the provider plans to comply with Waiver Programs related to treatment services, comprehensive assessment and placement of clients, individualized treatment planning, coordination of services, documentation and treatment plan review, and level of care requirements, among other requirements.  The Enrollment Checklist includes the following attestation:  "[b]y signing below, the authorized officer agrees that the provider agency understands and will comply with the demonstration requirements, and that the content of this application is accurate and indicates the agency's intent."  MINN. DEP'T HUMAN SERVS., 1115 SUBSTANCE USE DISORDER SYSTEM REFORM ENROLLMENT CHECKLIST, DHS-7325, https://edocs.dhs.state.mn.us/lfserver/Public/DHS-7325-ENG.

**B.     The Federal and State False Claims Acts**

39.     The Federal FCA creates liability for "any person who," among other things:

a.     "[K]nowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" 31 U.S.C. § 3729(a)(1)(A);

b.     "[K]nowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" 31 U.S.C. § 3729(a)(1)(B);

c.     "[C]onspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)" 31 U.S.C. § 3729(a)(1)(C); or

d. "[K]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G).

40.    The FCA further provides that any person who violates the FCA "is liable to the United States for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus 3 times the amount of damages which the Government sustains because of the act of that person."  31 U.S.C. § 3729(a)(1).  The Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 increased the civil penalty to between $12,537 to $25,076 for violations occurring after November 2, 2015.  28 U.S.C. § 2461; 28 C.F.R. §§ 85.3, 85.5.

41.    The FCA provides that "the terms 'knowing' and 'knowingly' – (A) mean that a person, with respect to information – (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud."  31 U.S.C. § 3729(b)(1).

42.    The FCA provides that "the term 'claim' – (A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that— (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government— (I) provides or has provided any portion of the

money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2).

43.    The FCA provides that "the term 'obligation' means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3). In the health care context, such as Medicaid, the term "obligation" is further defined as "[a]ny overpayment retained by a person after the deadline for reporting and returning the overpayment," that must be reported "[b]y the later of…60 days after the date on which the overpayment was identified…or the date any corresponding cost report is due, if applicable." 42 U.S.C. § 1128J(d); *see also* 42 U.S.C. § 1320a-7k(d).

44.    The FCA provides that "the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

45.    The Defendants' acts alleged herein constitute violations of the FCA. The FCA allows any person having information about an FCA violation to sue on behalf of the United States, and to share in any recovery (called a "*qui tam*" action). The FCA requires that the Complaint be filed under seal (without service on the defendants during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit. The person suing is known under the FCA as the "relator."

46.    Additionally, Minnesota has enacted its own false claims act, Minn. Stat. § 15C, which closely tracks the Federal FCA. The Minnesota FCA applies to the State portion of

Medicaid losses caused by false or fraudulent Medicaid claims to the jointly federal-State funded

Medicaid program and failure to report and return any overpayments therefrom.  The

Defendants' acts alleged herein also constitute violations of the Minnesota FCA.  The Minnesota

FCA contains a *qui tam* provision governing, *inter alia*, a relator's right to claim a share of the

State's recovery.  See Minn. Stat. § 15C.13.

47.     Regarding government health care programs, specifically, Minnesota law

provides that:

> Any vendor of medical care who willfully submits . . . claim for reimbursement for
> medical care which the vendor knows is a false representation and which results in the
> payment of public funds for which the vendor is ineligible shall, in addition to other
> provisions of Minnesota law, be subject to an action by the state of Minnesota or any of
> its subdivisions or agencies for civil damages.  The damages awarded shall include three
> times the payments which result from the false representation, together with costs and
> disbursements, including reasonable attorney fees or their equivalent.

Minn. Stat. § 256B.25.

48.     Minnesota regulations further state that a provider's failure to comply with the

terms of their Minnesota Health Care Programs Provider Agreement or regulations governing

utilization control, documentation, provision of covered services, and government health care

program integrity will be subject to monetary recovery, sanctions, or criminal or civil action.

Minn. R. 9505.0194; *see also* Minn. R. 9505.0460 ("[a] provider who wrongfully obtains a

medical assistance payment is subject to Minnesota Statutes, sections 256B.064, 256B.121,

609.466, and 609.52; United States Code, title 42, section 1320a-7b; and parts 9505.2160 to

9505.2245").

49.     MDHS must recover any Medical Assistance "funds paid to a provider if the

department determines that the Payment was obtained fraudulently or erroneously," which may

include where MDHS determines there was:  "A. intentional and unintentional error on the part

of the provider. . . B. failure of the provider to comply fully with all authorization control

requirements, prior authorization procedures, or billing procedures . . . and D. fraudulent or abusive actions on the part of the provider."  Minn. R. 9505.0465; *see also* Minn. R. 9505.2160-2245 (setting forth procedures for identifying and imposing sanctions—including recovery of payment—for fraud and abuse by government health care program payment recipients).  Under MDHS program integrity regulations, "fraud" is defined to include "making a false statement, false claim, or false representation to a program where the person knows or should reasonably know the statement, claim, or representation is false."  "Abuse" is defined as "a pattern of practices that are inconsistent with sound fiscal, business, or health service practices, and that result in unnecessary costs to the programs or in reimbursements for services that are not medically necessary or that fail to meet professionally recognized standards for health service," including, among other things, "submitting repeated claims, or causing claims to be submitted, using procedure codes that overstate the level or amount of health service provided," submitting claims for services that do not meet the general coverage requirements of Minn. R. 9505.0210, and "failing to develop and maintain health services records" as required by MDHS regulations."  Minn. R. 9505.2165.

50.    The allegations in this Complaint have not been publicly disclosed within the meaning of the FCA, as amended, 31 U.S.C. § 3730(e)(4), or Minn. Stat. § 15C .05(f).  If the Court finds there was a public disclosure of such allegations, Marston is an "original source" as that term is used in the federal and Minnesota FCA.  Minn. Stat. § 15C .05(f); *see also* Minn. Stat. § 15.C.01, subd. 4.

## V.    <u>FACTS AND ALLEGATIONS</u>

51.    Defendants have engaged in ongoing schemes to defraud federal and state government health care programs since at least November 2018.

52.    Defendants have exploited and violated federal and Minnesota laws and

regulations governing reimbursement for drug and alcohol addiction treatment, in order to fraudulently maximize reimbursement, thereby increasing NuWay's revenue at the expense of taxpayers and NuWay House's clients.

53.    Flush with reimbursements from government health care programs, Defendants Vennes and Roberts have been paid substantial sums, including, in 2021 over $800,000 and $400,000 in reportable annual compensation, respectively.  NuWay Alliance executives, including Vennes, received quarterly bonuses, contingent on organizational achievement of revenue surplus targets.  While NuWay Alliance referred to these bonus payments as "outcomes-based compensation," the only "outcome" measurement taken into account was the revenue of NuWay Alliance and the entities it operates; there was no consideration of client outcomes. Vennes understood that his compensation greatly exceeded that of other CEOs of similar non-profit organizations and expressed concern regarding the optics of such high executive compensation for a non-profit organization that primarily serves low-income beneficiaries of government assistance programs.  However, such concern did not deter Vennes from continuing to receive excessive compensation.  In 2020 NuWay Alliance provided Vennes – at Vennes's demand – with a luxury company car, a Mercedes Benz sports car worth approximately $200,000.  Vennes requested that much of his compensation be paid as employee retention incentive and bonus payments to conceal the full magnitude of his compensation.

**A.    The NuWay Model: Systematically Maximize Billing, While Minimizing the Amount and Quality of Care, Violating Medical Necessity and Program Rules**

54.    Since at least 2018, Defendants have engaged in a scheme to fraudulently maximize the reimbursement NuWay House receives from government health care programs, while systematically providing medically unnecessary care in violation of program rules to avoid immediate detection of its scheme.  Defendants' goal is to admit and treat as many clients as

possible, without regard to whether NuWay House provides a level of care appropriate for the

client's needs or diagnosis, so that, as stated by Vennes to Marston, NuWay becomes "too big to

fail." Specifically, NuWay House has sought to enroll thousands of clients so that government

regulators are reluctant to shut NuWay House down for fraud and thereby force thousands of

clients out of treatment. As Vennes informed Marston, if regulators ever attempted to act against

NuWay House and its affiliates, NuWay would enlist the media to intimidate regulators into

submission by portraying such action as risking displacement of thousands of vulnerable adults

In Vennes's words, "if NuWay has all the clients, NuWay wins."

       **1.**      **NuWay Fraudulently Bills for the Maximum Number of Hours of Treatment Its Level of Care Designation Permits, Regardless of the Needs of Individual Clients**

     55.     Defendants have accomplished their scheme through several means, intentionally

designed to fraudulently maximize billing to government health care programs, without regard to

quality or necessity of care.

     56.     Specifically, contrary to both Waiver Program and broader Minnesota health care

program requirements for individualized client assessments, NuWay's practice was to assess all

individuals who sought outpatient services from any of NuWay's IOP facilities, *pro forma*, as an

ASAM Level 2.1, the maximum level of care that NuWay's IOP is certified to provide. Indeed,

NuWay went as far as to pre-fill primary diagnosis codes into client intake records before

assessment of the patient.

     57.     With each IOP client assessed as an ASAM Level 2.1, Defendants structured

NuWay's IOP to uniformly bill for 20 hours of therapy per week for all IOP clients, regardless of

the medical needs of the individual patient. Defendants reasoned that, because ASAM Level 2.1

was defined as the level at which clients require between 9 and 19 hours of therapy per week, the

absolute maximum units of service for which NuWay could bill under Level of Care 2.1 without

risking automatic denial of claims, was 20 hours.

58.     Since at least 2016, NuWay House (and then NuWay Alliance) operated an incentive compensation program under which the amount paid to its counselors depended on the number of clients that the counselor certified as requiring—and billed for—20 hours of therapy per week.  Specifically, NuWay House (and then NuWay Alliance) implemented a policy of awarding "compliance" bonuses to counselors based on the rate at which the counselor's "comply" with NuWay's standard of billing for 20 hours of therapy services per patient, per week.  Such counselors completed and updated client treatment plans, which plans included the number of hours of therapy each client was to receive each week.

59.     These policies and practices run contrary to the foundational principle of the Waiver Program that, to be effective and reimbursable, SUD services must be provided in a manner and at a level of intensity appropriate for the individual client, based on an individualized assessment of the client's needs.  As required by Minnesota health care program participation and reimbursement requirements, the frequency and intensity of SUD services received by a client must be based not only on the comprehensive assessment performed at the outset of the treatment, but also on treatment plans that must be reviewed and updated by the counselor that treats the patient, during the client's treatment.  Absent inappropriate policies and incentives, the expectation is that, for some clients, more intensive treatment is appropriate, while other clients require fewer hours of therapy.  A client whose condition is improving would experience a gradual step down before they are discharged, while a client not improving may be referred to a higher level of care.  Under NuWay's IOP, however, all clients received an identical course of treatment that did not vary in intensity during their time with NuWay.  At all times during such course of treatment NuWay billed the maximum weekly units of service for which NuWay can

bill, with each counselor being paid a bonus to certify the need for—and bill—precisely 20 hours of therapy per patient, per week.

60.     Defendants then submitted and caused to be submitted claims for payment that falsely represented that NuWay had complied with government health care program requirements, and then fraudulently collected both Behavioral Health Fund, MinnesotaCare, and Medical Assistance reimbursement, including a Waiver Program add-on payment intended specifically to reimburse NuWay for closely assessing client needs and placing them in a treatment setting that provided an appropriate level of care, when, in fact, NuWay did neither.

### 2. Defendants Implemented a Scheme to Falsely Bill Government Health Care Programs for Nearly Double the Amount of Care Actually Provided

61.     In November 2019, Vennes and Roberts implemented changes to NuWay's IOP designed to simultaneously fraudulently increase the reimbursement received by NuWay from government health programs and decrease the actual time spent providing care to clients. Specifically, Vennes and Roberts developed a plan to reduce of care provided by NuWay to each IOP client by nearly 50%, while still claiming, on claims submitted to government health care programs, that NuWay provided the same amount of care that it had previously provided.

62.     Before November 2019, NuWay's IOP consisted of four group therapy sessions, five days a week.  Each group therapy session was approximately 50 minutes in duration and was billed as a unit of care under the timed HCPCS code, H2035 (alcohol/drug treatment program, per hour).  Breaks were taken during the last ten minute of each hour, such that NuWay billed four units of H2035 for 200 minutes of group therapy per day, or 20 units of H2035 for 17 hours of group therapy per week.

63.     In November 2019, however, Vennes and Roberts changed NuWay's IOP schedule to reduce the duration of each of its four group therapy sessions to 31 minutes, with 5-

minute breaks between each consecutive session.  The total therapy time for IOP clients was thus
reduced to 124 minutes per day, or just over 10 hours per week.[4]

64.    Despite this drastic reduction in the amount of care provided to NuWay clientele,
NuWay continued submitting claims to government health care programs for four, one-hour
units of H2035 per day—the equivalent of 20 hours of care per week.  Vennes and Roberts
reasoned that NuWay could provide less care, without experiencing a corresponding reduction in
reimbursement, by separately billing each 31-minute period of group therapy as a single, one-
hour unit of service.  Put otherwise, the Defendants unbundled and separately billed consecutive
sessions of the same service (group therapy) that were separated only by brief, five-minute
breaks, such that NuWay repeatedly claimed two separate one-hour units of service within the
same hour of care.  Vennes and Roberts thus deliberately structured NuWay's IOP and related
billing procedures to vastly overstate the amount of care actually provided to clients on claims
submitted to government health care programs, in contravention of state and federal law
governing billing for timed services.

65.    Marston was not involved in the decision to change NuWay's IOP schedule and
learned about the change in 2020, when he and the Revenue Cycle department at NuWay were
asked to process IOP claims to government health care programs.  During a 2020 NuWay
leadership team meeting, Roberts told NuWay leadership that he had implemented the change to
31-minute sessions, explaining that he did so to address challenges posed by the COVID-19
pandemic and related shift to telemedicine.  Roberts concealed that he and Vennes had
implemented the change in November 2019, long before any COVID-19-related shutdowns.

---

[4] In April 2022, the length of group therapy sessions was increased to 35 minutes.

**B.    Defendants Knowingly Violated Documentation Requirements Necessary for Reimbursement of SUD Treatment Services**

66.    Additionally, since at least 2018, Defendants knowingly violated basic documentation requirements to support the claims NuWay submitted to government health care programs.

67.    NuWay House's documentation failures are extensive and include, for example, that:  (1) despite billing enhanced rates for mental health and substance use disorders, NuWay's client assessment documentation routinely did not include co-occurring mental health diagnoses—instead including only pre-filled SUD diagnosis codes; (2) NuWay counselors did not update treatment plans during treatment; and (3) NuWay did not maintain individualized and correct documentation of therapy services.  Rather, counselors charted each therapy session with a standard, non-patient-specific note that the client was present and recorded each session in client charts as lasting exactly 31 minutes.  That thousands of client notes document identical service durations across multiple claims, when some sessions end early, while others go over scheduled time; and clients arrive late or depart early, makes it extraordinarily unlikely that all NuWay services were, at all times and for all clients, precisely the same duration.

68.    These documentation violations are well-known to NuWay's directors and officers, including Vennes and Roberts, as NuWay and its affiliates have been repeatedly cited for these violations during the past four years and earlier by MDHS and during audits and evaluations by private payers ███████████████.  Despite being ordered to make changes to correct these violations, Defendants took no such action, preferring to "drive 65 in a 55" instead.

**1.    A 2018 SIRS Audit and Correction Order Identifies Severe and Systematic Documentation Failures at NuWay**

69.    Specifically, in 2018, MDHS's Surveillance and Integrity Review Section ("SIRS") audited NuWay and identified serious and systematic documentation violations by

NuWay.  To address these issues, Vennes, on behalf of NuWay, signed a stipulated provider agreement, in which NuWay agreed to return money wrongfully paid by government health care programs and to promptly address the documentation and other violations concerning claims sent to government health care programs.  Roberts was deemed responsible for addressing these issues on a prospective basis.

70.    In addition, following a routine licensing review later in 2018, NuWay received a Correction Order from MDHS licensure authorities on November 13, 2018.  The Correction Order stemmed from a review of NuWay's compliance with SUD facility license requirements and identified numerous violations of Minnesota law, namely that:

(i)   NuWay "failed to document all services for which requests for payment of public funds for medium intensity residential treatment services as outlined in [Minn. Stat. § 254B.05, subd. 5(b)(8)] were provided[.]" found that various NuWay facilities had "failed to comply with an applicable law, statute, or rule";

(ii)  NuWay "failed to meet the requirements to receive enhanced rate funding for programs that offer services to individuals with co-occurring mental health and chemical dependency problems under [Minn. Stat. §254B.05, subd. 5(c)]" – often because no documentation existed to support such funding – yet billed at this enhanced rate; and

(iii) NuWay "failed to document all services for which requests for payment of public funds for non-residential treatment services as outlined in [Minn. Stat. § 254B.05, subd. 5(b)(1)] were provided," and "billed for more hours of services than could be supported by documentation" on numerous occasions.

71.    The Correction Order stated that "[i]immediately and on an ongoing basis, the license holder must ensure that compliance with the provider enrollment agreement or registration requirements for receipt of public funding meets all applicable requirements and that all treatment services are provided in the amount and type that are billed for.  Within 30 days of receipt of this order, the license holder must submit a plan detailing how these requirements will be met and monitored on an ongoing basis."

72.    In addition, the Correction Order identified numerous repeated violations of Minnesota law requiring documentation supporting claims made to government health care programs, including, among other things:

(i)   Violation of Minn. Stat. §§ 254A.19, subd. (b), 245A.65, subd.2(a), and 245G.09, subd. 3, requiring documentation that orientation was provided to clients on various issues;

(ii)  Violation of Minn. Stat. § 245G.05, subd. 1(b), requiring documentation that clients were provided with educational information concerning treatment options for opioid addiction;

(iii) Violation of Minn. Stat. § 245G.04(a), requiring that initial service plan be completed on the day of service initiation and describe the needs to be addressed in the first treatment section;

(iv) Violation of Minn. Stat. § 245G.09, subd. 3, requiring an assessment of the client's risk of abusing other vulnerable adult;

(v)  Violation of Minn. Stat. § 245G.05, subd. 1(a), requiring that comprehensive assessment be signed and dated, completed on the day of service initiation, contain basic demographic and medical history information;

-33-

(vi) Violation of Minn. Stat. §§ 245G.06, subd. 1 and 245G.20(5), requiring that treatment plans be completed on the fourth session after service initiation, that treatment plan updates be signed by the client, documentation of updated treatment plans, specification of the amount, frequency, and anticipated duration of treatment, identification of referral resources to client when needs should be addressed concurrently by another provider, identification of goals to be reached in order to complete treatment, and identification of active interventions to stabilize mental health symptoms in the case of clients with co-occurring disorders;

(vii) Violation of Minn. Stat. §§ 245G.06, subd. 3, 245G.09, subd. 3(7), and 245G.20(6), requiring that client files contain documentation of issues related to attendance and adequate weekly treatment plan reviews; and

(viii) Violation of Minn. Stat. § 245G.06, subd. 4, requiring timely, complete, and accurate service discharge summaries.

73. The Corrective Order required NuWay to ensure immediate and ongoing compliance with these laws and to cure the deficiencies within 30 days.

74. However, as detailed herein, Defendants implemented no corrective measures to address these deficiencies and compounded the problems with new fraudulent and abusive practices designed to fraudulently maximize NuWay's revenue while NuWay provided medically unnecessary and deficient care to NuWay clients.

**2.    BCBS/Anthem Identify Severe and Systematic Documentation Failures and Duplicative Billing by NuWay During a 2021 Desk Audit**

75. In the spring of 2021, following a desk audit by Blue Cross and Blue Shield of Minnesota ("BCBS"), NuWay received a recoupment demand from BCBS for 100% of

approximately $180K paid by BCBS for services at NuWay, due to missing or insufficient documentation.  Simultaneously, a different Blue Cross Blue Shield insurer, Anthem, hired an outside consultant, Alliant Consulting, Inc. ("Alliant") to audit NuWay charges totaling over $430k.

76.    In addition, of 32 client files reviewed by Alliant during the audit, ***32 of 32 of the files contained deficient client assessments, no diagnosis, and no explanation of medical necessity for treatment***.  The Alliant audit also stated that the units of services being billed by NuWay were not supported by the units of service documented regarding 620 claims – a reference to both the striking insufficiency of group therapy records and NuWay's ongoing practice of billing one hour-long unit of care for each of four, 31-minute-long segments of therapy.  Specifically, the audit findings state that, among other things:

**Reviewer Comments:**

Sixty-eight (68) claims within fifteen (15) clinical records did not contain documentation to support that the service billed was rendered. Services impacted by this finding included the following:

- Fifty-five (55) claims for treatment services (H2035 and H2035 HQ). All of these claims were also billed with the co-occurring complexity (HH) modifier.
- Nine (9) claims for peer support services (H0038 U8).
- Four (4) claims for treatment coordination (T1016 HN U8).

In six hundred twenty (620) instances across thirty-one (31) records, the units of service billed were not supported by the units of service documented. There were several reasons for this citation:

- Four (4) hours of group counseling were billed for one hundred fifty five (155) minutes of service. In these instances services were billed with one (1) start and end time documented for the entire session (i.e., 1:30pm-4:05pm). This group was then followed by a second group supporting an additional forty-five (45) minutes of service. In most cases, this group consisted of a lecture or video, and the topics were not always clearly relevant to the members' treatment plans. (Example I on Shared Drive)
- Four (4) hours of group counseling were billed separately with individual start and end times documented on each note. In almost all instances, the start and end time supported exactly thirty-one (31) minutes of service. Additionally, all of the notes contained a "Group note" followed by an "Individual note." When written in this format, the notes appeared to be duplicated with minimal, if any, changes.. As a result, the documentation did not support the number of units billed. (Example J on Shared Drive)

77.    Alliant also found that, for 243 claims, the treatment plan documented was deficient, or in the case of 17 claims, altogether missing; and that the procedure code billed was not correct for the service provided for 572 claims.

78.    In the process of retrieving and reviewing claims for the Anthem audit, moreover, NuWay's Revenue Cycle personnel identified over 4,300 line items in 2021 alone in which NuWay's clinical documentation did not match the selected billing code.

79.    NuWay conveyed to BCBS/Anthem that NuWay was engaged in extensive efforts to correct their failures, hoping to overcome BCBS/Anthem's substantial recoupment request. These assurances were, however, contradicted both by Vennes's statements to Marston behind closed doors and Vennes's actions.  For example, around this time, Vennes came to view both Marston's and the broader Revenue Cycle team's interest in compliant billing practices as an impediment to his and Roberts' goal of fraudulently maximizing reimbursement and sought to distance Marston and Revenue Cycle personnel from billing compliance issues.

80.    Specifically, during the fall of 2021, while this audit was ongoing, Marston raised to Vennes that NuWay Alliance and NuWay House's compliance practices were not as strong as Vennes typically represented and strongly recommended that NuWay Alliance implement a compliance program based on compliance program guidance issued by the HHS Office of Inspector General ("OIG") and widely adopted as industry standard.

81.    On September 17, 2021, Marston presented to Vennes a compliance plan that included a hotline through which all NuWay House and NuWay Alliance employees could report ethical violations directly to the Board, consistent with the OIG compliance program guidance. Far from supporting the proposed plan, Vennes was incensed by Marston's suggestion that NuWay Alliance would expend resources on compliance—which Vennes viewed as reducing revenue surplus and potentially slowing the admission of new clients.  Vennes expressed, moreover, that he would not implement any plan that included any means through which an employee could bypass Vennes and report compliance concerns to the Board.  Concerned that Marston and Revenue Cycle personnel would continue to push for the implementation of compliance measures, Vennes immediately informed Marston that Marston and the broader Finance Department was to be "firewalled" from any legal or compliance matters, which would

now be the responsibility of Tom Meier, NuWay's Chief Administrative Officer.

82.    At the conclusion of the BCBS/Anthem audits, the auditors held an exit meeting with NuWay officers on January 13, 2022.  This meeting was led by outside counsel, who NuWay had engaged to respond to the audits.  Dr. Corey Waller and Dr. Michael Miller – consultants then engaged by outside counsel on NuWay's behalf – also attended.  Approximately 15 employees of BCBS, Anthem, Alliant, and NuWay Alliance's leadership team and applicable clinical, compliance and finance directors also attended.

83.    During this meeting, BCBS/Anthem voiced grave concern about the documentation practices at NuWay.  NuWay officers and agents vigorously expressed their commitment to improving its compliance practices and informed BCBS/Anthem that NuWay would engage Dr. Waller's consultancy, HMA, in addition to a medical coding training and certification association, American Academy of Professional Coders ("AAPC"), to assist with improvements to NuWay's documentation practices.  Solely due to NuWay's representations regarding its self-correction plan, BCBS/Anthem ultimately withdrew their recoupment requests.  BCBS/Anthem informed NuWay it was provided "Directed Feedback" about required documentation corrections and considered the audits complete.

84.    Upon completion of the BCBS/Anthem audit, however, Defendants – led by Vennes and Roberts – again took no action to correct NuWay's documentation practices, as now recommended by BCBS/Anthem, ███████████████, and previously, MDHS.  Instead, NuWay continued to engage in the same abusive and fraudulent practices designed to fraudulently maximize the amount received by NuWay from government health care programs, while providing deficient and medically unnecessary care to its clients at levels significantly lower than represented.

### 3.     MDHS Identifies Additional Documentation and Service Failures at Cochran Recovery Services in a December 2021 Correction Order

85.     Meanwhile, allegations of compliance deficiencies continued to mount. Following a routine licensing review, on December 30, 2021, MDHS issued a Correction Order to Cochran Recovery Services, care of Robert, that identified numerous violations of Minnesota law following a routine licensing review.  See Minn. Dep't of Human Servs., Correction Order Letter to Cochran Recovery Services, Inc.  (Dec. 30, 2021), *available at* https://www.dhs.state.mn.us/main/idcplg?IdcService=GET_DYNAMIC_CONVERSION&RevisionSelectionMethod=LatestReleased&dDocName=LLO_461459.  Among other things, MDHS licensure authorities found repeated violations of each of:

> (i) Minn. Stat. §§ 245A.04, subd. 1(i) and 245A.191(a), which require that requests for payment of public funds for services meet applicable requirements to receive an enhanced rate;
>
> (ii) Minn. Stat. §§ 245.05, subd. 1(a) and 245G.09, subd. 3, which require that comprehensive client assessments include certain information about the client's needs;
>
> (iii) Minn. Stat. §§ 245G.06, subds. 1-2 and 345G.09, subd. 3(6), which require that individual treatment plans contain certain information;
>
> (iv) Minn. Stat. §245G.06, subd. 3(a), which requires documentation of weekly reviews of treatment services; and
>
> (v) Minn. Stat. § 245G.06, subd. 3(c), which requires inclusion of certain information in treatment plan reviews.

86.     The Correction Order required NuWay to ensure immediate and ongoing compliance with these laws, and/or to cure the deficiencies within 30 days.  Vennes signed and

returned the Correction Order, signaling NuWay's agreement to cure the identified deficiencies.

87.    Generally, Vennes had expressed that he was not concerned about MDHS licensure review findings because, in his view, it was MDHS's job to look for problems and all SUD providers receive negative feedback from MDHS.

88.    The Defendants took no action in response to the Correction Order.

> ### 4.    NuWay Receives a CID from U.S. DOJ in April 2022 Relating to an Alleged Kick-Back Scheme and Marston Engages His Own Counsel

89.    Separately, on April 1, 2022, NuWay House received a Civil Investigative Demand ("CID") from the U.S. Department of Justice ("DOJ") regarding a False Claims Act investigation about NuWay's provision of housing in exchange for agreeing to receive outpatient treatment at NuWay (*i.e.*, whether such exchange constitutes an illegal "kick-back" and a false claim to government health care programs).

90.    The CID specifically identified Marston by title, *i.e.*, in his official capacity as CFO, and Marston provided information to the DOJ in response to the CID through his provision of documents and by an interview on September 16, 2022.

91.    In connection with the CID, and upon NuWay outside counsel's statement to him that (1) NuWay's counsel does not represent him in connection with the CID, and (2) Vennes was likely to set Marston up to "take the fall" for the organization's mounting compliance issues, Marston hired the undersigned counsel to advise him regarding the CID in August 2022.

92.    Beginning in about August 2022, Marston incurred attorneys' fees and expenses in connection with the CID.  Despite repeated requests to NuWay for advancement of these fees, as required by Minn. Stat. § 317A.521, NuWay has not reimbursed Marston for any such fees.

> ### C.    HMA Warns NuWay in August 2022 That NuWay Is Facing Serious Fraud, Waste, and Abuse Liability for Their Clinical Documentation Failures

93.    Faced with these ongoing failures, Marston encouraged NuWay to engage HMA

to provide compliance consulting services.  In the spring of 2022, a year after BCBS/Anthem made its recoupment demand, Meier acknowledged that NuWay and its affiliates needed to improve their compliance practices to expand into additional states and engaged HMA to assist in remedying the compliance deficiencies identified during the BCBS/Anthem audit.  Onsite and remote working sessions were held between HMA and NuWay personnel during June and July of 2022, during which HMA reviewed NuWay's clinical and revenue cycle operations.  However, consistent with Vennes's earlier announced "firewalling" of Marston, Marston was not invited to meetings with HMA, except for one meeting to which he was invited, on the day of the meeting, by Roberts.

94.    On August 11, 2022, Dr. Waller of HMA provided Vennes with a report summarizing numerous, significant clinical documentation failures by NuWay, most of which had been known to Defendants – and gone uncorrected – for years.  In conversations between Dr. Waller and Vennes, as relayed to Marston by Vennes, Dr. Waller characterized NuWay's residential program documentation as "poor," and its outpatient documentation as "non-existent."

95.    Vennes met with the NuWay leadership team, including Marston, Roberts, and Meier, the following day, but did not inform them of HMA's latest report or recommendations, again turning a blind eye to the company's ever-growing growing fraud, waste, and abuse liability.

96.    That same day, HMA presented its findings to NuWay's management team, including Marston, Meier, Roberts, Angela Hansen (Director of Quality, Training and Compliance), Morgan Kluender (Director of Revenue Cycle), Lindsay Gephart (Vice President, Outpatient Services), and Marian Spiess (Director of Residential Services).  In its presentation,

HMA stated that NuWay had not implemented changes to its documentation practices since the BCBS/Anthem audit in 2021. Additionally, in its presentation, HMA advised NuWay, in no uncertain terms, that NuWay had submitted and continued to submit false claims in violation of the FCA. Although HMA characterized many deficiencies as relating to NuWay Alliance's "Revenue Cycle," the vast majority fell under the purview of NuWay House's clinical arm, under the leadership of Roberts.

97.    Among other things, HMA listed the following deficiencies in its report:

(i)  Primary diagnosis codes were routinely added to the electronic health record ("EHR") prior to assessment of the patient;

(ii) When submitting claims for payment, NuWay routinely used the same modifier for co-occurring diagnoses, without variation between patients, as would be expected if such modifiers were used only when the patient's medical record accurately reflects co-occurring diagnoses;

(iii) NuWay failed to verify primary diagnosis codes using a certified coder and/or clinician;

(iv) NuWay failed to perform sufficient internal audits of medical records and claims;

(v) Inconsistent and "light" documentation, primarily for residential clients;

(vi) Residential programming does not clearly support ASAM Level 3.5, the level of care that NuWay represents it provides in its residential programs.

(vii)    Residential group notes do not support medium intensity programming requirements.

98.    Among other things, HMA's presentation assigned to Roberts the tasks of

correcting clinical documentation and identifying and remediating gaps between NuWay's documentation and services and those called for by ASAM level of care criteria.

99.    At the conclusion of his presentation of HMA's report, Dr. Waller warned the NuWay officers in attendance of the gravity of NuWay House's documentation failures.  In particular, despite being unaware of NuWay's pending CID, Dr. Waller informed the attendees that, based on his experience as an expert for CMS and federal regulators, NuWay would easily lose a fraud, waste, and abuse lawsuit.

100.    Overwhelmed and disturbed by Dr. Waller's statements, Marston then asked if Dr. Waller could identify the most serious and pressing issues faced by NuWay.  Dr. Waller responded that the crux of the problem was NuWay House's "clinical practices and documentation."  In addition, Dr. Waller stated that the company had "months to make the changes" and that if the company had not "righted the ship" within six to nine months, it would be too late.  Dr. Waller stressed that NuWay House's documentation does not support the claims it submits to payers and noted that he recently worked on what he considered a similar case, in which the defendant psychiatrist was sentenced to 36 months in prison.

### D.    Marston Notifies NuWay Management That NuWay Has Billed Government Health Care Programs for More Than $30 Million in Duplicate Services and Suspends Billing of Fraudulent Claims

101.    Also on August 11, 2022, NuWay Revenue Cycle Director Morgan Kluender informed Marston that NuWay's practice of charging government health care programs "four [on-hour] units" for four, successive 31-minute therapy sessions, with five-minute breaks between each, had resulted in about $30 million in additional revenue from government health care programs to NuWay since the practice began in November 2019.

102.    Marston immediately instructed Kluender to formulate a plan to obtain accurate billing data in order to proactively identify any overpayments and take corrective action.  Using

NuWay's software for EHR, Procentive, Kluender compiled data from March 2020 through early August 2022. With the assistance of NuWay's financial consultant, eCapital Advisors, LLC ("eCapital"), Kluender extracted data on every outpatient service billed during that period (approximately 2.5 million line items). eCapital data scientists then formatted and filtered the data in a spreadsheet, reflecting all instances in which the defendants submitted false claims to health care programs with more than one unit of service billed for the same, one-hour period of therapy. An excerpt from the eCapital analysis (below) establishes Defendants engaged in fraudulent pattern billing by claiming four 31-minute therapy sessions as four, one-hour units of service per day. Each row is a separate claim submitted to a health care program, including government health programs administered by government contractors. For example, Client 6354 received 2 hours and 10 minutes of care, yet Defendants billed Medical Assistance for 4 units (representing 4 hours) of care, with duplicate billing for the same hour of care. Defendants repeated this pattern for each client on the excerpt. This spreadsheet also establishes that, in the month of June of 2021 alone, Defendants caused NuWay to submit about 80,000 claims for therapy under HCPCS Code H2035 for a one hour unit, when in fact NuWay only provided 31 minutes of care.

| Date of Service | Staff | Client Number | Payer | Code | Modifiers | Hours | Units | Start Time | End Time | Charge | Programs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/21/202 | Walford, Matth | 11471 | UCare - PMAP (before 12.31.2021) | H2035 HQ HQ HH GT | | 0.52 | 1.00 | | 09:01 AM | 41.68 | Outpatient-University |
| 6/21/202 | Walford, Matth | 11471 | UCare - PMAP (before 12.31.2021) | H2035 HQ HQ HH GT | | 0.52 | 1.00 | | 09:37 AM | 41.68 | Outpatient-University |
| 6/21/202 | Walford, Matth | 11471 | UCare - PMAP (before 12.31.2021) | H2035 HQ HQ HH GT | | 0.52 | 1.00 | 09:42 AM | 10:13 AM | 41.68 | Outpatient-University |
| 6/21/202 | Walford, Matth | 11471 | UCare - PMAP (before 12.31.2021) | H2035 HQ HQ HH GT | | 0.52 | 1.00 | 10:18 AM | 10:49 AM | 41.68 | Outpatient-University |
| 6/21/202 | Hewitt, Timothy | 15457 | Health Partners - PMAP | H2035 HQ HQ 95 | | 0.52 | 1.00 | 08:30 AM | 09:01 AM | 39.3 | Outpatient-University |
| 6/21/202 | Hewitt, Timothy | 15457 | Health Partners - PMAP | H2035 HQ HQ 95 | | 0.52 | 1.00 | | 09:37 AM | 39.3 | Outpatient-University |
| 6/21/202 | Hewitt, Timothy | 15457 | Health Partners - PMAP | H2035 HQ HQ 95 | | 0.52 | 1.00 | | 10:13 AM | 39.3 | Outpatient-University |
| 6/21/202 | Hewitt, Timothy | 15457 | Health Partners - PMAP | H2035 HQ HQ 95 | | 0.52 | 1.00 | 10:18 AM | 10:49 AM | 39.3 | Outpatient-University |
| 6/21/202 | Freerksen, Ellie | 15361 | Blue Plus - PMAP | H2035 HQ HQ HH | | 0.52 | 1.00 | 08:30 AM | 09:01 AM | 41.68 | Outpatient-Rochester |
| 6/21/202 | Pendal, Joseph | 13979 | UCare - PMAP (before 12.31.2021) | H2035 HQ HQ HH GT | | 0.52 | 1.00 | 08:30 AM | 09:01 AM | 41.68 | Outpatient-University |
| 6/21/202 | Pendal, Joseph | 13979 | UCare - PMAP (before 12.31.2021) | H2035 HQ HQ HH GT | | 0.52 | 1.00 | | 09:37 AM | 41.68 | Outpatient-University |
| 6/21/202 | Pendal, Joseph | 13979 | UCare - PMAP (before 12.31.2021) | H2035 HQ HQ HH GT | | 0.52 | 1.00 | 09:42 AM | 10:13 AM | 41.68 | Outpatient-University |
| 6/21/202 | Pendal, Joseph | 13979 | UCare - PMAP (before 12.31.2021) | H2035 HQ HQ HH GT | | 0.52 | 1.00 | 10:18 AM | 10:49 AM | 41.68 | Outpatient-University |
| 6/21/202 | Rothstein, Mega | 8035 | Blue Plus - PMAP | H2035 HQ HQ HH GT | | 0.52 | 1.00 | 08:30 AM | 09:01 AM | 41.68 | Outpatient-211B |
| 6/21/202 | Rothstein, Mega | 8035 | Blue Plus - PMAP | H2035 HQ HQ HH GT | | 0.52 | 1.00 | | 09:37 AM | 41.68 | Outpatient-211B |
| 6/21/202 | Rothstein, Mega | 8035 | Blue Plus - PMAP | H2035 HQ HQ HH GT | | 0.52 | 1.00 | | 10:13 AM | 41.68 | Outpatient-211B |
| 6/21/202 | Rothstein, Mega | 8035 | Blue Plus - PMAP | H2035 HQ HQ HH GT | | 0.52 | 1.00 | 10:18 AM | 10:49 AM | 41.68 | Outpatient-211B |
| 6/21/202 | Helget, Mary | 15167 | Hennepin Health - PMAP | H2035 HQ HQ HH | | 0.52 | 1.00 | 08:30 AM | 09:01 AM | 41.68 | Outpatient-211B |
| 6/21/202 | Helget, Mary | 15167 | Hennepin Health - PMAP | H2035 HQ HQ HH | | 0.52 | 1.00 | | 09:37 AM | 41.68 | Outpatient-211B |
| 6/21/202 | Helget, Mary | 15167 | Hennepin Health - PMAP | H2035 HQ HQ HH | | 0.52 | 1.00 | 09:42 AM | 10:13 AM | 41.68 | Outpatient-211B |
| 6/21/202 | Helget, Mary | 15167 | Hennepin Health - PMAP | H2035 HQ HQ HH | | 0.52 | 1.00 | 10:18 AM | 10:49 AM | 41.68 | Outpatient-211B |
| 6/21/202 | LiuXia, Alice | 1930 | Blue Plus - PMAP | H2035 HQ HQ HH GT | | 0.52 | 1.00 | 08:30 AM | 09:01 AM | 41.68 | Outpatient-211B |
| 6/21/202 | LiuXia, Alice | 1930 | Blue Plus - PMAP | H2035 HQ HQ HH GT | | 0.52 | 1.00 | | 09:37 AM | 41.68 | Outpatient-211B |
| 6/21/202 | LiuXia, Alice | 1930 | Blue Plus - PMAP | H2035 HQ HQ HH GT | | 0.52 | 1.00 | 09:42 AM | 10:13 AM | 41.68 | Outpatient-211B |
| 6/21/202 | LiuXia, Alice | 1930 | Blue Plus - PMAP | H2035 HQ HQ HH GT | | 0.52 | 1.00 | 10:18 AM | 10:49 AM | 41.68 | Outpatient-211B |
| 6/21/202 | Meyer, Alicia | 15223 | Hennepin Health - PMAP | H2035 HQ HQ HH | | 0.52 | 1.00 | 08:30 AM | | 41.68 | Outpatient-211B |
| 6/21/202 | Meyer, Alicia | 15223 | Hennepin Health - PMAP | H2035 HQ HQ HH | | 0.52 | 1.00 | | 09:37 AM | 41.68 | Outpatient-211B |
| 6/21/202 | Meyer, Alicia | 15223 | Hennepin Health - PMAP | H2035 HQ HQ HH | | 0.52 | 1.00 | 09:42 AM | 10:13 AM | 41.68 | Outpatient-211B |
| 6/21/202 | Meyer, Alicia | 15223 | Hennepin Health - PMAP | H2035 HQ HQ HH | | 0.52 | 1.00 | | 10:49 AM | 41.68 | Outpatient-211B |
| 6/21/202 | Challender, Kevi | 6354 | MA (R24 Higher Rate) - Medical Assistance | H2035 HQ HQ HH | | 0.52 | 1.00 | 08:30 AM | 09:01 AM | 41.68 | Outpatient-University |
| 6/21/202 | Challender, Kevi | 6354 | MA (R24 Higher Rate) - Medical Assistance | H2035 HQ HQ HH | | 0.52 | 1.00 | | 09:37 AM | 41.68 | Outpatient-University |
| 6/21/202 | Challender, Kevi | 6354 | MA (R24 Higher Rate) - Medical Assistance | H2035 HQ HQ HH | | 0.52 | 1.00 | | 10:13 AM | 41.68 | Outpatient-University |
| 6/21/202 | Challender, Kevi | 6354 | MA (R24 Higher Rate) - Medical Assistance | H2035 HQ HQ HH | | 0.52 | 1.00 | 10:18 AM | 10:49 AM | 41.68 | Outpatient-University |
| 6/21/202 | Killoran, Karen | 14189 | Blue Plus - PMAP | H2035 HQ HQ HH GT | | 0.52 | 1.00 | 08:30 AM | 09:01 AM | 41.68 | Outpatient-Rochester |
| 6/21/202 | Killoran, Karen | 14189 | Blue Plus - PMAP | H2035 HQ HQ HH GT | | 0.52 | 1.00 | | 09:37 AM | 41.68 | Outpatient-Rochester |
| 6/21/202 | Killoran, Karen | 14189 | Blue Plus - PMAP | H2035 HQ HQ HH GT | | 0.52 | 1.00 | | 10:13 AM | 41.68 | Outpatient-Rochester |
| 6/21/202 | Killoran, Karen | 14189 | Blue Plus - PMAP | H2035 HQ HQ HH GT | | 0.52 | 1.00 | 10:18 AM | 10:49 AM | 41.68 | Outpatient-Rochester |
| 6/21/202 | Zwirlein, Emily | 15414 | UCare - PMAP (before 12.31.2021) | H2035 HQ HQ HH GT | | 0.52 | 1.00 | 08:30 AM | 09:01 AM | 41.68 | Outpatient-3Rs |
| 6/21/202 | Zwirlein, Emily | 15414 | UCare - PMAP (before 12.31.2021) | H2035 HQ HQ HH GT | | 0.52 | 1.00 | | 09:37 AM | 41.68 | Outpatient-3Rs |
| 6/21/202 | Zwirlein, Emily | 15414 | UCare - PMAP (before 12.31.2021) | H2035 HQ HQ HH GT | | 0.52 | 1.00 | 09:42 AM | 10:13 AM | 41.68 | Outpatient-3Rs |
| 6/21/202 | Zwirlein, Emily | 15414 | UCare - PMAP (before 12.31.2021) | H2035 HQ HQ HH GT | | 0.52 | 1.00 | | 10:49 AM | 41.68 | Outpatient-3Rs |

103.    For the period of March 2020 through August 2022, eCapital calculated a maximum overpayment amount of $47 million, with a likely overpayment amount at around $30 million.

104.    Because HMA had recently described duplicative and overbilled claims as fraudulent, Marston directed Kluender to refrain from submitting further claims that listed more units of care than were actually provided.

### 1.    Defendants Ignore Marston When He Urges Defendants to Address Their Fraudulent and Abusive Practices

105.    The following day, August 12, Marston met with Vennes and informed him of HMA's findings and that, per Kluender's analysis, NuWay's practice of separately billing each 31-minute group therapy session as a separate, one-hour unit of HCPCs code H2305 had resulted in $30 million in "duplicate claims" in which NuWay billed two, one-hour units for services

rendered during the same hour-long period (the "31-Minute Billing Issue"). Marston urged Vennes to take correction action.

106. Marston recommended that Vennes disclose the HMA findings to the Board and outside counsel. However, Vennes refused.

107. Instead, Vennes threatened and harassed Marston. Specifically, Vennes told Marston he "doesn't want the company to be about risk management." Vennes informed Marston that "there is a lot of risk at NuWay right now" and warned Marston that if he could not handle a high degree of risk, "perhaps [he] should leave." Vennes promised to "take care of" Marston if he left voluntarily.

108. In addition, during this meeting, Vennes attempted to justify NuWay's documentation violations by claiming that "everybody has bad charts" and that NuWay's "are better than everyone else's." Marston reminded Vennes that telling a police officer that "everyone else was speeding" is not helpful when pulled over by a police officer for speeding. Vennes responded that "the only way for NuWay to get where it's going is to drive 65 in a 55." Vennes further stated that, because, in Vennes's view, Medicaid under-reimburses providers, NuWay only needs "40-50 percent of its charts to be in compliance" with Medicaid standards. Vennes reiterated to Marston his intent to continue submitting false claims to government health care programs and called Dr. Waller a "shit magnet."

109. Ultimately, Marston convinced Vennes to suspend submission of claims to government health care programs pending further review of the 31-Minute Billing Issue and to agree that NuWay would inquire of HMA regarding the 31-Minute Billing Issue, provided that Vennes be allowed to first vet Marston's question to ensure that Marston did not elicit any "unintended" feedback from HMA. However, Vennes declined Marston's suggestions to pose

the same question to outside counsel and the Board.

110.    Following this meeting, Marston emailed Vennes a draft question to pose to HMA regarding the 31-Minute Billing Issue.  Vennes directed Marston to send the question to Roberts "for vetting" and noted that Roberts might "nuance and edit" the draft question.  Marston subsequently sent the draft question to Roberts, who responded:  "[t]he verified answer to this question is potentially helpful in the short game but the more pertinent information for long term process improvement is whether we can bill and document one timespan encompassing multiple non-continuous units (in essence, ability to account for breaks without increasing documentation volume).  That answer gets at the crux of sustainability and documentation quality."  Vennes agreed, but instructed Roberts that the question at hand should address only "lingering concerns that being reimbursed for 60 minutes of care for 35 mins [sic] sessions is acceptable or insurance fraud."  Roberts agreed that Marston's question did so, and Vennes directed Marston to submit the question to HMA and report back.  Marston did so on August 13.

111.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████

112.    Meanwhile, on August 13, Lindsay Gephart, NuWay's Vice-President of Outpatient Services, sent a proposed revised schedule for a NuWay location, designed to serve as a "pilot for other sites."  Gephardt noted that "[g]iven the ongoing discussion about billing codes/duplicate billing I wanted to make sure we fully understand what the issues are."  Kluender responded later that day that the proposed change to providing 3 hours and 55 minutes of face-to-treatment "works really well if solving for the HMA conversation yesterday and we plan to bill 4 units daily."  Kluender warned, however that the company should not "try to bill

5 units for the [proposed] schedule" because that "would only perpetuate what was discussed yesterday with the duplicate timespans of clients being two places at once (on paper). Essentially, a client can't have two start times in a give[n] hour.  If we bill lecture from 8-845, the billing for that goes out 8-9 am.  Per the payer and the claim, a client can't be both in lecture and group in the same hour.  Also, ending at 12:05 would mean that nothing (group or Individual) can be billed until 1 pm."  Finally, Kluender noted that "[w]hile 31 minutes is the minimum it rolls into a 60-minute billing unit; so, to have two start times in the same hour block creates an overlap.  That becomes the problem, on paper, the client is two places at once, which is an issue under Fraud, Waste and Abuse."

113.    On August 16, 2022, Marston met with NuWay's outside counsel.  Meier and Vennes also attended this meeting.  After this meeting, as Marston was walking to his car in the parking lot, █████████████████████████████████████████

██████████████████████████

114.    From August 16 through August 18, 2022, Marston contacted eight of the nine Board members by phone and disclosed NuWay's fraudulent conduct, and recommended they consult with HMA and NuWay's outside counsel in defense of the BCBS/Anthem Audit, without NuWay staff present, at the scheduled August 22 Board meeting.  At the insistence of the Directors, Marston then arranged for outside counsel to present at the August 22 Board meeting.

115.    Additionally, on August 17, 2022, Marston discussed the 31-Minute Billing Issue with HMA.  During this call, HMA consultants Briana Jacob and Linda Krish advised that "pattern billing" practices in which the same service duration is always billed for every session and every client raises False Claims Act concerns.  Marston subsequently conveyed to Vennes, Roberts, and Meier that HMA's feedback was that "the frequency of providing just slightly more

than 31 minutes could pose a problem.  It could have the appearance of trying to maximize billable units while providing the bare minimum of care."

116.    As the seriousness and urgency of NuWay's violations continued to mount, Vennes remained disinterested in bringing the company into compliance.  On August 18, Vennes met with the NuWay management team, including Roberts, Meier, Monique Bourgeois (Chief Community Relations Officer at NuWay), and Marston.  Not once during that 90-minute meeting did Vennes mention the HMA report or the 31-Minute Billing Issue.  Marston asked Vennes at the end of the meeting what the plan was to address the HMA findings and Vennes curtly responded that "there is a contract with HMA we're going to sign to fix the problem."

117.    Despite Vennes's placating statements, NuWay – per Vennes and Roberts – continued to do nothing to address its fraudulent billing violations.  On August 22, Vennes prevented outside counsel involved in the audits and compliance reviews from meeting with the Board during its meeting the same day, opting, instead, to have different outside counsel, who was less familiar with NuWay's billing compliance issues and who Vennes viewed as more likely to downplay (if not wholly deny) such issues, present to the Board as NuWay's outside counsel.  During their August 22, 2022 meeting, however, the Board did meet with HMA and interviewed NuWay staff regarding the 31-Minute Billing Issue and other concerns of fraudulent billing practices.

118.    The same day, outside counsel who was not allowed to present at the Board meeting withdrew from representation of NuWay.

119.    On August 23, 2022, HMA emailed Meier a proposed amended contract for assisting NuWay in taking actions to correct its fraudulent and abusive billing practices.

120.    On August 25, 2022, Marston emailed Vennes with proposed corrective actions,

consistent with HMA's recommendations, but Vennes did not respond.  Marston asked Vennes

during a NuWay leadership meeting later the same day about engaging HMA to implement

corrective actions.  Vennes did not respond, stating merely that he did not know how to run an

organization except by cultivating a culture of "performance."

121.    Marston emailed Vennes, Meier, and Roberts on August 25, 2022 to provide an

"[u]pdate on claims."  The email stated that NuWay was "still holding IOP claims so that no

further harm is done to the company" and identified three issues:[5]

1. Per HMA IOP clinical documentation is insufficient to justify billing
2. Per HMA and ▮▮▮▮▮▮▮, the practice of always billing just over the minimum required time is problematic.
3. When combing these two issues the problems compound.

Marston noted that the IOP withheld claims amount to about $800,000 per week and proposed a

"few short-term fixes that should be implemented immediately, namely":

1. Change documentation requirements immediately
2. Turn on the hard-stop Audit Ready box in Procentive so that a Program Manager must review and approve clinical documentation as meeting HMA's standard before a claim can be generated.
3. Turn on any other hard-stop boxes in Procentive to address documentation issues, for instance, diagnosis codes.
4. Align programming with the number of hours/units being billed.
5. Relocate the compliance department outside of the department they audit.

Marston asked that Vennes, Meier, and Roberts "advise if any changes have been made to any of

the above items."

122.    Vennes and Marston met again the next day, August 26, 2022, with Meier present

as a witness at Vennes's direction.  During this meeting, Vennes asked Marston about the 31-

---

[5] Portions of this email have been redacted to withhold information that NuWay may claim is protected by the attorney-client privilege and/or attorney-work product doctrine.

Minute Billing Issue exposure, the process for estimating the amount overcharged, and the date on which Marston had stopped submitting claims for reimbursement. Meier asked if there was something NuWay should be doing to address the issue and Vennes responded: "we have a lot of reserves and can do this for quite a while, I just need to know the liability." Marston stated: "my top priority is getting clarity so we can bill, I just need a legal opinion."

123.    Rather than responding to Marston's proposed corrective actions or obtaining a legal opinion that billing could continue, despite the 31-Minute Billing Issue, Vennes threatened Marston, demanding in an August 29, 2022 email that Marston meet with NuWay's outside counsel (*i.e.*, counsel who had not resigned) without Marston's counsel (who Marston had recently engaged) present. Marston responded to Vennes's threatening email that same day, stating that his attorney had advised him not to meet with NuWay counsel without his own counsel present. Marston also asked if Vennes had engaged HMA. Vennes did not respond.

124.    Marston contacted Kluender on August 29, 2022 to determine whether NuWay had made any changes to NuWay's clinical documentation practices, since Marston was not aware of any communications from Roberts or Vennes announcing such changes. Kluender responded that she was unaware of any such changes.

125.    In emails on August 29 and August 30, 2022, Vennes threatened Marston, again directing Marston to meet with NuWay counsel without Marston's counsel present. Vennes advised Plaintiff that one solution would be for Marston to fire his current counsel and retain new counsel and bring them to a meeting on August 31, the following day. Marston had received no request from NuWay counsel to meet, or from Vennes requesting a meeting, other than the threatening email from August 29.

126.    On August 30, 2022, Marston learned from Meier that, despite HMA having

provided an engagement contract, HMA still had not been engaged and that Vennes was responsible for determining when and if HMA would be engaged.

127.    On August 31, 2022, Marston emailed Vennes an update on withheld claims and recommended that he fix NuWay's billing and documentation practices immediately, pursuant to the plan already laid out by HMA.  Marston advised Vennes that NuWay's staff knew how to fix the problems.  Once again, Vennes did not respond.

128.    During a NuWay leadership team meeting on September 1, 2022, Marston again inquired of Vennes whether NuWay would engage HMA to pursue corrective actions.  Vennes responded that Meier and Robert would advise Vennes regarding engagement of HMA.  Vennes also told Marston that there was no longer any concern regarding the 31-Minute Billing Issue, and directed Marston to cease analysis.

129.    During this meeting, Marston learned that, at the end of August, Board members Doug Hall and Jeff Cowen had resigned from the Board following the Board's August 22 meeting with HMA and its discussion of NuWay's fraudulent billing and documentation practices.

130.    Following the September 1, 2022 NuWay leadership team meeting, and despite Vennes's statement that the 31-Minute Billing Issue did not pose a concern, NuWay's Revenue Cycle personnel informed NuWay leadership that, given the uncorrected deficiencies identified in the HMA report, they would not continue to submit claims.[6]

131.    During a subsequent six-minute meeting between Vennes, Meier, and Marston on September 2, Marston disclosed that $180,000 in claims per day, about $3 million total, were

---

[6] Upon information and belief, Meier—who was assigned responsibility for billing after Marston was terminated—later attempted to persuade Revenue Cycle personnel to resume submission of claims by informing them that HMA had "recanted" its report.  When Revenue Cycle personnel demanded proof that the report had been recanted, Meier did not respond.

still being withheld by NuWay pending the duplicate billing issue. Once again, Vennes did not ask for input regarding resolution of NuWay's False Claims Act violations.

132. On September 6, 2022, Roberts, Meier, Hansen, Kluender and Marston participated in a NuWay Compliance Committee meeting, which was recorded by NuWay. During that meeting, Marston again stated that NuWay should engage HMA immediately.

133. Further, on September 6, 2022, Marston and his counsel met with NuWay's remaining outside counsel.

134. During a NuWay leadership team meeting held on September 8, 2022, Marston's August 25, 2022 email to Vennes, Meier, and Roberts was displayed on the board room screen and his recommendations were discussed. During this meeting, Marston recommended that NuWay create a coding department to ensure accuracy of NuWay's documentation so NuWay could resume billing as soon as possible. Marston advised that these changes should be made quickly and that, to wait 30-60 days, as earlier suggested by Meier during the meeting to avoid upsetting NuWay counselors, would be expensive compared to "flipping the switch" and dealing with staff unrest as they adjust. Vennes, however, did not direct that any action be taken or inquire about executing Marston's recommendations. No one at the meeting responded to Marston's remarks. Marston reminded the attendees that HMA was available to help remedy the compliance and billing fraud issues.

135. Marston, Vennes, and Meier met again on September 9, 2022 for approximately 10 minutes. During this meeting, Vennes did not ask Marston for any input regarding resolution of NuWay's documentation and billing fraud issues, Marston's recommendations regarding the same, or engagement of HMA.

136. Faced with Vennes's and NuWay's now chronic inaction, Marston again emailed

Vennes, Meier, and Roberts on September 12, 2022 stating that it had been one month since HMA reported NuWay would lose a lawsuit alleging fraud, waste, and abuse in its receipt of payment from government health care programs.  In the same email, Marston provided a financial impact update, offered changes that would help move the company toward a resumption of billing, and asked if any changed that HMA had recommended had been implemented.  Vennes did not respond.

137.    The same day, Vennes cancelled NuWay's leadership team meeting scheduled for later that day.  During that meeting, which was held regularly and rarely, if ever, cancelled – the leadership team could have discussed solutions cross-functionally to fix the company's documentation and billing fraud problems.

138.    On September 14, 2022, Marston alerted Vennes that Marston did not believe NuWay could sign MDHS revalidation forms, which are required to maintain enrollment in government health care programs in Minnesota and which include an attestation that the organization is in compliance with applicable law.  Despite Marston repeatedly disclosing to Vennes and the Board his and outside consultants' concerns about NuWay's billing practices, Vennes responded to Marston's email by asking:  "Why would you assume this?"  And "What your plan to resume billing is?"

139.    Marston responded the same day with attachments and copied text of federal regulations about a company's responsibility to certify that claims are "true, accurate, and complete."  Marston stated that he didn't believe NuWay's claims were "true, accurate and complete."

140.    Shortly thereafter, Vennes again cancelled the NuWay leadership team meeting scheduled for that day at the last minute.

141.    In addition, Marston and Kluender were scheduled to attend a regular meeting with Roberts to facilitate coordination between clinical and Revenue Cycle departments on precisely the cross-functional issues identified by HMA.  However, while Marston and Kluender appeared for this September 15, 2022 meeting, Roberts did not attend.

142.    Bewildered by the lack of action to address the issues preventing NuWay from submitting compliant claims, on September 15, 2022, Marston emailed Vennes and Meier, reminding them that HMA's findings indicated that the problems reside in Roberts' function and not in Marston's function (Revenue Cycle).  Specifically, Marston stated:

> Guys, I think there's a communication breakdown. The claims themselves are pristine and ready to send. The problem is that the clinical documentation doesn't justify being reimbursed for what is on the claim. So by sending the claims as is, we're misrepresenting what happened in the programs because the documentation is inaccurate or insufficient. The issue is what HMA refers to as clinical documentation. Even though they list this type of thing in their Rev Cycle section, at NUWAY, those things are in the clinical function. These include diagnosis, modifiers, notes, attendance, time in/out, etc. All of these things need to support each claim for service. If you want to get it fixed fast we could make a lot of progress by getting everyone in a room to solve it. IMO Angela and Morgan know what to do and just need authority and support.

### 2.    Defendants Fire Kluender for Refusing to Bill Fraudulent Claims and Begin to Retaliate Against and Falsely Blame Marston When He Alerts Law Enforcement to NuWay's Fraud

143.    The following day, September 16, 2022, Vennes and NuWay Alliance fired Kluender because she refused to submit false claims to government and private payers.  NuWay and Vennes also removed the Revenue Cycle department from Marston's oversight, reducing his responsibility by approximately 75%, because he refused to instruct Ms. Kluender to submit false claims.

144.    Vennes sought no assistance from Marston in addressing NuWay's billing or documentation issues.  To the contrary, he sought to prevent Marston from improving NuWay's billing practices.

145.    On September 16, 2022, after Vennes and NuWay Alliance fired Kluender, federal law enforcement interviewed Marston about NuWay's False Claims Act and fraud, waste, and abuse, and retaliation against employees who refused to commit fraud.  On September 18, 2022, Marston's counsel informed NuWay's counsel that Marston had been interviewed by federal law enforcement, and that Marston would "continue to cooperate with [outside counsel's] investigation into the historic and ongoing fraud."  Marston's counsel repeated Marston's August 19, 2022 demand for advancement of legal expenses, as required by Minn. Stat. § 317A.521.

146.    On September 19, 2022, Vennes again cancelled his leadership team meeting with Marston and others.

147.    On September 20, 2022, Vennes met with NuWay's Revenue Cycle department, NuWay's Human Resources department, and the entire NuWay leadership team, but excluded Marston from this meeting.  Vennes, Meier, Roberts, Bourgeouis, and Ryan Clukey (NuWay Vice-President of Human Resources) attended.

148.    The same day, Vennes and NuWay terminated Marston's access to company resources and placed him on administrative leave.  Vennes relieved Marston of all responsibilities and directed him to submit a detailed plan that would advise Vennes how to fix Roberts' clinical documentation and billing practices that HMA found subjected NuWay to False Claims Act liability so NuWay could resume billing.  Vennes incorrectly stated that most problems to be corrected fell within Marston's department and falsely claimed that Marston "continue[d] to impede our investigation into the billing issues and our prompt resolution of them," had "failed to fully cooperate with important internal processes, and had "fundamentally failed to help develop timely solutions."  Vennes directed Marston to present his plan on

September 28 to the NuWay leadership team, and invited Marston to consider mutual separation from NuWay .

149.    Marston presented his plan to Vennes by letter dated September 26, 2022.  In this letter, Marston corrected Vennes's false statements in his September 20, 2022 email, and confirmed that since NuWay's consultants informed him that NuWay was engaging in fraud by submitting false claims to government and private insurers, he repeatedly communicated to Vennes, the Board, other NuWay officers, and now federal law enforcement that NuWay had serious issues and needed to take corrective action.  Marston confirmed that he had fulfilled his responsibility as CFO to detect and prevent fraud, by raising these concerns.

150.    In his September 26 letter to Vennes, Marston reiterated that Vennes had not taken corrective action regarding these serious allegations, and had instead skipped meetings with Marston, refused to discuss the serious allegations of fraud, "firewalled" Marston from NuWay employees and officers, and retaliated against Marston and Kluender for their whistleblower disclosures.  Marston stated that Vennes was attempting to hold him responsible for conduct under Vennes's and Roberts' control, and that they had asked him to recommend a correction action plan to address the issues he had been raising with Vennes and the Board for over a month, when the necessary correction action had already been recommended to NuWay by, inter alia, HMA – recommendations that Vennes refused to acknowledge or implement.

151.    Before detailing his recommendations, Marston recommended that NuWay hire HMA to consult on NuWay's clinical and Revenue Cycle operations, since the identified problems concern clinical documentation and practices, and Marston is not a clinical expert nor a billing expert.  Marston noted that he did not have authority to direct Roberts, Vennes does, and that Vennes had taken no action and provided no response to Marston's recommendation to

direct Roberts or others to implement the recommends of outside counsel or HMA.  Finally,

Marston's September 26 letter contained a timeline of events detailing Marston's prior efforts to

convince Vennes to take corrective action regarding its fraudulent billing practices.

152.    Marston's "Recommended Plan" to NuWay – in his September 26 letter –

proposed the following (with redactions for information about NuWay's discussions with its

counsel):[7]

1. Hire HMA and direct responsible NuWay staff to implement HMA recommendations (se
   forth in their report) within 30 days, including:

   - o  Correct diagnosis coding errors P 4,7; Roberts
   - o  Correct accuracy of modifier usage P 5; Roberts
   - o  Correct pattern time-stamped 31/35-minute groups P 5; Roberts
   - o  Correct inconsistent and light clinical documentation P 11; Roberts
   - o  Close gaps between diagnosed ASAM 3.5 level of care indicated with
        programming provided P 11; Roberts
   - o  Correct documentation that policies are followed P 11; Roberts
   - o  Enroll as MH provider P 6; Vennes
   - o  Create Coder positions P 7; Vennes
   - o  Add clinical staff in UR P 8; Vennes

- Implement the CMS Compliance plan Marston provided in the fall of 2021 ███
  ████████████████████████████

   - o  Establish a VP of compliance position with a direct reporting line to the board of
        directors' compliance committee
   - o  Establish an anonymous 1-800 number for staff to report violations or complaints
   - o  Structure the compliance department to report to the CEO

- Obtain a qualified legal opinion by independent counsel regarding the duplicate billing
  practice.

---

[7] Portions of this email have been redacted to withhold information that NuWay may claim is protected by the
attorney-client privilege and/or attorney-work product doctrine.

- Retain HMA or another company to conduct pre-bill reviews and retrospective coding evaluations. For submitted claims identified in retrospective coding evaluations as unsupported, disclose and return overpayments within 60 days.

- Establish a committee or committees of the Board of Directors responsible for oversight of compliance, audit, and finance with authority to directly communicate with NuWay staff.

Most of these changes need to occur in Roberts' area. This plan can be implemented immediately upon direction of the CEO and Board of Directors. These recommendations are not complicated and only require a sincere desire to execute by the Board, Roberts and you. I am perplexed why you and the Board have been unresponsive to my attempts to implement corrective action.

153.    The following day, Clukey emailed Marston, stating that the plan "does not the expectations of leadership" and informing Marston he would remain on a "paid administrative leave through October 7 at which time NUWAY will be reevaluating your leave pay status and employment generally."  The email concluded:  "At this point, we would like to work with you on a mutually agreeable separation package.  Since this was not addressed in the letter, NUWAY will prepare and send one to you."

### 3.    Defendants Terminate Marston's Employment at NuWay and Deprive Him of Employment Benefits Due to Him

154.    On October 5, Clukey informed Marston that his "employment is terminated effective immediately, October 5, 2022" and sent a draft separation agreement to Marston, with a window of 21 days for Marston to consider whether he would agree to the separation agreement.

155.    On October 11, 2022, Clukey sent Marston a letter informing him that his "employment was terminated on October 5, 2022, based on NuWay's assessment of [his]: competence in performing the duties and responsibilities of the CFO position; leadership, communication, and problem-solving skills; and fulfillment of the legal duties [he] owed to the company."

156.    Before his termination, however, Marston received flawless performance reviews by Vennes, and was ranked as a "Top Performer" in every measured category.

157.    In addition, on or about October 19, 2022, NuWay Revenue Cycle employee Brooke Potter resigned from her position at NuWay, rather than submit false claims at Vennes's and Robert's – and now Meier's – insistence.  Once in receipt of Potter's resignation, NuWay immediately terminated Potter's employment.

### 4.    Defendants Continue to Breach Plaintiff's Employment Agreement with NuWay and Applicable Law

158.    On October 28 and December 13, 2019 Marston and NuWay signed an Employment Agreement, respectively, governing Marston's employment by NuWay from January 1, 2018 through December 21, 2024 (the "Employment Agreement").

159.    Section 4(A) of the Employment Agreement states that Marston's base salary for 2019 would be $240,000.00, in addition to $72,000 in executive retention incentive compensation, discussed below.

160.    Section 4(B) of Employment Agreement states that Marston shall be "eligible to receive an annual cash incentive compensation award of up to twenty five percent (25%) of his Base Salary in each calendar year during the Term, based on the performance evaluation described in Section 3(B) above.  [Marston's] incentive compensation opportunity for each such year shall be twenty five percent (25%) of Base salary for each calendar year.  The Board may elect to override and increase these quarterly incentives at the end of the year for superior performance."

161.    Section 4(C) of the Employment Agreement outlines various benefits that Marston was entitled to while employed at NuWay during the term.  Regarding "Paid Time-Off," or "PTO," Section 4(C)(ii) states that NuWay "will provide [Marston] with paid time-off in

accordance with NUWAY's paid time-off policies and practices (including, without limitation, with respect to accrual timing rollover and cash-out rights) as may be in effect from time to time for similarly situated employees; provided, however that [Marston] shall be eligible to accrue not less than 27 days of paid vacation in each full year that he is employed."

162.    Section 401 of NuWay's Employee Handbook describes NuWay's policies and practices with respect to PTO; it states:

> • Generally, earned but unused PTO/PT PTO time will be paid following the end of your employment. Exceptions to this include, but are not limited to:
>
> - There will be no pay-out of PTO/PT PTO unused but earned balances unless the termination is voluntary, and a courtesy of a written notice period of at least fourteen (14) calendar days is given for hourly staff or thirty (30) calendar days for salary staff has been given.
>
> - To qualify for payment of unused PTO/PT PTO, you must work throughout the notice period and maintain proper performance.
>
> - There will be no payout of PTO/PT PTO unless the employee has returned all Company property.
>
> - There will be no payout of PTO/PT PTO if the employee has been involuntarily terminated for misconduct, to be determined pursuant to the disciplinary policy identified in Appendix D.

163.    Section 4(D) of the Employment Agreement states that "while [Marston] is employed by NUWAY during the Term of his Agreement, [he] shall participate in NUWAY's Executive Incentive Retention Plan (the 'Retention Plan') pursuant to the terms thereof (as may be amended from time to time)."  This section allots $72,000 to the account for 2019, and states that future credits will be determined "in the sole and absolute discretion of the CEO."

164.    Section 6 of the Employment Agreement address "Termination of Employment During the Term."  Section 6(A) states that in the event of termination by NuWay, NuWay "will

pay all of [Marston's] earned but unpaid Base Salary and accrued deferments through the effective date of termination of his employment in accordance with applicable law ***and any benefits otherwise owed to the Executive through the effective date of the termination of his employment in accordance with NUWAY's applicable, plans programs and policies***[.]"

(Emphasis added).

165.   Section 7(E) and (F) of the Employment Agreement contain certain restrictive covenants regarding Marston's prospective employment and solicitation of NuWay employees following his termination.  Those sections state:

> i.  Non-Solicitation of Employees. The Executive covenants that while employed by NUWAY and for a period of one (1) year after his employment with NUWAY terminates for any reason he will not, on his own behalf or the benefit of any other person or entity, directly or indirectly solicit or otherwise seek to induce any employee or independent contractor of NUWAY to terminate such employee's employment or such independent contractor's relationship with NUWAY to perform work for a Competitive Organization.
>
> ii.  Non-Compete. The Executive covenants that while employed by NUWAY and for a period of one (1) year after his employment with NUWAY terminates for any reason, Executive shall not directly or indirectly, either for himself or for any Competitive Organization accept a Competitive Position without the express written permission of NUWAY.
>
> (F)    iii.  Definitions: For the purposes of his paragraph 7(E), (1) a "Competitive Organization" is any person (including but not limited to Executive), partnership, corporation, company, organization, or other entity that operates within the markets (Metropolitan Statistical Areas) in which NUWAY operates and offers behavioral health services or (a) for the purposes of paragraph 7(E)(i), intends to offer behavioral health services within two (2) years after the termination of the employee's employment or independent contractor's relationship under paragraph 7(E)(i); or (b) for the purposes of paragraph 7(E)(ii), intends to offer behavioral health services within two (2) years after the termination of Executive's employment; and (2) a "Competitive Position" is defined as a position that is the same as or substantially similar to any of the positions in which Executive was

employed during Executive's final three (3) years of employment with Company, or the position of Chief Executive Officer or the equivalent. Intellectual Property Assignment Agreement. The Executive covenants and agrees that any copyright, trademark or other intellectual property rights arising from the Executive's performance of his duties hereunder shall be the property of NUWAY and the Executive hereby assigns all of his right, title and interest herein to NUWAY and agrees to execute such documents of assignment, transfer and registration as NUWAY may reasonably request to evidence its ownership thereof.

166.   On December 13, 2019, Marston separately executed an agreement concerning NuWay's Executive Retention Incentive Plan.  Section 4.1 of this agreement requires that

NuWay make a lump sum payment from the Retention Plan account to Marston in no event later than the fifteenth day of the third month after the applicable "Vesting Date."  Section 4.2 states that if Marston "incurs a Separation from service with NUWAY due to voluntary resignation without Good Reason or an Involuntary Separation from Service, as well as if Executive fails to satisfy the claims release requirement set forth in Section 4.1.1 above, ***this shall be a Vesting Date and Executive shall be vested in all amounts credited to the Account as of that date, however, shall forfeit any future credits to the Account***."  (Emphasis added).

167.    On January 7, 2021, Marston and NuWay entered into a 2020 Addendum to Employment Agreement that amended the Employment Agreement to require that NuWay pay Marston $240,000 and $312,000 in annual salary, respectively, in 2020 and 2021.  This Addendum also amended section 4(B) of the Employment Agreement to require that NuWay pay Marston $60,000 in executive incentive compensation for 2020 and 2021, respectively.  Finally, the Addendum amended section 4(D) of the Employment Agreement to require that NuWay "credit [Marston's] account within the Retention Plan with an amount equal to (i) $104,400 within calendar year 2020 and (ii) $64,200 within calendar year 2021."

168.    On December 27, 2021, Marston and NuWay entered into a 2021 Addendum to the Employment Agreement that further amended section 4(B) of the Employment Agreement to require that NuWay pay Marston $92,400 in executive incentive compensation for 2022. Marston continued to be paid the same annual salary as in 2021 in 2022:  $312,000.

169.    Based upon information and belief, accrued but unused PTO is regularly paid to NuWay former employees upon their departure, whether or not the termination is voluntary or involuntary.

170.    Plaintiff has executed no release regarding NuWay since his termination, but has

complied with Section 7 of the Employment Agreement, to the extent enforceable.

171.    Since Marston's termination, NuWay refused to compensate Marston for 353.56 hours of accrued by unused PTO due to him under the Employment Agreement and applicable law.  This unpaid PTO is due to Marston considering that he was wrongfully terminated and was not terminated for misconduct.

172.    NuWay has also refused to compensate Marston for at least $341,000 in vested benefits due to him under the Retention Plan and applicable law.

173.    NuWay's ongoing failure to provide these benefits to Marston are further evidence and instances of NuWay's illegal retaliation against Marston in response to his good faith reporting of Defendants' suspected violations of law.

**E.    Financial Harms to the Government and NuWay Clients**

174.    Defendants' fraudulent and deficient documentation and billing practices resulted in government health care programs paying tens of millions of dollars for unsupported, unreasonable, unnecessary, non-existent and/or duplicated services.

175.    Beyond the financial fraud inherent in Defendants' scheme, however their revenue- and growth-driven inadequate medical treatment has caused serious harm to very sick clients who desperately need competent addiction treatment services.  Chart reviews demonstrate a consistent lack of adequate intake and diagnostic procedures, failure to provide the appropriate level of services to clients, and reduced quantity of care.

## VI.    CLAIMS FOR RELIEF

### CLAIMS AGAINST ALL DEFENDANTS

### Count One

### Federal False Claims Act – False Claims
### (31 U.S.C. § 3729(a)(1)(A))

176.    Marston realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

177.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

178.    From at least 2018 to the present, Defendants knowingly violated applicable statutes, regulations, and government health care program requirements prohibiting overbilling government health care programs for medical services, requiring sufficient documentation for billing government health care programs, and mandating that services meet requirements related to the quality, frequency, intensity, and individualized-nature of care.

179.    Compliance with such requirements was—and Defendants knew that compliance with such requirements was—material to payment by government health care programs.

180.    By and through the acts described above, Defendants have knowingly presented and caused to be presented false and fraudulent claims for payment and approval.

181.    The Government, unaware of the falsity of all such claims made and caused to be made by Defendants, has paid and continues to pay such false and fraudulent claims that would not be paid but for Defendants' illegal conduct.

182.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

183.    Additionally, the United States is entitled to the maximum penalty of between

$12,537 to $25,076 (or other statutory maximum provided for by law) for every violation alleged herein.

184.    Defendants are also liable for Marston's litigation expenses and attorneys' fees.

## Count Two

### Federal False Claims Act – False Records or Statements
### (31 U.S.C. § 3729(a)(1)(B))

185.    Marston realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

186.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

187.    From at least 2018 to the present, Defendants violated applicable statutes and regulations prohibiting overbilling for medical services and insufficient documentation for the same.

188.    By and through the acts described above, Defendants knowingly made, used, and caused to be made or used false records or statements material to false or fraudulent claims.

189.    The Government, unaware of the falsity of the records, statements, and claims made and caused to be made by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

190.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

191.    Additionally, the United States is entitled to the maximum penalty of between $12,537 to $25,076 (or other statutory maximum provided for by law) for every violation alleged herein.

192.    Defendants are also liable for Marston's litigation expenses and attorneys' fees.

## Count Three

### Federal False Claims Act – Reverse False Claims
### (31 U.S.C. § 3729(a)(1)(G))

193.    Marston realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

194.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

195.    From at least 2018 to the present, Defendants violated applicable statutes and regulations prohibiting overbilling for medical services and inadequate documentation for the same.

197.    Despite receiving credible information of potential overpayments beginning in 2018 and continuing to September 2022, Defendants did not investigate or take any action to identify the overpayments, and neither reported nor returned the overpayments to government health care programs within 60 days of identification of the overpayments, as required under 42 U.S.C. § 1320a-7k(d).

198.    By and through the acts described above, Defendants have knowingly made, used, and caused to be made and used a false record and statement material to an obligation to pay money to the Government and they have concealed and improperly avoided an obligation to pay money to the Government, including specifically Defendants' obligation to report and repay past overpayments of Medicaid and other government health care program claims for which Defendants knew they were not entitled to and therefore refunds were properly due and owing to the United States.

199.    The Government, unaware of the concealment by the Defendants, has not made demand for or collected the years of overpayments due from the Defendants.

200.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

201.    Additionally, the United States is entitled to the maximum penalty of between $12,537 to $25,076 (or other statutory maximum provided for by law) for every violation alleged herein.

202.    Defendants are also liable for Marston's litigation expenses and attorneys' fees.

### Count Four

**Federal False Claims Act – Conspiracy**
**(31 U.S.C. § 3729(a)(1)(C))**

203.    Marston realleges and incorporates by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

204.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

205.    From at least 2018 to the present, Defendants have conspired to knowingly and intentionally submit false and fraudulent claims for payment and statements and records to government health care programs through failure to comply with applicable statutes and regulations prohibiting overbilling for medical services and inadequate documentation for the same.

206.    Through the acts described above, Defendants conspired to commit violations of 31 U.S.C. §§ 3729(a)(1)(A), (B), and (G).  Further to Defendants' conspiracy and fraudulent scheme, despite knowing that tens of millions of dollars in payments from the federal government have been received in violation of the False Claims Act, Defendants have refused and failed to refund these payments and have continued to submit false or fraudulent claims, statements, and records to the United States.

207.    The Government, unaware of the Defendants' conspiracy and fraudulent schemes, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

208.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

209.    Additionally, the United States is entitled to the maximum penalty of between $12,537 to $25,076 (or other statutory maximum provided for by law) for each and every for every violation alleged herein.

210.    Defendants are also liable for Marston's litigation expenses and attorneys' fees. 42 U.S.C. § 3730(d).

### Count Five

**Minnesota False Claims Act**
**(Minn. Stat. §§ 15C, *et seq*.)**

211.    Marston realleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

212.    This is a civil action brought by Marston, on behalf of the State of Minnesota, against Defendants under the Minnesota False Claims Act, Minn. Stat. §§ 15C, *et seq*.

213.    By and through the acts described above, Defendants have knowingly made, used, or caused to be made or used a false record or statement material to an obligation to pay money to Minnesota and they have concealed and improperly avoided an obligation to pay money to Minnesota, including specifically Defendants' obligation to report and repay past overpayments to government health care program claims for which Defendants knew they were not entitled to and therefore refunds were properly due and owing to Minnesota.

214.    The Minnesota FCA, Minn. Stat. § 15C.02(a)(1) creates liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or

approval." Defendants have violated this provision of the Minnesota FCA.

215. The Minnesota FCA, Minn. Stat. § 15C.02(a)(2) creates liability for any person who "knowingly makes or uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a political subdivision, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state or a political subdivision knowingly makes, uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent claim." Defendants have violated this provision of the Minnesota FCA.

216. The Minnesota FCA, Minn. Stat. § 15C.02(a)(7) creates liability for any person who "knowingly makes or uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a political subdivision, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state or a political subdivision." Defendants have violated this provision of the Minnesota FCA.

217. The Minnesota FCA, Minn. Stat. § 15C.02(3) creates liability for any person who "conspires with another person to perform an act described in subdivisions (1), (2), (4), (5), (6), or (7)." Defendants have violated this provision of the Minnesota FCA.

218. Pursuant to the Minnesota FCA, Defendants are thus liable to Minnesota for civil penalties in the amounts set forth in the federal False Claims Act, United States Code, title 31, section 3729, and as modified by the federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, plus three times the amount of damages that the state or the political subdivision sustains. Minn. Stat. § 15C.02(a). Defendants are also liable for Marston's litigation expenses and attorneys' fees under Minn. Stat. § 15C.12.

219.    Defendants' actions were knowing, malicious, willful, and with conscious disregard for Marston's rights under the law.  Marston intends to move for amendment of this complaint to include a claim for exemplary and punitive damages in an amount to be determined at trial.

## CLAIMS ON BEHALF OF MARSTON PERSONALLY AGAINST DEFENDANTS NUWAY HOUSE, INC. AND NUWAY ALLIANCE, INC.

### Count Six

### Retaliation in Violation of False Claims Act
### (31 U.S.C. § 3730(h))

220.    Marston realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

221.    NuWay harassed, discriminated against, threatened, and ultimately terminated the employment of Marston because of lawful acts Marston undertook to stop violations of, and a conspiracy to violate, the False Claims Act.  NuWay's retaliation also independently violates the FCA, 31 U.S.C. § 3730(h).

222.    NuWay's retaliation and discrimination has inflicted damages on Marston including, but not limited to, two times back pay, interest on back pay, future earnings, lost employment benefits (including health insurance benefits and retirement contributions), job-search expenses, humiliation, mental anguish, and emotional distress, and litigation expenses and attorneys' fees, all collectively in an amount to be determined at trial.

223.    NuWay's actions were knowing, malicious, willful, and with conscious disregard for Marston's rights under the law.  Marston intends to move for amendment of this Complaint to include a claim for exemplary and punitive damages in an amount to be determined at trial.

## Count Seven

### Retaliation in Violation of Minnesota False Claims Act
### (Minn. Stat. § 15C.145)

224.    Marston realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

225.    NuWay harassed, discriminated against, threatened and ultimately terminated the employment of Marston because of the lawful acts Marston undertook to stop violations of, and a conspiracy to violate, the False Claims Act.  NuWay's retaliation also independently violates the Minnesota FCA, Minn. Stat. § 15C.145.

226.    NuWay's retaliation and discrimination has inflicted damages on Marston including, but not limited to, two times back pay, interest on back pay, future earnings, lost employment benefits (including health insurance benefits and retirement contributions), job-search expenses, humiliation, mental anguish, and emotional distress, and litigation costs and attorneys' fees, all collectively in an amount to be determined at trial.

227.    NuWay's actions were knowing, malicious, willful, and with conscious disregard for Marston's rights under the law.  Marston intends to move for amendment of this Complaint to include a claim for exemplary and punitive damages in an amount to be determined at trial.

## Count Eight

### Breach of Contract

228.    Marston realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

229.    Marston's work for NuWay is governed by the Employment Agreement and

Addendum and Retention Plan.[8]  These agreements contained, in relevant part, provisions guaranteeing certain benefits no matter the reason for termination so long as termination was not for misconduct.

230.     NuWay breached these agreements by retaliating against Marston for refusing to engage in NuWay's scheme to increase revenue at further risk to client sales and for taking lawful acts to prevent violations of the federal FCA state law.

231.     NuWay further breached the contract by refusing to provide the contractually and/or legally required termination benefits to Marston following his termination

232.     Because of NuWay's breach of contract, Marston has suffered damages including, but not limited to lost past and future earnings, lost employment benefits, job-search expenses, humiliation, embarrassment, mental anguish, emotional distress, litigation expenses, and attorneys' fees—in an amount to be determined specifically at trial.

233.     NuWay's conduct was performed knowingly, maliciously, oppressively, and with conscious disregard for both Marston's rights and state and federal law.  Marston intends to move for amendment of this Complaint to include a claim for exemplary and punitive damages in an amount to be determined at trial.

### Count Nine

**Violation of the Minnesota Whistleblower Act**
**(Minn. Stat. §§ 181.931 et seq.)**

234.     Marston realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

---

[8] Marston's entitlement to benefits under the Retention Plan is subject to a claims procedure described in the Retention Plan.  While NuWay has denied Marston benefits promised to him under the Retention Plan to date, Marston is currently appealing this determination pursuant to the aforementioned claims procedure and reserves the right to amend this complaint to state claims specifically related to the Retention Plan upon conclusion of the claims procedure.

235.    The Minnesota Whistleblower Act ("MWA") prohibits retaliation against employees for reporting violations, suspected violations and/or planned violations of law. Minn. Stat. § 181.932.

236.    NuWay is an "employer" and Marston is an "employee" within the meaning of Minn. Stat. § 181.931.

237.    Marston reported to NuWay, in good faith, violations, suspected violations, or planned violations of law by NuWay, Vennes, and Roberts, including violations of statutory and common law.

238.    Marston reported to NuWay, in good faith, a situation in which the quality of health care services provided by a health care facility, organization, or health care provider violated a standard established by federal or state law or a professionally recognized national clinical or ethical standard and placed the public at risk of harm.

239.    NuWay retaliated against Marston because of his reports to NuWay by, among other things, reducing the scope of Marston's responsibilities at NuWay, terminating Marston's employment, and depriving him of accrued but unused PTO and vested benefits under the Retention Plan.

240.    NuWay's retaliation against Marston violated the MWA.

242.    As a direct and proximate result of NuWay's illegal conduct, Marston has suffered, and continues to suffer, emotional distress, humiliation, mental anguish, embarrassment, pain and suffering, loss of reputation, loss of enjoyment of life, lost wages and benefits, and has incurred litigation expenses and attorneys' fees and other serious damages.

243.    NuWay's conduct was performed knowingly, maliciously, oppressively, and with conscious disregard for both Marston's rights and state and federal law. Marston intends to

move for amendment of this Complaint to include a claim for exemplary and punitive damages in an amount to be determined at trial.

## Count Ten

## Advancement under Minn. Stat. § 317A.521

244.    Marston realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

245.    NuWay is a "Corporation" as defined in Minn. Stat. § 317A.521.

246.    In or around April , 2022, Marston, in his official capacity as an officer and director of NuWay, was made a party, or threatened to be made a party, to the federal government's investigative proceeding concerning an potential kick-back scheme by NuWay. Particularly, Marston was identified by title in the CID issued by DOJ in April 2022.

247.    Marston hired legal counsel to advise him in connection with this proceeding and incurred attorneys' fees and expenses.

248.    Marston has not been identified by another organization or employee benefit plan for the same liability, acted in good faith, reasonably believed that his conduct was in the best interests of the corporation, and has received no improper personal benefit.

249.    Despite repeatedly requesting advancement of these fees, neither NuWay nor the Board, or any special legal counsel, have agreed that Marston may be compensated by NuWay for his attorneys' fees and expenses, pursuant to Minn. Stat. § 317A.521, subd. 6.

250.    Under Minn. Stat. § 317A.521, Plaintiff is entitled to indemnification from NuWay for his attorneys' fees and expenses incurred in connection with the federal government's investigation of a potential kick-back scheme by NuWay.

**Count Eleven**

**Declaratory Judgement on NuWay's Unenforceable Restrictive Covenant**

251.    Marston realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

252.    NuWay's Employment Agreement with Marston contains unenforceable restrictive covenants.

253.    NuWay cannot enforce the restrictive covenants because it does not have clean hands.

254.    NuWay cannot enforce its restrictive covenants because those covenants are overbroad and far more onerous than necessary to protect any legitimate business interest.

## VII.    PRAYERS FOR RELIEF

WHEREFORE, Marston prays for judgment against Defendants as follows:

**A**.    That Defendants are enjoined from violating the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq*., and the Minnesota FCA;

**B**.    That judgment be entered against Defendants and for the United States and the Marston in an amount equal to three times the damages caused by Defendants' misconduct and a civil penalty for each FCA violation in the maximum statutory amount;

**C**.    That judgment be entered against Defendants and for Minnesota and Marston in the amount of the damages sustained by Minnesota multiplied as provided for in the Minnesota FCA, plus civil penalties in the ranges provided by the Minnesota FCA;

**D**.    That Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

**E**.    That judgment be granted for Marston against Defendants for all costs, including, but not limited to, court costs, litigation expenses, expert fees, and all attorneys' fees permitted

under 31 U.S.C. § 3730(d), and comparable provisions of the Minnesota FCA;

      **F**.     That Marston be awarded the maximum amount permitted under 31 U.S.C. § 3730(d) and comparable provisions of the Minnesota FCA;

      **G**.     That Marston be awarded all available damages, prejudgment interest, fees and costs pursuant to Marston's personal claims for retaliation, wrongful termination, advancement, and breach of contract and covenants of employment under the federal FCA, 31 U.S.C. § 3730(h), and common law, including, without limitation, two times back pay plus interest (and prejudgment interest), reinstatement or in lieu thereof front pay, compensation for his accrued but unused PTO, and litigation expenses and attorneys' fees;

      **H**.     That the restrictive covenants in Marston's Employment Agreement are unenforceable, null, and void; and

      **I**.     That the Court award such other relief as the Court deems proper.

## JURY DEMAND

      Pursuant to Federal Rule of Civil Procedure 38, Marston requests a jury trial.

Dated:  November 18, 2022            Respectfully submitted,

                            John Marti (#0388393)
                            marti.john@dorsey.com
                            50 South Sixth Street, Suite 1500
                            Minneapolis, MN 55402
                            Telephone: (612) 340-2600
                            Facsimile: (612) 340-2868

                            *Attorney for Plaintiff John Marston*